UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 NOV 18 PM 4: 03

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. **1120CR 142** |
| **Plaintiff,** | : | |
| | : | **JUDGE** J. COLE |
| **v.** | : | **INDICTMENT** |
| | : | |
| ALEXANDER SITTENFELD, | : | 18 U.S.C. § 666(a)(1)(B) |
| a/k/a "P.G. Sittenfeld," | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 1346 |
| **Defendant.** | : | 18 U.S.C. § 1951(a), (b)(2) |
| | : | |
| | : | **FORFEITURE ALLEGATION** |
| | : | |
| | : | |

**THE GRAND JURY CHARGES**:

1.     At times relevant to this Indictment, the City of Cincinnati was a municipal corporation and political subdivision of the State of Ohio located in the Southern District of Ohio. The City of Cincinnati received federal benefits in excess of $10,000 during both the twelve-month calendar year of 2018 and the twelve-month calendar year of 2019.

2.     At times relevant to this Indictment, the Port was organized under Chapter 4582 of the Ohio Revised Code, as amended.  The Port is governed by a board of directors, with half of the board of directors appointed by the City of Cincinnati and half of the board members appointed by Hamilton County.  The Port has the responsibilities of a governmental entity and the exercise of its powers are essential governmental functions of the state pursuant to Ohio law.

**The Defendant**

3.     At times relevant to this Indictment, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, was an agent of the City of Cincinnati, that is, he was employed as

elected member of the City of Cincinnati City Council. In his role as an elected member of Cincinnati City Council, **SITTENFELD** was a "public official," who owed a duty to provide honest services to the citizens of the City of Cincinnati and to the Cincinnati City Council. Because of his role as an elected member of Cincinnati City Council, the Citizens of Cincinnati and the Cincinnati City Council had an intangible right to the honest services of **SITTENFELD**.

### Other Individuals and Entities

4.      At times relevant to this Indictment, Cooperating Witness 1 ("CW") was a developer pursuing a real estate development project ("Project 1") in Cincinnati. Project 1 required City of Cincinnati official action prior to development by CW. CW was cooperating with and operating at the instruction of law enforcement with respect to Project 1.

5.      At times relevant to this Indictment, UCE-1 and UCE-2 were undercover law enforcement agents who posed as business partners of CW and financial supporters of Project 1; and UCE-3 was an undercover who posed as a business partner and the boss of UCE-1 and UCE-2. UCE-1, UCE-2, and UCE-3 are referred to collectively as the "UCEs."

6.      The business of the UCEs and CW, including Project 1, would affect interstate commerce. For purposes of **SITTENFELD's** conduct, Project 1 is located in downtown Cincinnati. Project 1 involved property owned by the City of Cincinnati that was later transferred to the Cincinnati Port Authority ("Port") in 2019. Project 1 required City of Cincinnati official action prior to development by CW.

7.      Political Committee A ("PAC") is a federally-regulated political committee organized in or around February 2018. The PAC is operated for **SITTENFELD's** benefit and is controlled by **SITTENFELD**.

## The Scheme

8.     From 2018 to 2019, **SITTENFELD** corruptly solicited and received payments to the PAC, controlled by **SITTENFELD**, all in connection with Project 1 and in return for providing specific official action relating to Project 1.  In so doing, **SITTENFELD** engaged in a scheme to defraud the citizens of Cincinnati and Cincinnati City Council of his honest services as a council member and committed acts of bribery and attempted acts of extortion.  Specifically, in November and December 2018, in connection with and in return for four $5,000 contributions to his PAC, **SITTENFELD** promised that he could "deliver the votes" in City Council to support development of Project 1.  Then, in September and October 2019, **SITTENFELD** again corruptly accepted four $5,000 checks to his PAC intending to be influenced and rewarded in connection with Project 1 and in return for his specific official action for the benefit of Project 1.

## 2018 Solicitations

9.     Since at least 2017, CW has been pursuing the development of Project 1.  CW had a financial interest in Project 1, but CW could not develop Project 1 without formal approval by the City of Cincinnati.  In 2017, CW sent a letter to the City of Cincinnati requesting that the City enter a Memorandum of Understanding relating to the development of Project 1.  Ultimately, CW sought a development agreement with the City that would allow CW to develop Project 1.  Throughout 2017 and 2018, CW's efforts to reach an agreement with the City relating to the development of Project 1 were unsuccessful, though CW continued to pursue an agreement from the City.

10.     In 2018, **SITTENFELD** requested money from CW on multiple occasions, knowing that CW was actively seeking an agreement with the City to develop Project 1 and, up to then, had been unsuccessful in his attempts.  For example, on or about September 21, 2018,

SITTENFELD contacted CW to request a $10,000 campaign donation in checks from multiple limited liability companies ("LLCs").

11.     Prior to the November 2018 general election, individuals were permitted to contribute $1,100 to City of Cincinnati candidates both individually and from as many LLCs as that individual owned. To address this, local Issue 13 was proposed and subsequently placed on the November 2018 ballot, which would amend the City Charter so that individuals had the choice of either giving up to $1,100 in campaign contributions individually or through an LLC, but not both or under multiple LLCs. In the November 2018 election, City of Cincinnati residents voted to pass Issue 13.

12.     Following SITTENFELD's September 2018 solicitation for payment from CW, on or about October 26, 2018, less than two weeks before the 2018 election, CW spoke to SITTENFELD via telephone. During the call, CW referenced Project 1 and said it was "*starting to heat up,*" to which SITTENFELD responded, "*good.*" CW then said he knew two investors (UCE-1 and UCE-2) involved in Project 1 with capital sources and LLCs who could support SITTENFELD. SITTENFELD stated that he would love to meet with the Project 1 investors. In a reference to Issue 13, SITTENFELD stated that the law regarding LLCs was changing a week from next Tuesday, and he would make himself available to meet with the investors before then.

13.     Four days later, on or about October 30, 2018, CW indicated that one of CW's investors, UCE-1, would not be able to meet with SITTENFELD until November 7 or 8 (after the election), but wanted to know if SITTENFELD was still free to meet on one of those dates. SITTENFELD replied that, "*one challenge is that is obviously after the, the deadline,*" referring to the "deadline" as the Election Day in which Issue 13 would be voted on by City residents. CW then offered to try to get others to support SITTENFELD, and explained how another public

official in Cincinnati (hereinafter, "Public Official A") was working against CW's efforts relating to Project 1. **SITTENFELD** confirmed that he knew of CW's problems with Public Official A, stating specifically, "*I know a pretty good amount about it.*" CW further explained that because of these issues, he was trying to keep his name off contributions. **SITTENFELD** responded that he has "*obligations to do the things I need to do be a successful candidate,*" and "*what that means is,*" he wants CW to support him financially. **SITTENFELD** continued:

> But, I mean, the one thing I will say, is like, you know I mean, <u>you don't want me to like, to be like, "hey [Cooperating Witness], like, love you, but can't,"</u> you know, like; you know, look, I, I want, I want people to support me, that's like, if a candidate doesn't want people to support them, they're a shitty, dumb candidate. And, you know, I've been, obviously a lot of people have come through in a really big way and it's been awesome so far, and I'd love, I'd love for you to be one of those people too.

CW then responded by telling **SITTENFELD**, "*We'll make something happen*" to which **SITTENFELD** asked, "*You can do it before LLC thing?*" **SITTENFELD** then listed a number of entities and the amounts those entities contributed before the law change. **SITTNEFELD** told CW it would be "*big*" if CW could "*round up five LLCs before next Tuesday.*" He then agreed to meet CW and the investor for lunch on November 7, 2018, then added, "*and then you're gonna deliver the goods before next Tuesday,*" again referencing the Issue 13 deadline (election day).

14.    On or about November 2, 2018, CW called **SITTENFELD**. CW told **SITTENFELD** that CW had bad news—they would not be able to deliver the LLC checks before the next week. But, CW explained, the good news was that CW could get **SITTENFELD** $20,000 over the next few weeks, with $10,000 by next week. Specifically, CW stated that CW's investor, UCE-1, would pay $10,000 to **SITTENFELD** this week but that the investors will want to know that, for Project 1, "*it's gonna be a yes vote, you know, without, without a doubt.*" **SITTENFELD**

responded, "*you know, obviously nothing can be illegal like . . . illegally nothing can be a quid, quid pro quo. And I know that's not what you're saying either. But what I can say is that I'm always super pro-development and revitalization of especially our urban core.*" **SITTENFELD** went on, "*And we can, we, we, we can discuss that more in person. But I'm not, I'm not sure; in seven years I've voted in favor of every single development deal that's ever been put in front of me.*" **SITTENFELD** and CW then discussed setting up the meeting with the investors. **SITTENFELD** stated he would like five minutes to walk them through some of the "*voting data*" so they can appreciate his "*starting point,*" stating, "*my sense is that it will give them some comfort.*" **SITTENFELD** went on: "*These guys want to know, I mean look, people want to invest in a winning endeavor right? And I want to, I want give to them the confidence and the comfort that that's what they're doing.*"

### SITTENFELD Accepts Payment for Project 1

15.    The in-person meeting happened less than a week later, on or about November 7, 2018. On that day, **SITTENFELD** met with CW and UCE-1 for lunch at a downtown Cincinnati restaurant. During the lunch meeting, they discussed the type of development agreement CW was looking for from the City for Project 1. After indicating that he would shepherd votes for the project, **SITTENFELD** showed UCE-1 his "*political*" data, in the context of UCE-1 providing financial support to **SITTENFELD**. **SITTENFELD** stated to UCE-1, "*you like making good bets and good investments,*" and he proceeded to present voting data showing that he is politically popular throughout Cincinnati, and he stated he is likely to be the next mayor. **SITTENFELD** told UCE-1 that every successful developer and business leader in Cincinnati, "*they've already placed their bet with me.*" UCE-1 stated that their interest is making Project 1 "*veto proof*";

**SITTENFELD** suggested that he can influence votes better than anyone. **SITTENFELD** stated, "*... I can move more votes than any single other person, including [Public Official A].*"

16.     Following lunch, **SITTENFELD** agreed to "*deliver votes*" for the project in return for $20,000. **SITTENFELD** and UCE-1 walked to a private location where a one-on-one conversation regarding Project 1 continued. UCE-1 explained to **SITTENFELD** that CW's issues with Public Official A were a concern for UCE-1. UCE-1 then told **SITTENFELD** that UCE-1 wanted enough City Council support for Project 1 to guarantee the development agreement could not be vetoed by Public Official A, and then offered **SITTENFELD** $20,000 "*to get that deal.*" **SITTENFELD** responded by promising UCE-1 that he would deliver City Council votes to support a development agreement for CW to develop Project 1. Specifically, **SITTENFELD** responded, "*Honestly, I can, I can deliv-, I can sit here and say, I can deliver the votes.*" **SITTEFNELD** stated he would "*talk to [Public Official A] about it directly.*" UCE-1 then asked **SITTENFELD** how he (**SITTENFELD**) wanted to receive the money. **SITTENFELD** offered, "*eighteen LLC checks each for $1,100 before December 1,*" but also indicated, "*I do have a PAC that one, no one's like snooping around in who's giving that there, I mean I think frankly a lot of people don't even know I have it. Any LLC or individual can give up to $5,000 to that.*"

17.     After UCE-1 voiced concern about contributions in his name and LLC checks being connected to UCE-1, **SITTENFELD** and UCE-1 agreed the initial $10,000 out of $20,000 would be paid in money orders attributed in other individuals' names. At the end of the meeting, directly after they discussed getting money to **SITTENFELD** by "*the last week in November,*" the following conversation occurred:

**SITTENFELD**: *Yeah, no, I appreciate it.*

UCE-1: *'Cause like I said, [Cooperating Witness] wants to get that development agreement you know and so if you can. . .*

**SITTENFELD:** *We're gonna make it, we're, we're gonna make it happen.*

**UCE-1:** *If you can pull those votes together that's awesome.*

**SITTENFELD:** *Yeah, yeah, yeah, we, we definitely can. . . .*

18. On or about November 21, 2018, during a recorded telephone call between **SITTENFELD** and UCE-1, **SITTENFELD** told UCE-1 that money orders are the equivalent to cash and there are caps on how much cash a campaign can accept. **SITTENFELD** suggested UCE-1 provide the money to his PAC, either in the name of an individual or an LLC. **SITTENFELD** explained, "*There is a PAC, the* [PAC] *that my name is not connected to. One, basically no one knows about it. And two, my name and no filings, and no paperwork, and no anything is connected to it. And instead of those limits being $1,100, someone can give up to $5,000 to that.*" **SITTENFELD** further stated, "*If it goes to this* [PAC] *instead of to, 'SITTENFELD for Cincinnati,' nothing about it in any way will ever be connected to me and no one will, you know, no one's going to be poking around for it to find your names on it.*" **SITTENFELD** further explained, due to the higher limit, UCE-1 could give a total of four checks for $5,000 each. **SITTENFELD** stated they could give from "*a couple LLCs amongst your thing,*" for starters, which "*won't come back to you guys and isn't attached to me.*" **SITTENFELD** explained he wanted to make sure "*I'm doing this right and I also want to protect you guys.*"

19. **SITTENFELD** and UCE-1 spoke by telephone on or about November 26, 2018 during which **SITTENFELD** confirmed that the UCs will be providing two checks $5,000 to the PAC.

### SITTENFELD Receives Payment for Project 1

20. On November 28, 2018, **SITTENFELD** met UCE-1 and UCE-2 at a private location in downtown Cincinnati for the purpose of collecting two checks for $5,000 each from

UCE-1. During the meeting, **SITTENFELD** asked whether there was *anything new on the [Project 1] front*," and **SITTENFELD** then stated:

> *Look, I'm ready to shepherd the votes as soon as it gets to us at council. Just a matter of, and by the way, I mean if, if, like the Law Department is ever being sluggish drafting up the ordinances or anything. I can give a, but at this point I'm kind of in like waiting mode until it gets to our part of the, part of the process.*

**SITTENFELD** went on to state, "*It's gotta happen, I mean, I've already, in the conversation I've already had with my colleagues . . . .*" Later in the conversation, UCE-1 provided **SITTENFELD** with two checks, each in the amount of $5,000, for a total of $10,000. **SITTENFELD** then stated:, "*And this way, as I told him (UCE-1), this PAC, my name is not, I mean this will, can certainly support and benefit me, but my name is not connected to it in any way.*"

21.     On or about December 4, 2018, **SITTENFELD** spoke on the phone with UCE-1 and stated that the two checks they gave him on November 28 were from corporations and not from LLCs. **SITTENFELD** said it was fine, but asked him to talk to his "*universe of buddies and investors and . . . give us the name*" so they could double check to make sure the checks are from LLCs.

22.     On December 17, 2018, **SITTENFELD** met UCE-1 and UCE-2 at a private location in downtown Cincinnati. The purpose of the meeting was to provide **SITTENFELD** with four checks, in the amount of $5,000 each, to PAC, which would replace the two $5,000 paid to **SITTENFELD** on November 28, 2018. UCE-1 provided the four checks to **SITTENFELD**, to which **SITTENFELD** responded, "*All, all a big help. No, this is huge.*" Shortly after **SITTENFELD** placed the four checks in his jacket pocket, **SITTENFELD** stated he would get the votes for Project 1, explaining: "*don't let these be my famous last words, but I can always get a vote to my left or a vote to my right.*"

23. On the night of December 17, 2018, after collecting $20,000 from UCE-1, **SITTENFELD** left the following voice message with Cooperating Witness:

> **SITTENFELD**: *[Cooperating Witness], what's going on brother, PG. I just wanted to let you know how much I have really enjoyed getting to know [UCE-1] and [UCE-2]. No uh, no surprise that you attract great dudes and talented investors and partners. But uh, looking forward to doing what I can to help get [Project 1] across the finish line. So, uh, never hesitate to reach out. Let me know how I can be helpful on that front. Talk to you soon my man.*

### Transfer of Project 1 to the Port

24. In the ensuing months, **SITTENFELD** communicated with the UCEs a number of times relating to the progress of Project 1. During a meeting on or about March 14, 2019, they discussed Project 1 being stuck in the City's Economic Development Department until CW finds a development partner; UCE-1 said they might have bring the Project 1 straight to City Council, to which **SITTENFELD** responded, "*let's do it.*"

25. In the spring of 2019, **SITTENFELD** discussed with CW and UCE-1 whether they supported the transfer of Project 1 from the City to the Port. During a call between CW and **SITTENFELD** on or about May 2, 2019, **SITTENFELD** and CW agreed transferring the property associated with Project 1 from the City to the Port was a positive development. **SITTENFELD** told CW that he (**SITTENFELD**) has been the "*strategic piece to the downtown puzzle*" and "*would be glad to champion this* (Project 1)." Similarly, during a call with UCE-1 on or about June 25, 2019, UCE-1 placed a telephone call to **SITTENFELD** indicated that transferring Project 1 from the City to the Port was a good idea.

26. On or about June 26, 2019, City Council voted to approve the transfer of Project 1 from the City to the Port. **SITTENFELD** voted in favor of the transfer.

27. After the City transferred Project 1 to the Port, CW continued to have difficulty negotiating a development agreement that would allow CW to develop Project 1.

**SITTENFELD Accepts and Receives Additional Payment for Project 1**

28. In September and October 2019, **SITTENFELD** received additional payments from the UCEs knowing and believing the payments were made in connection with Project 1 and in return for specific official action relating to obtaining a development agreement from the Port for Project 1 and for advancing legislation and other potential official action to further Project 1.

29. On or about July 8, 2019, UCE-1 and UCE-2 met with **SITTENFELD**. During the meeting, **SITTENFELD** stated the transfer to the Port was "*no sweat.*" **SITTENFELD** stated that he would give a nudge on the City side and the Port side to "*make haste on a development agreement.*" UCE-2 also discussed **SITTENFELD** possible statewide legislation that would allow the UCEs to run a sports book out of Project 1, as well as increase barriers of entry for competitors to operate a sports book.

30. On or about September 19, 2019, **SITTENFELD** had a call with UCE-1, during which they discussed an upcoming meeting with UCs in Columbus and **SITTENFELD** indicated he wanted to be helpful with Project 1.

31. On or about September 24, 2019, **SITTENFELD** met UCE-1, UCE-2, and UCE-3 in a hotel room in Columbus, Ohio.[1] The purpose of the meeting was to discuss Project 1 and placing a legal sports wagering facility within Project 1. **SITTENFELD** stated after UCE-3 entered the room, "*[UCE-3], we got to make sure the sports betting thing goes through and the Cincinnati operation happens.*" After discussing how to obtain a "*controlled environment*" in Cincinnati as it relates to sports betting, **SITTENFELD** stated: "*So like you can use zoning code, you know, and be like something, you know, we will only let this activity occur in places zoned for*

---

[1] A staff member employed by **SITTENFELD** was also present.

*x, y, you know I mean, I'm just, I'm confident there's some tool that if really need be within City limits could create a controlled environment.*" In response, UCE-3 agreed with **SITTENFELD's** approach, stating, "*[t]his is what I would like you to do. This is what I would like you to do. I don't mind what it costs. . . . So today, you hear me . . . we're gonna take care of you, not a problem. And then keep these guys (UCE-1 and UCE-2) in the loop,*" to which **SITTENFELD** responded, "*yeah.*"

32.     Following further discussion by **SITTENFELD** relating to the ways official action through the City of Cincinnati could help Project 1, UCE-3 provided **SITTENFELD** with two $5,000 checks paid to the order of PAC, while promising two checks more in the future. **SITTENFELD**, "*I'm very appreciative . . . this means a lot.*" The conversation then continued with a discussion about the official action **SITTENFELD** could take to advance the project through local control over aspects of gaming. **SITTENFELD** agreed the City could provide a local solution to the issue, stating: "*Right. That's the kind of thing, again, like you know, my mind goes to zoning, bonding, other specs. I'm confident there is . . .*"

33.     **SITTENFELD** called UCE-1 the next day. **SITTENFELD** told UCE-1 that he was "*appreciative for your guys' generosity.*"     **SITTENFELD** also stated that he needed to "*attribute each check to a name*" for purposes of FEC filings.

34.     On or about October 29, 2019, **SITTENFELD** met UCE-1 and UCE-2 at a private location in downtown Cincinnati. During the meeting, UCE-1 gave **SITTENFELD** two more $5,000 checks, previously referenced by UCE-3, paid to the order of PAC. After UCE-1 provided the two checks to **SITTENFELD,** the following conversation ensued:

**SITTENFELD:** *Thank you guys.*

UCE-1: *I'll send you the names. I forgot to ask him (UCE-3) which LLC he wanted them under and I'll, I'll figure it out. I don't know even where they . . .*

**SITTENFELD:** *Where do you guys find these LLCs? Do I not want to know?*

UCE-2: *Yeah, you probably don't.*

**SITTENFELD:** *As long as it's like . . .*

UCE-2: *Yeah, it'll pass, it'll pass the muster test.*

**SITTENFELD:** *As long as it passes muster and like a person with a name. My political enemies, like, not to freak you guys, but they like, they like poke around this shit.*

**SITTENFELD** later referenced the checks stating, "*so besides like not asking, real people, real LLCs,*" to which UCE-2 responded, "*yes.*" After **SITTENFELD** discussed issues with local regulation of sports betting given the proposed statewide legislation that was pending, UCE-1 told **SITTENFELD** that "*the first step of any of this is making sure [Project 1] goes through*"; **SITTENFELD** responded, "*Yeah, the, the, the, the deal, of course, of course.*" **SITTENFELD** later again agreed that the most important thing is getting Project 1 through.

35.     Over the next several months, from November 2019 to February 2020, **SITTENFELD** indicated to UCEs in recorded calls that he continued to apply pressure, and he promised to apply additional pressure, to public officials relating to a development agreement for Project 1.

## COUNTS 1-2

### (Honest Services Wire Fraud)

36.     Paragraphs 1 through 35 of the Indictment are incorporated here.

37.     Beginning on or about September 21, 2018 to on or about February 4, 2020, in the Southern District of Ohio and elsewhere, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, knowingly devised and intended to devise a scheme and artifice to defraud and deprive the citizens of the City of Cincinnati and the Cincinnati City Council of the honest services of **SITTENFELD**, an elected member of Cincinnati City Council, through bribery and the concealment of material information.

### PURPOSE OF SCHEME

38.     The purpose of the scheme and artifice was for **SITTENFELD** to use his official position with Cincinnati City Council to enrich himself through corruption by seeking, receiving, accepting, and agreeing to receive and accept things of value from individuals supporting Project 1 in exchange for favorable specific official action.

### MANNER AND MEANS

39.     The scheme and artifice was carried out in the following manner and means, among others:

a.      **SITTENFELD** contacted CW knowing CW had business before the City of Cincinnati relating to Project 1 and knowing that CW was having difficulty developing Project 1 because of issues Project 1 had involving the City of Cincinnati.

b.      **SITTENFELD** met with UCE-1 knowing and believing that UCE-1 had a business relationship with CW relating to Project 1.

Page **14** of **20**

c.  **SITTENFELD** soliciated and sought money from CW and UCE-1 knowing that CW had business before the City of Cincinnati relating to Project 1 and believing that UCE-1 had business before before the City of Cincinnati relating to Project 1.

d.  **SITTENFELD** then agreed to receive and accept money from UCE-1 and others knowing that CW had business before the City of Cincinnati relating to Project 1 and believing that UCE-1 had business before the City of Cincinnati relating to Project 1.

e.  **SITTENFELD** later personally accepted and received money from UCE-1 and UCE-3, to include:  two checks totaling $10,000 to PAC for **SITTENFELD's** benefit on or about November 28, 2018 (which were not deposited); four checks totaling $20,000 to PAC for **SITTENFELD's** benefit on or about December 17, 2018; two checks totaling $10,000 to PAC for **SITTENFELD's** benefit on or about September 24, 2019; and two checks totaling $10,000 to PAC for **SITTENFELD's** benefit on or about October 29, 2019.

f.  **SITTENFELD** accepted and received money from UCE-1 and others knowing and believing that the money was given to **SITTENFELD** in exchange for **SITTENFELD** promising to provide and providing specific official action in his role as a public official relating to Project 1.

g.  In exchange for and because of the money accepted and received by **SITTENFELD, SITTENFELD** promised to and did provide specific official action relating to Project 1, to include promising to "deliver the votes" on matters before Cincinnati City Council relating to Project 1; promising to pursue official action that would advance Project 1; promising to pressure and advise, and pressuring and advising, other public officials to take official action relating to Project 1; and voting in the interests of Cooperating Witness 1, UCE-1, and UCE-2 with regards to Project 1.

h.       **SITTENFELD** took steps to hide, conceal, and cover up his activity by accepting the payments in a manner to hide the identities of the individuals providing the payments.

### USE OF INTERSTATE WIRES

40.       On or about the dates listed below, in the Southern District of Ohio and elsewhere, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds:

| Count | Date | Wire Transmission |
|---|---|---|
| 1 | November 21, 2018 | Telephone call between the Defendant and UCE-1 in which the Defendant discussed paying money to Political Committee A. |
| 2 | September 25, 2019 | Telephone call between the Defendant and UCE-1 in which the Defendant discussed receipt of payment on September 24, 2019. |

**In violation of Title 18, United States Code, Sections 1343 and 1346.**

### COUNT 3

**(Bribery Concerning Programs Receiving Federal Funds)**

41.       Paragraphs 1 through 23 of the Indictment are incorporated here.

42.       From on or about September 21, 2018 to on or about December 17, 2018, in the Southern District of Ohio and elsewhere, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, being an agent of a local government that received federal benefits in excess of $10,000 in the twelve-month period from January 2018 to December 2018, corruptly solicited

and demanded for his own benefit, and accepted and agreed to accept a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and series of transactions of such local government involving a thing of value of $5,000 and more, to wit, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, while a member of Cincinnati City Council, corruptly solicited and demanded, and accepted and agreed to accept, payments to PAC for his benefit from UCE-1, who was posing as a businessman supporting Project 1, while intending to be influenced and rewarded in connection with business, transactions, and series of transactions involving the City of Cincinnati and Project 1.

**In violation of Title 18, United States Code, Section 666(a)(1)(B).**

**<u>COUNT 4</u>**

**(Attempted Extortion under Color of Official Right)**

43.     Paragraphs 1 through 23 of the Indictment are incorporated here.

44.     From on or about September 21, 2018 to on or about December 17, 2018, in the Southern District of Ohio and elsewhere, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, a member of the Cincinnati City Council, knowingly attempted to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18 United States Code 1951, to wit, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld"),** solicited, obtained, agreed to accept, accepted, and received payments to PAC from UCE-1, with UCE-1's consent, knowing the payments were made in exchange for the defendant's specific official action in his role as a member of the Cincinnati City Council to further Project 1, under color of official right.

**In violation of Title 18, United States Code, Section 1951(a), (b)(2).**

## COUNT 5

### (Bribery Concerning Programs Receiving Federal Funds)

45.     Paragraphs 1 through 7 and 28 through 35 of the Indictment are incorporated here.

46.     From on or about July 8, 2019 to on or about February 5, 2020, in the Southern District of Ohio and elsewhere, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, being an agent of a local government that received federal benefits in excess of $10,000 in the twelve-month period from January 2019 to December 2019, corruptly solicited and demanded for his own benefit, and accepted and agreed to accept a thing of value from a person, intending to be influenced and rewarded in connection with business, a transaction, and series of transactions of such local government involving a thing of value of $5,000 and more, to wit, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, while a member of Cincinnati City Council, accepted and agreed to accept payments to PAC for his benefit from UCEs, who were posing as businessmen supporting Project 1, while intending to be influenced and rewarded in connection with business, transactions, and series of transactions involving the City of Cincinnati and Project 1.

### In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT 6

### (Attempted Extortion under Color of Official Right)

47.     Paragraphs 1 through 7 and 28 through 35 of the Indictment are incorporated here.

48.     From on or about July 8, 2019 to on or about February 5, 2020, in the Southern District of Ohio and elsewhere, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, a member of the Cincinnati City Council, knowingly attempted to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as

those terms are defined in Title 18 United States Code 1951, to wit, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, obtained, agreed to accept, accepted, and received payments to PAC for his benefit from UCEs, with UCEs' consent, knowing the payments were made in exchange for the defendant's specific official action in his role as a member of the Cincinnati City Council to further Project 1, under color of official right.

**In violation of Title 18, United States Code, Section 1951(a), (b)(2).**

## FORFEITURE ALLEGATION

Upon conviction of one or more of the offenses set forth in Counts 1 through 6 of this Indictment, the defendant, **ALEXANDER SITTENFELD (a/k/a "P.G. Sittenfeld")**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation(s), including but not limited to a sum of money up to $40,000, which represents the amount of proceeds the defendant obtained as a result of the offense(s).

## SUBSTITUTE ASSETS

If any of the property described above, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C.

§ 2461(c), to seek forfeiture of any other property of the defendant, up to the value of the property

described above.

**A TRUE BILL**

/s/

**GRAND JURY FOREPERSON**

**DAVID M. DEVILLERS**
**UNITED STATES ATTORNEY**

**MATTHEW C. SINGER/EMILY N. GLATFELTER**
**ASSISTANT UNITED STATES ATTORNEYS**