# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:20-CR-142** |
| **Plaintiff,** | : | |
| | : | **JUDGE COLE** |
| **v.** | : | |
| | : | **GOVERNMENT RESPONSE TO** |
| **ALEXANDER SITTENFELD,** | : | **DEFENDANT'S MOTION TO** |
| a/k/a "P.G. Sittenfeld," | : | **DISMISS** |
| | : | |
| **Defendant.** | : | |
| | : | |

The United States respectfully submits this response in opposition to Defendant Alexander Sittenfeld's Amended Motion to Dismiss the Indictment.  (Doc. 25 (PageID 134) (Motion to Dismiss)).  In response, the government asserts that the Court should deny the Defendant's motion for the reasons set forth in the following memorandum.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

*s/ Matthew C. Singer*
MATTHEW C. SINGER (IL 6297632)
EMILY N. GLATFELTER (0075576)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email:  Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov

## MEMORANDUM OF LAW

The Indictment in this case alleges the elements of the bribery charges set forth in Counts 1 through 6 of the Indictment, along with specific facts that properly put the Defendant on notice of those charges.  The law is clear:  this is all that is required.

Nevertheless, the Defendant argues that facts in the Indictment negate elements relating to his criminal intent.  Specifically, the motion asks the Court to assess the Defendant's intent to enter a quid pro quo based on the Defendant's interpretation of select paragraphs from the Indictment, while ignoring pages of specific facts detailing the charges.  This is not the law.  In assessing whether the Indictment provides sufficient notice, the Court cannot, as the Defendant urges, ignore pages of specific facts alleging the Defendant's conduct.  Nor can the Court weigh evidence in the context of a motion to dismiss.  This is because the government presents its evidence at trial, not in an Indictment.  And the jury assesses that trial evidence—including a defendant's intent—based on all the facts and surrounding circumstances.  The request to usurp this process must be rejected.

The Defendant's attempt to focus the Court on certain facts seems premised on another misunderstanding of the law—that because the Defendant purports to be "prodevelopment," and because the payments went to his PAC rather than his pocket, he could not commit bribery.  But the Sixth Circuit is clear:  it is not a defense to bribery that the public official would have done the official act anyway, even without payment; and receiving bribe payments through a PAC is no less corrupt.  The Indictment here alleges the Defendant received payments into his PAC knowing they were made in return for specific official acts—to include agreeing to deliver votes and use the zoning code to benefit a project.  Contrary to the Defendant's claims, these actions are not "core features of our democratic system" or "everyday American democratic activity"—this is bribery, in violation of federal law, as charged in the Indictment.

1

## I.  PROCEDURAL BACKGROUND

In a twenty-page Indictment, a grand jury charged the Defendant with two counts of honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346 (Counts 1 and 2); two counts of bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B) (Counts 3 and 5); and two counts of attempted extortion under color of official right, in violation of 18 U.S.C. § 1951(a), (b)(2) (Counts 4 and 6).  The charges detail a corruption scheme spanning September 2018 to February 2020 in which the Defendant agreed to accept $40,000 in bribe payments to a PAC in return for official action relating to a downtown development project, Project 1.

The Defendant has filed a motion to dismiss or, or in the alternative, a motion to strike certain official acts set forth in the Indictment.  (Doc. 25 (PageID 134)).  In the motion, the Defendant argues that allegations in the Indictment refute an explicit quid pro quo; that allegations of official action should be stricken; that the § 666 count does not allege corrupt intent; and that the statutes are unconstitutionally vague.  As set forth below, these arguments are meritless.

## II.  LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1); *United States v. Superior Growers Supply, Inc.,* 982 F.2d 173, 176 (6th Cir. 1992) (Sixth Amendment notice requirement "protected by Fed. R. Civ. P. 7(c)").  To be constitutionally sufficient, an indictment must:  "(1) 'set out all of the elements of the charged offense and must give notice to the defendant of the charges he faces,' and (2) '[be] sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts.'"  *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (quoting *United States v. Douglas,* 398 F.3d 407, 411 (6th Cir. 2005)).  Under this standard, an Indictment is sufficient if it "set forth all

the elements necessary to constitute the offence intended to be punished," along with a general description of the "facts and circumstances as will inform the accused of the specific offence." *United States v. Lee*, 919 F.3d 340, 349 (6th Cir. 2019) (quoting *Hamling v. United States*, 418 U.S. 87, 117–18 (1974)).  The indictment must be read "as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications."  *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007).

Because only notice of the charges is required, the government need not allege in the indictment the "elements of proof (as opposed to the elements of the offense)," and the Court may not assess the sufficiency of the evidence in the indictment or resolve jury issues on a motion to dismiss.  *Douglas*, 398 F.3d at 419; *United States v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001) ("courts evaluating motions to dismiss do not evaluate the evidence upon which the indictment is based"); *United States v. Rodriguez-Rivera*, 918 F.3d 32, 34 (1st Cir. 2019) ("Unlike a civil complaint . . . a criminal indictment need only apprise the defendant of the charged offense"); *United States v. Burks*, 746 F. App'x 191, 198 (4th Cir. 2018) ("[A] valid indictment returned by a legally constituted and unbiased grand jury is enough to call for trial of the charges on the merits.") *United States v. Gillette*, 738 F.3d 63, 74 (3d Cir. 2013) (court may not examine "sufficiency of the government's evidence in a pretrial motion to dismiss because the government is entitled to marshal and present its evidence at trial").

### III.    ARGUMENT

The Indictment in this case sufficiently sets forth all charges in the Indictment.  Because of overlap in the law and the Defendant's arguments, the honest services and extortion charges are addressed together; the section that follows addresses the challenge to the federal funds bribery charges; and the final section addresses Defendant's meritless constitutional challenge.

**A.  The Indictment Properly Alleges Honest Services and Extortion Charges**

**1.  The Quid Pro Quo Standard**

Counts 1 and 2 allege the Defendant committed honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346.  Section 1343 makes it a crime to devise or intend to devise a "scheme or artifice to defraud" through the use of wire communications traveling in interstate commerce. 18 U.S.C. § 1343.  Section 1346 defines a "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.  The "intangible right" covers schemes to deprive another of honest services by participating in a "bribery or kickback scheme."  *Skilling v. United States*, 561 U.S. 358, 407–08 (2010).

Counts 4 and 6 allege the Defendant committed attempted extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951.  The statute defines "extortion" as "the obtaining of property from another, with his consent, . . . under color of official right."  *Id*. at § 1951(b)(2).  As the Supreme Court has explained, "[e]xtortion by the public official was the rough equivalent of what we would now describe as 'taking a bribe.'"  *Evans v. United States*, 504 U.S. 255, 260 (1992) (holding there is no inducement requirement for extortion under color of official right).

In *McCormick v. United States,* the Supreme Court explained the standard for a Hobbs Act bribery charge in the campaign contribution context.  500 U.S. 257 (1991).  At the outset, the Court explained that campaign contributions form a legitimate part of our political system, and thus, a close-in-time connection between a campaign contribution and an official act is insufficient, by itself, to sustain a conviction under the Hobbs Act.  *Id*. at 272.  Nevertheless, the Court went on, a public official may "commit extortion in the course of financing an election campaign."  *Id*. at 273. Indeed, "[t]he receipt of such contributions is also vulnerable under the Act as having been taken

4

under color of official right, but only if the payments are made in return for an *explicit* promise or undertaking by the official to perform or not to perform an official act." *Id*. (emphasis added).

The Supreme Court clarified this requirement in *Evans* a year later. In *Evans*, the defendant argued that an alleged bribe payment was a campaign contribution. 504 U.S. at 257–58. The Court affirmed the jury instruction in the campaign contribution context, which stated in relevant part: "if a public official demands or accepts money in exchange for [a] specific requested exercise of his or her official power, such a demand or acceptance does constitute a violation of the Hobbs Act regardless of whether the payment is made in the form of a campaign contribution." *Id.* at 258. As the Court explained, "the offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the quid pro quo is not an element of the offense." *Id.* at 268. The Court concluded: "We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Id.* In a concurring opinion, Justice Kennedy added, "*the official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.* The inducement from the official is criminal if it is express or *if it is implied from his words and actions*, so long as he intends it to be so and the payor so interprets it." *Id.* at 274 (emphasis added).

### **"Explicit" Does Not Mean "Express"**

Courts applying *McCormick/Evans* in Hobbs Act cases involving campaign contributions are clear that, contrary to the Defendant's interpretation, "explicit" does not mean "express." As the Sixth Circuit instructed in *United States v. Blandford*, "Explicit, as explained in *Evans*, speaks not to the form of the agreement between the payor and payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated. *Put simply,*

5

Evans *instructed that by 'explicit'* McCormick *did not mean 'express.'*"  33 F.3d 685, 696 (6th Cir. 1994).  (emphasis added).  The Court then explained the *McCormick/Evans* standard:  "*Evans*, we believe, merely clarified . . . that the quid pro quo of *McCormick* is satisfied by something short of a formalized and thoroughly articulated contractual arrangement (*i.e.*, *merely knowing the payment was made in return for official acts is enough*)."  *Id*. (emphasis added); *see also* Sixth Cir. Patt. Jury Inst. 17.02 (setting forth Hobbs Act elements based on *McCormick/Evans*).

The Seventh Circuit's application of the *McCormick* standard in *United States v. Blagojevich* is instructive.  794 F.3d 729, 738 (7th Cir. 2015). In *Blagojevich*, the defendant challenged the jury instructions as deficient.  In rejecting the defendant's claim, the Seventh Circuit noted that the Hobbs Act instructions "track[ed] *McCormick*" and that "the statute does not have a magic-words requirement.  Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'"  The court went on:  "'Nudge, nudge, wink, wink, you know what I mean' can amount to extortion under the Hobbs Act, just as it can furnish the gist of a Monty Python sketch."  *Id*. ("Suppose Blagojevich believed that winks and nudges avoid the *McCormick* standard.  That would be legally wrong[.]"); Sixth Cir. Patt. Jury Inst. 17.02 (bribe agreement need not be explicit or express "for otherwise the law's effect could be frustrated by knowing winks and nods").

The Sixth Circuit has also cited *McCormick* and *Evans* in setting forth requirements for an honest services fraud violation in the campaign contribution context.  In *United States v. Terry*, the defendant, a judge, received $1,200 in campaign contributions and campaign benefits, and then a year later denied summary judgement motions at the donor's request.  707 F.3d 607, 611 (6th Cir. 2013).  The defendant was found guilty at trial of conspiring to commit and committing honest services fraud.  The Sixth Circuit affirmed the district court's instruction that, to find an honest services fraud violation, the jury "needed to find a 'quid pro quo,' that is, [the defendant] agreed

6

'to accept [a] thing of value in exchange for official action.'" *Id*. at 614.  Citing *McCormick*, the Court recognized the key feature that distinguishes campaign contribution cases from those involving other types of payments:  "*Without anything more*, a jury could not reasonably infer that a campaign contribution is a bribe *solely* because a public official accepts a contribution and later takes an action that benefits a donor." *Id*. at 615 (emphasis added).  The Court held, what matters in the campaign contribution context is that "payments were made in connection with an agreement, which is to say 'in return for' official actions under it." *Id*. at 613.  "As most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess."[1] *Id*.  Moreover:

> "[M]otives and consequences, not formalities," are the keys for determining whether a public official entered an agreement to accept a bribe, and the trier of fact is "quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor."

*Id.* (*quoting Evans*, 504 U.S. at 274).  The Court also held the district court properly denied the defendant's motion to dismiss because the indictment tracked the statutory language.  *Id*. at 611; *see also United States v. Beasley*, 2014 WL 1870786, at *2 (E.D. Mich. May 8, 2014) (rejecting argument "that campaign contributions cannot be considered bribes or kickbacks unless there is 'an *explicit promise* that the contribution is being provided in return for the official to perform a *specific act*,'" because it's "premised on an erroneous reading of *McCormick*, *Evans*, and *Terry*.").[2]

### "Official Action"

In addition, the Hobbs Act and honest services fraud require that a bribe payment be made in return for "official action" under *McDonnell v. United States*, which articulated a two-part test:

---

[1] As set forth below, this is one reason the Defendant's motion fails here.

[2] Following a guilty verdict, the defendant in *Beasley* challenged the pleadings on other grounds.  The Sixth Circuit rejected the challenge and affirmed the convictions.  700 F. App'x 394, 398 (6th Cir. 2017).

7

"[f]irst, the Government must identify a question, matter, cause, suit, proceeding or controversy that may at any time be pending or may by law be brought before a public official.  Second, the Government must prove that the public official made a decision or took an action on that question, matter, cause, suit, proceeding, or controversy, or agreed to do so."  136 S. Ct. 2355, 2368 (2016). As the Supreme Court explained, the question or matter must "involve a formal exercise of governmental power" like "a determination before an agency or a hearing before a committee," and must be "specific and focused that is 'pending' or 'may by law be brought' before a public official."  *Id*. at 2372.  Although arranging a meeting or merely talking to another public official, without more, would not qualify, for example, "a decision or action to initiate a research study— or a decision or action on a qualifying step, such as narrowing down the list of potential research topics" would be an "official act."  *Id.* at 2370–72.  In addition, making a "decision or tak[ing] an action" also "may include using his official position to exert *pressure* on another official to perform an 'official act,' or to *advise* another official, knowing or intending that such advice will form the basis for an 'official act' by another official."[3]  *Id*. at 2372 (emphasis added).  The Court further explained that a public official need not "in fact intend to perform the 'official act,' so long as he agrees to do so."  *Id*. at 2371; *see* Sixth Cir. Patt. Jury Inst. 17.02 (laying out *McDonnell* standard).

### 2.  The Indictment Satisfies These Standards

Here, the honest services and Hobbs Act charges easily meet these standards.  Counts 1 and 2 track the statutory language and elements of honest services fraud (paragraphs 37–38), and set forth facts detailing the manner in which the Defendant violated the statute:  by knowingly contacting and soliciting individuals with business before the City relating to Project 1; accepting

---

[3] The Defendant's recitation of the law fails to address this language, and instead the motion argues that "persuasion" is not official action despite the Indictment's plain use of "pressure" and "advise," words which comes directly from *McDonnell*, as addressed below.  *See infra* Part IV.A.3 at 15.

8

and receiving specific payments on specific dates to his PAC from an individual connected to Project 1; and, in exchange for and because of the money, promising to perform specific official action relating to Project 1 (paragraphs 39–40).  (Doc. 3 at 14–16 (PageID 39–41).)

Similarly, Counts 4 and 6 track the statutory language and elements for extortion under color of official right, and set forth facts detailing the manner in which the Defendant violated the statute:  by soliciting, obtaining, agreeing to accept, accepting, and receiving payments to his specific PAC on specific dates with an individual's consent; and knowing that the payments were made in exchange for the Defendant's specific official action as a councilmember to further Project 1 (paragraphs 44 and 48).  (*Id*. at 17–19 (PageID 42–44).)  Along with the introductory paragraphs (paragraphs 1–7), these allegations are all that is required to provide the Defendant notice of the elements and of the facts and circumstances of these charges to enable him "to plead double jeopardy if charged for the same crime and facts in a future proceeding."  *Lee*, 919 F.3d at 354.

Nevertheless, the Indictment sets forth eleven pages of additional facts notifying the Defendant of the factual bases for the honest services, Hobbs Act, and § 666 charges, to include:

| Paragraph 8: | details the contours of the corrupt exchange and the dates of the payments. |
| --- | --- |
| Paragraphs 9–10: | detail the background of Cooperating Witness ("CW") and Project 1, including CW's failed efforts to sign a development agreement with the City, along with the Defendant's solicitation of payments from CW, including on September 21, 2018. |
| Paragraphs 12–13: | detail phone conversations between CW and the Defendant, in which the Defendant indicates his knowledge about CW's struggles with a City official regarding development of Project 1 and the Defendant continues to solicit payments from CW. |
| Paragraph 14: | details an offer of an explicit quid pro quo—Project 1 investors (UCEs) would pay $10,000 "this week" but they will want to know "*it's gonna be a yes vote . . . without a doubt*" on Project 1.  The Defendant responded that nothing can be illegal but that he wanted to meet to discuss with UCE-1 in person so the Defendant could provide "confidence" that they are "invest[ing] in a winning endeavor." |

9

| Paragraph 15: | details the Defendant's meeting with CW and UCE-1 on November 7, 2018, during which they discuss the type of development agreement CW wants from the City, and the Defendant tries to convince them to support him financially. |
|---|---|
| Paragraphs 16–17: | detail the Defendant's meeting later that day with UCE-1, wherein the Defendant "agrees to 'deliver votes' for the project in return for $20,000." Specifically, UCE-1 offered "*to get that deal*," through which UCE-1 would pay the Defendant $20,000 to guarantee enough City Council votes for Project 1's development agreement so that it could not be vetoed. The Defendant responded, "*I can deliver the votes*," and the two began discussing how to deliver the $20,000 to the Defendant. |
| Paragraphs 18–22: | detail the Defendant's communications with UCE-1 about paying the $20,000 to the Defendant, leading to a $10,000 payment to Defendant through his PAC on November 28, 2018 (later returned because the checks were not from LLCs), and the $20,000 payment to Defendant through his PAC on December 17, 2018. Further, the Defendant promised to "*shepherd the votes as soon as it gets to us at council*," and explained, "*I can always get a vote to my left or a vote to my right*." |
| Paragraphs 24–30: | detail the Defendant's continuing promises to help Project 1 get a development agreement, with promises to help on the City side and the Port side, along with discussions about UCEs attempts to run a sports book out of Project 1. |
| Paragraphs 31–32: | detail a September 24, 2019 meeting in which the Defendant discusses ways to use the "*zoning code*" to create a controlled environment "*within City limits*" for sports betting to benefit Project 1, to which UCE-3 responded, "*this is what I want you to do. I don't mind what it costs. . . . So today, you hear me . . . we're going to take care of you*," and the Defendant replied, "*yeah*." They then continued to discuss ways the Defendant could provide official action through a "local solution," and a UCE provided $10,000 in checks to the PAC, while promising more checks in the future. |
| Paragraphs 34–36: | detail an October 29, 2019 meeting between the Defendant and two UCEs in which the Defendant received the previously promised checks to his PAC totaling $10,000 while discussing the "local regulation of sports betting" and "*the deal*"—"*making sure Project 1 goes through*." The Indictment further details the Defendant's indication that he continued to apply pressure, and promised to apply additional pressure, to public officials relating to the development agreement for Project 1. |

These facts sufficiently allege the Hobbs Act and honest services charges. The Defendant agreed to deliver enough votes to pass a development agreement for Project 1 knowing UCE-1 was paying $20,000 for that official action. The Defendant then continued to support the UCEs efforts and later accepted additional payments to his PAC in return for continued support for

10

Project 1, including by agreeing to support local regulations to advance a sports book in Project 1. Based on these facts, along with the other facts and recitation of the statutes and elements in the charges that followed, the Indictment informs the accused of the specific offenses and more than provides "essential facts consisting the offense charged." Fed. R. Civ. P. 7(c); *see Terry*, 707 F.3d at 611 (affirming denial of motion to dismiss because Indictment outlined the parties' relationship, detailed the official action provided, and listed the benefits received by the public official)[4]; *Beasley*, 2014 WL 1870786, at *5 (denying dismissal because Indictment satisfied Rule 7(c)).

### 3.  The Defendant's Motion

***Motion to Dismiss.***  The Defendant's arguments to the contrary have no merit.  The Defendant argues the Indictment provides "specific facts" that "negate an element or contradict the charge." (Doc. 25 at 11 (PageID 144)).   In support, the motion asserts that "detailed factual allegations confirm that there was no illicit agreement" because the Defendant "made clear his *intent*" given:  he replied "good" when told Project 1 was heating up; he indicated his support for "every single development deal"; he only provided "political data" in his first meeting with an undercover; and he "pushed back" when initially offered an "improper exchange." (*Id*. at 15–16 (PageID 149)).  The Defendant also argues that simultaneous discussion of "generic governmental acts" to promote Project 1 "in the same conversation as they discussed contributions" does not support an "explicit quid pro quo." (*Id*. at 16–17 (PageID 149–50)).  Essentially, the Defendant asks the Court to assess the sufficiency of the evidence—including his intent—and give weight to the Defendant's interpretation of select paragraphs in the Indictment, while ignoring most others.

This is not the law, and this is not an accurate description of the Indictment.  As set forth above, the government need not provide facts in an Indictment that prove its case, and the Court

---

[4] *See* Exhibit A (Superseding Indictment in *United States v. Terry*, No. 1:10CR390 (N.D. Ohio)).

11

may not assess the sufficiency of the evidence in the Indictment as if it were trial. *See Douglas*, 398 F.3d at 419 (indictment need not allege "elements of proof" but rather "the elements of the offense"); *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) ("the government need not recite all of its evidence in the indictment").[5] In other words, the Defendant's interpretation of the Indictment is irrelevant. What matters is whether the allegations put the Defendant on notice that he was being charged for knowingly receiving payments in return for specific official acts relating to Project 1—a quid pro quo—enabling him to plead double jeopardy if charged with the same crime based on the same facts. *Kuehne*, 547 F.3d at 696. The Indictment meets this requirement.

The Defendant's own cases do not support his position. (*See* Doc. 25 at 11–12 (PageID 144–45). *Landham* involved a "problematic" statute—18 U.S.C. § 875(c), which requires as an element viewing threatening statements from an "objective perspective of the recipient"—not at issue here. 251 F.3d at 1080 (generally, "courts evaluating motions to dismiss do not evaluate the evidence upon which the indictment is based."). And *Huet* support's the government's position. In *United States v. Huet*, the Third Circuit made clear "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence," and reversed dismissal of the indictment because the district court improperly engaged in factfinding by purporting to make a purely "legal" determination based on "undisputed" facts. 665 F.3d 588, 595–98 (3d Cir. 2012). The Defendant's motion therefore fails.

---

[5] Indeed, courts are clear that a district court may only assess the sufficiency of evidence based on facts in the Indictment in response to a motion to dismiss when the government stipulates to undisputed facts, which the government has not done here. *See Rodriguez-Rivera*, 918 F.3d at 35 ("No circuit, though, allows such a review on an incomplete or disputed factual record. Nor do the defendants point us to any case in which a circuit court blessed a requirement that the government complete the factual record prior to trial."); *United States v. Kurlemann*, 2010 WL 3585681, at *11 (S.D. Ohio Sept. 10, 2010) (citing *United States v. Levin*, 973 F.2d 463 (6th Cir. 1992), and *United States v. Ali*, 557 F.3d 715 (6th Cir. 2009) as examples of cases where stipulation to "undisputed facts" allowed broader inquiry on a motion to dismiss, but held them "not controlling" because of "disputed facts in this case that must be resolved by the jury").

An additional point bears highlighting:  the motion asks the Court to assess whether the Defendant's "intent" gave rise to a quid pro quo.  "It goes without saying that matters of intent are for the jury to consider."  *McCormick*, 500 U.S. at 270.  The jury must assess a defendant's "intent to exchange official acts for contributions . . . based on [the defendant's] words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them."  *Terry*, 707 F.3d at 614.  "The trier of fact is 'quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.'"  *Id*. at 613.  "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged quid pro quo."  *Lee*, 919 F.3d at 356; *United States v. Sampson*, 898 F.3d 270, 278 (2d Cir. 2018) (reversing dismissal: "where intent of the accused is an ingredient of the crime charged, its existence is a question of fact that a judge cannot resolve on the jury's behalf.").

This is important, here, because, far from "negating an element or contradicting a charge," (Doc. 25 at 11 (PageID 144)), a jury could hear the evidence cited in Defendant's motion and determine those facts support a corrupt agreement.  For example, a jury could reasonably infer based on the Defendant's actions that he did not "push back" when offered an "improper exchange," (*id*. at 16 (PageID 149)), but rather the opposite—the Defendant immediately offered to meet the investor in person after being offered an explicit quid pro quo and professed support for development projects because he was actively soliciting funds from an individual he knew was corrupt.  *See Lee*, 919 F.3d at 357 (although defendant stated, "'I'm not trying to influence you . . . I'm trying to make you think,' . . . a juror could easily have heard those words and concluded that they meant the exact opposite").  Further, whether the Defendant supported Project 1 before payment or believed in the project's merits is legally irrelevant: "it is no defense that an official

would have taken certain actions regardless of any alleged bribe." *United States v. Silver*, 948 F.3d 538, 562 n.14 (2d Cir. 2020); *see* Sixth Cir. Pattern Jury Inst. 17.02(2)(c)(3). More importantly, this evidence must be assessed in the context of all the evidence rather than in isolation. *Terry*, 707 F.3d at 613 ("Context may show that an otherwise legitimate contribution is a bribe."). This context includes not only allegations setting forth the charges and paragraphs laying out the parties' relationships, but those involving the Defendant's subsequent "agree[ment] to 'deliver votes'"—a veto-proof number of councilmembers supporting Project 1—"in return for $20,000." (Doc. 3 PageID 32); *Terry*, 707 F.3d at 613 (quid pro quo "is one of inferences taken from what the participants say, mean and do, all matters that juries are fully equipped to assess.").

The jury could also infer at trial, given all facts and surrounding circumstances, that the Defendant's discussion of a "local solution" for sports betting—like using the "*zoning code*" to help Project 1 "*within City limits*"—while simultaneously agreeing to be "*take[n] care of*" through contributions from corrupt businessmen, supports a quid pro quo. *Evans*, 504 U.S. at 269 (quid pro quo requires "only . . . that a public official has obtained a payment to which he was not entitled, *knowing that the payment was made in return for official acts*") (emphasis added). Again, this includes assessing, among others, the background of the parties, prior relevant communication, the context of the conversation, and the specific language and tone of the exchange—in other words, the entire context a jury must consider at trial. *Blagojevich*, 794 F.3d at 738 (quid pro quo often based on a "'Nudge, nudge, wink, wink, you know what I mean'" agreement); *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012) ("Inferring mental state from circumstantial evidence is among the chief tasks of factfinders."). Therefore, the jury at trial—not the Court through in Indictment—must assess the evidence to deduce the Defendant's intent relating to a quid pro quo.

For this reason, too, the Defendant's arguments for dismissing these counts fail.

***Motion to Strike.***  In the alternative, the Defendant argues that the Court should strike all allegations of official acts other than his own vote, specifically listing two official actions that the Defendant believes do not qualify.  (Doc. 25 at 17 (PageID 150)).  Again, as an initial matter, the government need not allege all evidence supporting the charges.  As the above law makes clear, the Indictment alleges the Defendant received payment in return for specific official action—while alleging the types of official action at issue—enough to notify the Defendant of the charges.

In any case, the Defendant's arguments are misplaced.  The motion first argues that "persuasion of Council colleagues is not an 'official act.'"  (*Id*. at 16 (PageID 149)).  Not so— *McDonnell* official action includes agreeing "to exert pressure on" or "to advise another official" to perform official act—both of which apply here. 136 S. Ct. at 2372.  Pressuring or advising other councilmembers to vote for a project is exactly the type of official action identified in *McDonnell*. In fact, as the Defendant is aware, the Indictment here alleges "pressuring and advising" other officials, consistent with the language of *McDonnell*, not "persuading," as defendant claims.

Next, the Defendant asserts that promising to "deliver the votes' of other Councilmembers on Project 1" is not official action because he only promised to "talk to" his peers.  (Doc. 25 at 18 (PageID 151)).  This is inconsistent with the Indictment and common sense—the Defendant agreed to deliver enough votes from City councilmembers (including his own) so that Public Official A could not veto a development agreement from the City for Project 1.  That is unquestionably an agreement to "take an action" on a "specific and focused" question or matter before the City. *McDonnell*, 136 S. Ct. at 2368 ("A 'question' may be . . . a proposition being or to be voted on").

The motion also suggests that, because the Defendant is a legislator rather than an executive, he somehow cannot influence other legislators under *McDonnell*.  But official action under *McDonnell* includes all "public officials" not just executive officials.  *Id*. at 2372; *see Lee*,

15

919 F.3d at 352 (holding defendant, a member of Summit County Council, did not need "direct leverage over other officials" to "exert pressure" under *McDonnell*).  Further, the Defendant's analogy to "political logrolling" is inapt.  The Defendant did not promise a vote-for-a-vote with another legislator; he promised a non-official he could deliver votes for private money to his PAC.  That is not "legislative persuasion"—it is bribery under federal law.  *See Blagojevich*, 794 F.3d at 734 ("[A] proposal to trade one public act for another, a form of logrolling, is fundamentally unlike the swap of an official act for a private payment.").

Finally, the Defendant argues that changes to the "zoning code" are not official action.  (Doc. 25 at 18–19 (PageID 151–52)).  The allegations in the Indictment involve the Defendant agreeing to make a decision on the "*zoning code*" to create a controlled environment "*within City limits*" that would permit the "local regulation of sports betting" for a specific question or matter, Project 1.  (Doc. 3 at 11–13 (PageID 36–38)).  Agreeing to change a local zoning law is "a formal exercise of governmental power" that qualifies as official action under *McDonnell*.  136 S. Ct. at 2372 (listing "a determination before an agency" as an example of official action).  That all the details of the decision were not laid out during the exchange is irrelevant.  *Terry*, 707 F.3d at 614–15.  And, again, "[i]t is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an official act."  *McDonnell*, 136 S. Ct. at 2371.  Because the Indictment alleges official action under *McDonnell*, the Defendant's motion to strike must also fail.

### B.  The Indictment Properly Sets Forth Federal Funds Bribery Charges

Counts 3 and 5 allege that the Defendant committed federal funds bribery, in violation of 18 U.S.C. § 666(a)(1)(B).  As the Sixth Circuit explained in *United States v. Abbey*:

> One violates 18 U.S.C. § 666(a)(1)(B) if he or she is an agent of local government and "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection

16

> with any business, transaction, or series of transactions" of the local government "involving any thing of value of $5000 or more."

560 F.3d 513, 520 (6th Cir. 2009) (quoting § 666(a)(1)(B)).

Counts 3 and 5 track the statutory language and elements for federal funds bribery and set forth facts detailing the manner in which the Defendant violated the statute: by corruptly soliciting, demanding, accepting, and agreeing to accept payments to his PAC from a specific individual on specific dates; and doing so while intending to be influenced and rewarded in connection with the business, transactions, and series of transactions involving the City and Project 1 (paragraphs 42 and 46). (Doc. 3 at 16–18 (PageID 41–43)). The Indictment also alleges pages of detailed facts, as described above, putting Defendant on notice that he was being charged under § 666 for his corrupt solicitation and acceptance of PAC money with intent to be influenced and rewarded in connection with Project 1's business with the City. These charges are properly alleged.

The Defendant's contrary position has no merit. As an initial matter, the motion advances several erroneous legal arguments regarding § 666. For example, the motion asserts: "The Sixth Circuit has carved out political contributions from its general holding that Section 666 does not require a quid pro quo," citing *Abbey* at 521; "*Abbey* recognized that the contribution context is 'unique' in ways that affect Section 666's intent-to-be-influenced requirement because '*almost all lawful contributions are given to influence future legislation or executive actions*," citing *Abbey* at 516 (emphasis in motion); and "*Abbey* pointed to *McCormick's* quid pro quo requirement as necessary "to ensure that an otherwise permissible activity is not unfairly criminalized," citing *Abbey* at 517, and *Terry* and *Blandford*. (Doc. 25 at 20–21 (PageID 153–54)).

All these assertions misinterpret the law in the § 666 context and *Abbey's* holding. *Abbey* did not involve campaign contributions (the quid was free property), and nowhere in the Court's discussion of § 666 does it "carve out" campaign contributions. 560 F.3d at 520–22 (discussing

17

§ 666). Rather, the language in *Abbey* quoted by the Defendant relates to the Hobbs Act. *Abbey* made no reference to campaign contributions impacting § 666 (in contrast to its Hobbs Act discussion); *Terry* involved honest services and *Blandford* the Hobbs Act—neither involved § 666.

Indeed, post-*Skilling*, the Sixth Circuit in *Porter* rejected the argument that § 666 "requires evidence of a quid pro quo" as required by the Hobbs Act. *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018). In doing so, the Court affirmed *Abbey's* holding that "the text of § 666(a)(1)(B) 'says nothing of a quid pro quo requirement to sustain a conviction, *express or otherwise*"; and "while *a quid pro quo of money for a specific . . . act* is sufficient to violate the statute, *it is not necessary*." *Id*. at 565–66 (quoting *Abbey*, 560 F.3d at 520) (emphasis added). Unlike § 1951 and § 1346, which do not define bribery, § 666(a)(1)(B) provides a clear statutory definition for what constitutes a bribe (*e.g.,* corruptly receiving payment "intending to be influenced") and a gratuity[6] (*e.g.,* corruptly receiving payment "intending to be . . . rewarded"). And courts apply that statutory language when setting forth the elements under § 666. *Abbey*, 560 F.3d at 520. Adopting the Defendant's argument would thus be inconsistent with the statutory language and Sixth Circuit law. *See also United States v. Garrido*, 713 F.3d 985, 996–97 (9th Cir. 2013) (holding in campaign contribution case "§ 666 does not require a jury to find a specific *quid pro quo*"); *United States v. Gilbert*, 2018 WL 2095853, at *9 (N.D. Ala. May 4, 2018) (rejecting argument requiring *McCormick* "explicit" quid pro quo language in indictment based on First Amendment concerns specific to that case because "the Eleventh Circuit has repeatedly rebuffed invitations to revisit its precedent and require a *quid pro quo* to sustain a Section 666 conviction.").

---

[6] *See United States v. Ford*, 435 F.3d 204, 210 (2d Cir. 2006) ("An illegal gratuity . . . may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.") (quoting *United States v. Sun–Diamond Growers of California,* 526 U.S. 398, 404–05 (1999)).

As for Defendant's "rule of lenity" claim, the motion does not argue how the statute is "grievously ambiguous" or cite any case that has so held, and the Sixth Circuit has had little difficulty applying the statutory language as elements of a § 666 charge.  So this argument also fails.  *United States v. McNair*, 605 F.3d 1152, 1192 (11th Cir. 2010) ("The rule of lenity does not apply here because defendant-appellants fail to identify a 'grievous ambiguity' in § 666(a)(1)(B) or (a)(2), or to show that the statutory language criminalizes innocent behavior.").

Finally, the Defendant raises the same claim relating to "corrupt intent" as he raised previously regarding the quid pro quo standard governing the Hobbs Act and honest services:  that "specific factual allegations" are "inconsistent with any notion that Mr. Sittenfeld performed his ordinary job duties with corrupt intent."  (Doc. 25 at 21 (PageID 154)).  But this argument fails for the reasons detailed above—the government need not allege, and the Court may not assess, the sufficiency of evidence.  Nor may the Court assess the Defendant's "corrupt intent."  *See Abbey*, 560 F.3d at 520 n.7 ("[T]he term 'corruptly' in criminal laws . . . denotes 'an act done with an intent to give some advantage inconsistent with official duty and the rights of others.'"); *Blagojevich*, 794 F.3d at 736 ("'[c]orruptly' refers to the recipient's state of mind and indicates that he understands the payment as a bribe or gratuity.").  Again, the jury assesses the Defendant's intent based on "all the surrounding circumstances" and "rational or logical inferences," *Terry*, 707 F.3d at 614; and, as set forth above, the jury could reasonably infer that the Defendant acted corruptly for the same reasons it could infer he engaged in a quid pro quo.  In any case, the Indictment tracks the statute (which establish the elements per *Abbey*) and details facts supporting the charges as set forth above, all that is necessary under Rule 7(c).  *Lee*, 919 F.3d at 349 ("set[ting] forth the offense in the words of the statute itself" sufficient so long as they establish the elements).

19

## C. The Applicable Statutes Are Constitutional

Finally, in conclusory fashion, the Defendant "argues that the statutes are unconstitutionally vague as applied to him." (Doc. 25 at 22 (PageID 155)). A statute is unconstitutionally vague only if, "as applied to this particular case," it either "(1) defines [the] offense in such a way that ordinary people cannot understand what is prohibited, or (2) encourages arbitrary or discriminatory enforcement." *United States v. Kettles*, 970 F.3d 637, 649–50 (6th Cir. 2020). "[A] strong presumptive validity applies to all acts of Congress." *Id*.

Here, the motion presents no indication how these statutes are unclear or encourage arbitrary or discriminatory enforcement as applied to the Defendant. Without more, the Court cannot assess the argument. *See United States v. Cain*, 2020 WL 3821099, at *4 (E.D. Ky. July 8, 2020) (rejecting outright "conclusory" arguments in pretrial motion). In any event, even if the Defendant included analysis in support, courts have rejected vagueness challenges to these statutes. *See United States v. Ng Lap Seng*, 934 F.3d 110, 135 (2d Cir. 2019) ("[C]ourts have uniformly rejected vagueness challenges . . . to § 666"); *United States v. Lopez-Martinez,* 2020 WL 5629787, at *33 (D.P.R. Sept. 21, 2020) ("[C]ourts have rejected void-for-vagueness constitutional challenges to the Hobbs Act as they relate to 'the sections of the Act [dealing] with extortion.'") (listing cases); *United States v. Douglas*, 2019 WL 1315731, at *8 (E.D. Mich. Mar. 22, 2019) ("The federal courts also uniformly have rejected vagueness challenges to charges for mail and wire fraud under 18 U.S.C. §§ 1341, 1343, and the definitional language of section 1346" involving "bribes or kickbacks," following *Skilling*). For these reasons, this argument also fails.

## IV. CONCLUSION

The Defendant's motion to dismiss or, in the alternative, motion to strike, should be denied.

20

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney


*s/ Matthew C. Singer*
MATTHEW C. SINGER (IL 6297632)
EMILY N. GLATFELTER (0075576)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
Fax: (513) 684-6385
Email:  Matthew.Singer@usdoj.gov
E-mail: Emily.Glatfelter@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Court's CM/ECF System this 25th day

of January 2021, which provides electronic notice to all parties.


*s/ Matthew C. Singer*
MATTHEW C. SINGER (IL 6297632)
Assistant United States Attorney

21