**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

             v.

ALEXANDER SITTENFELD,
  a/k/a "P.G. Sittenfeld,"

        Defendant.

Case No.: 1-20-cr-142

Hon. Douglas R. Cole

ORAL ARGUMENT:
02/16/21 at 2:00 p.m.

## **DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT**

**RITTGERS & RITTGERS**
**Attorneys at Law**

12 East Warren Street Lebanon,
Ohio 45036
TEL (513) 932-2115
FAX (513) 934-2201

<u>**ARGUMENT**</u>

The facts alleged in the indictment do not amount to crimes. For all six counts, the indictment alleges only that Mr. Sittenfeld engaged in customary political interactions. These facts fall well short of the necessary "explicit" quid pro quo—*i.e.*, the exchange of an identified official act for political contributions. *McCormick v. United States*, 500 U.S. 257, 273 (1991). Nor do the allegations support an objectively justified inference of the corrupt solicitation or receipt of an otherwise protected political contribution. These defects require dismissal. Where, as here, an indictment recites extensive and specific facts, and those facts show only innocent conduct, the charges must be dismissed.

Here, the facts alleged do not add up to a crime for three central reasons. ***First***, the facts pleaded do not show an explicit quid pro quo. Instead, the indictment pleads Mr. Sittenfeld's promotion of his record, accomplishments, and planned actions. It also pleads that he received contributions. But it draws no explicit link between the two. The requirement of explicitness is essential to transform protected, ordinary conduct into a criminal offense. Otherwise, the government can, as it did here, take protected conduct that is common in elective politics and treat it as a crime. ***Second***, the indictment also fails to plead an official act (other than Mr. Sittenfeld's own vote) because the alleged official acts do not qualify under *McDonnell v. United States*, which requires "identified," "specific," and "focused" questions or matters and action or agreement to act "on" them. 136 S. Ct. 2355, 2368-74 (2016). ***Third***, the indictment fails to plead a Section 666 offense because it alleges no explicit intent to be influenced or rewarded.

The government's responses fall short. The government contends that its barebones recitation of the offense elements, coupled with a request for inferential reasoning from a litany of facts, is enough. But the case law it cites either undermines its positions or is irrelevant.

1

Contrary to the government's apparent view, the volume of facts in the indictment describing conduct that is typical and routine in American democracy cannot suffice when the factual allegations do not amount to criminal conduct. And contrary to the government's assertion, Mr. Sittenfeld does not ask the Court to "usurp" the jury's fact-finding role at trial. Assessing whether the facts alleged in the indictment constitute a crime is a proper exercise of the duty to ensure that legally deficient charges do not go to the jury.

## I. RULE 7 DOES NOT PERMIT THE GOVERNMENT TO PLEAD FACTS THAT DO NOT AMOUNT TO A CRIMINAL OFFENSE

The indictment should be dismissed because it recites extensive and specific facts that do not, when taken as true, constitute a crime. Dismissal at this stage is not usurping the province of the jury; to the contrary, it is the Court's role to "[e]nsure that legally deficient charges do not go to a jury." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012) (internal quotation marks omitted); *see also United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001); *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992).

Although the Court's review of the facts at this stage is limited, the Court "need not blindly accept a recitation in general terms of the elements of the offense." *Huet*, 665 F.3d at 595. Even if an indictment recites the necessary elements in boilerplate statutory wording, "if the specific facts that are alleged [in the indictment] fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation," then the indictment fails. *Id.* (quotation omitted); *United States v. Smith*, 2011 WL 2417051, at *3 (E.D. Ky. June 13, 2011) (same); *see also United States v. Enmons*, 410 U.S. 396, 412 (1973) (affirming dismissal of indictment where the Hobbs Act did not prohibit the conduct charged); *Landham*, 251 F.3d at 1079 ("[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense" (quotation omitted)).

The government's cases indicate that, in general, an indictment is sufficient if it "set[s] out all of the elements" of the charged offenses, gives "notice to the defendant of the charges he faces," and is "sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding." Opp. 2. But where an indictment goes beyond reciting the elements of an offense and relies on particular factual allegations, the indictment must be dismissed if those factual allegations are legally insufficient or inconsistent with the alleged offense. *Huet*, 665 F.3d at 595. The government contests this rule, even arguing that *Huet* and *Landham* support its position. Opp. 12. That is incorrect. Although *Huet* found that the district court had erred by going outside the indictment "to truncate what it perceived as an incurably weak Government case," 665 F.3d at 597, *Huet* confirmed that a district court must dismiss an indictment where it alleges facts that are legally insufficient, *see id.* at 594-99, and in so doing, set a key standard that other courts apply when granting motions to dismiss, *see, e.g., United States v. Pimenta*, 2015 WL 6502098, *2, *4-5 (D. N.J. Oct. 27, 2015) (dismissing indictment because the facts it pleaded did not as a matter of law demonstrate the element that defendant was an agent of a bank) (citing *Huet*); *United States v. Webb*, 24 F. Supp. 3d 432, 440 (M.D. Penn. 2014) (dismissing indictment based on review of "specific facts alleged in the indictment to see if an offense [under the Travel Act] ha[d] been alleged"; rejecting argument that this was "based on the sufficiency of the evidence, not on the sufficiency of the government's pleading").

The government discounts (Opp. 12) *Landham* because it involves a federal threats statute that requires "objective" context to draw a line between **protected** free speech and a **criminal** threat. But *Landham*'s requirement (251 F.3d at 1080) that the indictment must "make th[e] context clear" to draw the requisite line has a counterpart when the government seeks to treat political contributions as bribes. The First Amendment and fundamental norms of our

democratic system require an explicit understanding before a legitimate political contribution crosses the line into an impermissible payment in return for an official act. And the alleged official act must be on a matter that is focused and concrete. Where an indictment's factual allegations show conduct on the innocent side of the line, it must be dismissed.

## II. THE INDICTMENT FAILS TO ALLEGE AN EXPLICIT QUID PRO QUO IN EXCHANGE FOR AN IDENTIFIED OFFICIAL ACT

In political contribution cases, the right of free speech and association and bedrock features of our democracy demand a high degree of certainty that criminal indictments clearly allege a federal offense. Allowing prosecution based on ambiguous facts and circumstances threatens to punish and chill elected officials who "act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries"—routine and protected conduct that (without more) does not constitute a crime. *McCormick*, 500 U.S. at 272.

Although the government glosses over the First Amendment considerations underlying this case, the Supreme Court has consistently tailored federal corruption laws to avoid sweeping in ordinary, lawful political conduct. *See McDonnell*, 136 S. Ct. at 2372-73; *Skilling v. United States*, 561 U.S. 358, 408-11 (2010); *United States v. Sun-Diamond Growers*, 526 U.S. 398, 406-12 (1999); *McCormick*, 500 U.S. at 272-74. Two requirements designed to prevent the government from charging routine political activity as a federal crime are fatal to this indictment: (1) an explicit quid pro quo (or explicit corrupt solicitation) and (2) specific, identified official action. The absence of either requirement "open[s] to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation." *McCormick*, 500 U.S. at 272.

The government does not dispute that the honest services fraud and Hobbs Act counts require an explicit quid pro quo.[1]  But it argues that the indictment satisfies the standard because, "contrary to the Defendant's interpretation," "explicit" does not mean "express."  Opp. 5. Mr. Sittenfeld has never so argued.  But for "explicit" to have any meaning, it has to require more than allegations of contributions and discussions of governmental action related only temporally. That is why the Sixth Circuit has said that "'explicit' in this context means '[c]lear in understanding,' such that 'the payor and payee were aware of' the 'terms' 'of the agreement between' them." Mot. 12 (quoting *United States v. Blandford*, 33 F.3d 685, 696 & n.13 (6th Cir. 1994)).  To meet that test, an explicit agreement cannot be "obscure or ambiguous" or "disguised in meaning." *Blandford*, 33 F.3d at 696 n.13 (citing Black's Law Dictionary 579 (6th ed. 1990)).

**A.  The Indictment Fails To Plead An Explicit Quid Pro Quo.**

The indictment fails to satisfy the explicit quid pro quo requirement because it does not plead that Mr. Sittenfeld agreed that his conduct would be "controlled" by the contributions.  The government is wrong that it can sidestep the pleading deficiency by pointing to the jury's role in determining intent; this is a question of whether the conduct constitutes a crime.  And the cases it cites demonstrate why the indictment fails to allege an explicit quid pro quo.

***1.  There is no allegation that official conduct would be "controlled" by contributions.***

The government must plead an "explicit" agreement that an office holder's "official conduct will be *controlled* by the terms of the promise or undertaking." *McCormick*, 500 U.S. at 273 (emphasis added); *accord United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013); *Blandford*, 33 F.3d at 696 & n.13.  That element is missing here.  The indictment clearly pleads

---

[1] The "explicitness" requirement equally applies to the intent-to-be-influenced element of the Section 666 bribery counts, which is functionally equivalent to the "exchange" requirement in the Hobbs Act and honest services charges. *See infra* Part III.

Mr. Sittenfeld's promotion of his record, accomplishments, and planned actions. It clearly pleads that he received contributions. But it fails to draw an explicit link between the two as required to transform protected, ordinary conduct into a criminal offense.

The government contends that the indictment need only satisfy basic notice requirements by tracking the statutory language and providing factual circumstances to inform Mr. Sittenfeld of the charged offense. Opp. 2-3, 8-9. As discussed, however, when the indictment lays out additional facts and those facts do not constitute a crime, dismissal is required. The government's response that "eleven pages of additional facts" in the indictment purportedly provide notice of the charges, Opp. 9, ignores that principle: the quantity of facts alleged does not help if they reveal innocent conduct as a matter of law rather than the necessary explicit quid pro quo. *Superior Growers Supply*, 982 F.2d at 178-79.

A close review of the indictment next to the government's purported summary table, Opp. 9-10, shows why the indictment fails to allege the necessary explicit link.

*Phase 1*. The first phase of the alleged scheme involved securing votes for Project 1. Opp. 10. As summarized in the government's table, Paragraph 14 "details an offer of an explicit quid pro quo" in November 2018 whereby the undercover agents, posing as investors, would make a political contribution, but "want to know 'it's going to be a yes vote . . . without a doubt' on Project 1." Opp. 9. Unaware of the government's surreptitious recording, Mr. Sittenfeld replied that any payment would not be linked to specific official action: "you know, obviously nothing can be illegal like . . . legally nothing can be a quid, quid pro quo. And I know that's not what you're saying either." Indictment ¶ 14. Mr. Sittenfeld then pointed the "investors" to his pre-existing and independent pro-development record: "[W]hat I can say is that I'm always super pro-development and revitalization of our urban core." *Id.* At a subsequent November 7, 2018

meeting, Mr. Sittenfeld restated his independent pro-development positions by "present[ing] voting data showing that he is politically popular throughout Cincinnati, and he stated he is likely to be the next mayor." *Id.* ¶ 15. Consistent with that record, Mr. Sittenfeld suggested he could "deliver the votes" based on his popularity, linking his abilities to his pre-existing pro-development record—not contributions. *Id.* ¶ 16. Nothing about these facts pleads a clear understanding by Mr. Sittenfeld that he was promising anything "in return" for payments or took payments intending to be influenced by them. *McCormick*, 500 U.S. at 273. Accordingly, the government's factual allegations in the first phase of the sting do not satisfy the explicit quid pro quo requirement. *United States v. Menendez*, 132 F. Supp. 3d 635, 644 (D. N.J. 2015) (dismissing counts in the absence of explicit quid pro quo as required by *McCormick*).

*Phase 2*. Nor does the government sufficiently allege an explicit quid pro quo in the second phase of the sting. During phase two, the undercover agents sought Mr. Sittenfeld's support to protect potential sports-betting activity at Project 1. The government alleges that over several months, Mr. Sittenfeld discussed his support for Project 1 with the undercover agents and ways he could be helpful, Opp. 10—just as any city councilmember would do to serve his constituents by revitalizing the city, attracting investment, and growing jobs. During one discussion on September 24, 2019, Mr. Sittenfeld allegedly proposed potential ways to place a legal sports wagering facility within the project including "ways to use the 'zoning code' to create a controlled environment 'within City limits,'" or perhaps a "local solution." *Id.* During the same meeting, one of the agents "provided $10,000 in checks to the PAC, while promising more checks in the future." *Id.* At a later meeting, the indictment alleges (but the table omits) yet another suggestion about "proposed statewide legislation." Indictment ¶ 34.

Notably absent from these discussions (in the indictment or table) is any factual

allegation suggesting an explicit understanding, even if not express, that the political contributions were conditioned on or made in return for an official act. The allegations that the contributions were given during the same conversations makes no difference because no facts alleged suggest that the discussed acts were intended to be ***controlled*** by the contributions. As *McCormick* squarely held, mere simultaneous discussion of contributions and a politician's views or activities does not support an inference of an explicit quid pro quo. 500 U.S. at 272.

In short, all the indictment alleges is contributions and discussions about supporting Project 1—a legal and typical *quid* and a legal and typical *quo*. But other than conclusory language and temporal proximity—neither of which suffices when the contributions and discussed conduct are otherwise legal, *McCormick*, 500 U.S. at 272—the indictment fails to allege that the contributions ***controlled*** the discussions related to support of Project 1.

### 2. The Issue Here Is Not One Of Intent.

The government improperly construes its obligation to allege an explicit quid pro quo as an issue of intent for the jury. Opp. 11-12. Of course, issues of intent are generally for the jury. But here, the objective facts alleged do not state a crime because they do not plead the context needed to allege a required element: the explicit understanding that an official's act would be controlled by contributions. *Cf. Pimenta*, 2015 WL 6502098, at *4-5 (dismissing indictment because the allegations did not satisfy the element that defendant was an agent of a bank). The government cannot escape its defective indictment by saying that the jury could speculate about issues of intent. In the political contribution context, excusing the government from charging an *explicit* exchange of official acts for contributions is a recipe for chilling protected conduct.

### 3. The Government's Cited Authority Illustrates Why This Indictment Falls Short.

The government principally relies on *Terry* and *United States v. Blagojevich*, 794 F.3d

729 (7th Cir. 2015). Neither case supports the government's position. To the contrary, those cases illustrate what it means to plead an explicit quid pro quo—exactly what is missing here.

In *Blagojevich*, the government charged then-Illinois Governor Rod Blagojevich with attempts to raise campaign contributions in exchange for the performance of official acts (among other charges). *Id.* at 733. As the opposition notes, the Seventh Circuit endorsed the Hobbs Act jury instruction because it "track[ed] *McCormick*," "the statute does not have a magic-words requirement," and it would be "legally wrong" if "Blagojevich believed that winks and nudges avoid the *McCormick* standard." Opp. 6. But the two examples that *Blagojevich* cited of Hobbs Act extortion reveal why the indictment's allegations against Mr. Sittenfeld are inadequate. 794 F.3d at 734. Neither example involved an *express* agreement to exchange political contributions for official acts. But, in both instances, Blagojevich refused to perform official acts (or reversed prior ones) until the political contributions were received, making the corrupt bargain *explicit*.

In the first example, lobbyists for the Children's Memorial Hospital "sought an increase in reimbursement rates for Medicaid patients" and Blagojevich replied that he would "approve an extra $8 to $10 million of reimbursement in exchange for a 'campaign contribution' of $50,000." *Id.* The indictment alleged that, after relaying the contribution request, Blagojevich called the hospital CEO "to tell him of his intent to increase the Illinois Medicaid reimbursement rate" and "directed" his deputy governor "to initiate such an increase[.]" Blagojevich Second Superseding Indictment ¶ 26, 1:08-cr-00888, Dkt. 231 (N.D. Ill. Feb. 4, 2010). But when the hospital CEO did not "return[] additional phone calls" and "no political contributions . . . had been received," Blagojevich told his deputy governor to halt the rate increase. *Id.* ¶ 28.

In the second example, Blagojevich "attempted to ensure" that a racetrack executive fulfilled a $100,000 campaign pledge before Blagojevich would sign an extension of a program

that taxed casinos for the benefit of racetracks. 794 F.3d at 734. The indictment alleged that Blagojevich told his campaign manager that he was "concerned that [the] Racetrack Executive would not make a contribution . . . if he signed the Racing Bill before the contribution was made" and instructed the campaign manager to speak with the Racetrack Executive "to ensure that" he "would make a contribution by the end of the year." Blagojevich Second Superseding Indictment ¶ 30, 1:08-cr-00888, Dkt. 231 (N.D. Ill. Feb. 4, 2010). The campaign manager relayed Blagojevich's concerns to the executive. *Id.* ¶ 31. The manager then reported to Blagojevich that he made it clear to the executive that the contribution has "got to be in now," before Blagojevich signed the bill. *Id.* ¶ 32.

These examples demonstrate the kind of necessary "explicit" link between the contributions and the act that qualify as knowing "winks and nudges." They are entirely unlike the allegations against Mr. Sittenfeld, where no action was expressly or implicitly made contingent on the receipt of political contributions and where Mr. Sittenfeld's actions or proposed actions to support Project 1 were entirely consistent with innocent conduct and Mr. Sittenfeld's prior policy positions. In other words, the "winks and nudges" that the Seventh Circuit found sufficient in *Blagojevich* illustrate why the indictment against Mr. Sittenfeld fails. The government cannot rely on an infinite series of speculative inferences to supply the missing "explicit" link.[2] *Cf. Superior Growers Supply*, 982 F.2d at 179 (conspiracy indictment cannot "stick" without supplying inferences, but doing so would "ignore the Supreme Court's admonition" that charges "are not to be made out by piling inference upon inference").

---

[2] While recognizing that Mr. Sittenfeld expressly stated that "nothing can be a quid, quid pro quo," or that the undercover agent was proposing one, *see* Indictment ¶ 14, the government cites *United States v. Lee*, 919 F.3d 340, 357 (6th Cir. 2019), for the proposition that the jury could infer that his words meant "the exact opposite." Opp. 13. But *Lee* is inapposite because it involved cash bribes—not political contributions—so *McCormick*'s heightened quid pro standard does not apply.

*Terry*, which the government relied on so heavily it even attached the indictment, provides an equally compelling contrast.  There, an Ohio state court judge who was running for reelection sought $1,200 in political contributions in exchange for denying two motions for summary judgment.  707 F.3d at 610.  The indictment alleged that the defendant "concealed from certain litigants the fact of his ex parte communications" with an auditor (on behalf a donor) who asked the judge to deny motions pending before him involving the donor, to which the judge replied "got it."  Terry Superseding Indictment ¶¶ 36, 41, 1:10-cr-00390, Dkt. 24 (N.D. Ohio Mar. 9, 2011).  The judge also "inform[ed] [the auditor] of the dates and times for his (TERRY'S) political fundraisers."  *Id.* ¶ 36.  After the judge denied the motions and confirmed to the auditor that he had taken "care of those two issues with those two cases that we talked about," the donor told the auditor, "You took care of that, he [TERRY] just told me."  *Id.* ¶ 40.

*Terry*'s factual allegations starkly contrast with the allegations here.  The judge there had no innocent reason for communicating ex parte with litigants about motions pending before him; the inference of an exchange of action for contributions is inescapable.  By contrast, city councilmembers (like Mr. Sittenfeld) are expected to engage with developers who have projects before the City Council, and those developers regularly contribute to councilmembers in their districts.  *Terry* recognized that this is not unusual and certainly not bribery.  707 F.3d at 613.  Instead, *Terry* explained, an "agreement" to exchange contributions for official acts, *i.e.*, a quid pro quo, is the "dividing line between permissible and impermissible payments."  *Id.* at 614.

Here, the facts do not support the inference of such an agreement by Mr. Sittenfeld.  Rather, the indictment alleges facts reflecting protected conduct and leaps to speculation of an improper exchange based on temporal proximity.  That is not sufficient to constitute an "explicit" quid pro quo, *see McCormick*, 500 U.S. at 272, and a criminal case should not proceed

when the factual allegations make clear that the indictment fails to charge a crime. *See, e.g., United States v. Wilcox*, 2010 WL 55964 (W.D. Mich. Jan. 4, 2010) (dismissing aggravated identity theft charge because indictment's factual allegations made clear that the conduct was not fraud within the meaning of the relevant statute).

### B. Aside From Mr. Sittenfeld's Own Vote, The Alleged Actions To Support Project 1 Are Not "Official Actions."

Even if the Court does not dismiss all counts based on the absence of an explicit quid pro quo, it should still strike all allegations of purported official acts (other than Mr. Sittenfeld's own vote) because they do not qualify as "official acts" under *McDonnell*. 136 S. Ct. at 2368-73. The government counters that it "need not allege all evidence supporting the charges" and that the indictment satisfies *McDonnell* because it uses the words "pressuring and advising" other officials on an assertedly "specific and focused" question or matter before the city. Opp. 15. That argument lacks merit.

In *McDonnell*, the Supreme Court sharply curtailed the scope of federal corruption prosecutions in order to avoid "serious constitutional concerns" and to define the line between lawful and unlawful conduct. 136 S. Ct. at 2367. The official must "make a decision or take an action on [a] question or matter" that is pending or could be brought before the official (or agree to do so). *Id.* at 2370. The Supreme Court emphasized two types of specificity to meet this test. First, the "question" or "matter" "must be more specific and focused than a broad policy objective"; the government action must be "focused and concrete." *Id*. at 2370, 2374. Second, the official must "make a decision or take an action *on* th[e identified] question or matter, or agree to do so." *Id.* at 2370. Merely "setting up a meeting, calling another public official, or hosting an event" does not (without more) qualify as official action. *Id.* at 2370-71.

Here, the indictment falls far short of *McDonnell's* demanding specificity standard:

*Phase 1*.  For the first phase of the sting, the government cites Mr. Sittenfeld's statements about his political abilities as qualifying "official acts."  Opp. 10.  Specifically, Paragraphs 16-17 detail one meeting where Mr. Sittenfeld allegedly bragged, "I can deliver the votes," and Paragraphs 18-22 detail another statement where Mr. Sittenfeld explained, "I can always get a vote to my left or a vote to my right."  *Id*.  These generalized expressions of confidence in his own political abilities are not "official acts" under *McDonnell*.  And while an official need only agree to perform a "specific" and "identified" official act, not perform it, *see McDonnell*, 136 S. Ct. at 2370, the indictment says nothing about *what* Mr. Sittenfeld intended or agreed to say, *when* he intended or agreed to say it, or to *whom*.  These allegations thus fail to allege an identifiable "official act" to serve as the alleged "quo" during phase one.

The government counters that the indictment satisfies *McDonnell* because it alleges that Mr. Sittenfeld "pressur[ed] and advis[ed]" other officials, *see* Opp. 15, but the indictment so states only in a conclusory way in the "manner and means" section of the honest services allegations (Indictment ¶ 39(g)), which are not incorporated in the Hobbs Act counts.  Otherwise, it uses "pressure" for the first time in connection with the second phase of the sting, *see* Indictment ¶ 35, and that allegation is wholly disconnected from Mr. Sittenfeld's statements about his political abilities during the first phase of the sting.  And even if a specific call or meeting took place (which is not alleged), it is *not* an official act for Mr. Sittenfeld to "encourage, cajole or argue with his colleagues to vote one way or another," "notwithstanding his alleged statements of confidence in his abilities to persuade them."  Mot. 16.  "Simply expressing support" for a question or matter "at a meeting, event, or call" "does not qualify as a decision or action" on the question or matter, "as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form

13

the basis for an 'official act.'" *McDonnell,* 136 S. Ct. at 2371. Otherwise, "the requirement that the public official make a decision or take an action on that [question or matter], or agree to do so, would be meaningless." *Id.*.

The government also attacks Mr. Sittenfeld's analogy to "political logrolling" in *Blagojevich* as "inapt" because Mr. Sittenfeld "did not promise a vote-for-a-vote" with another legislator. Opp. 16. But this argument only underscores the indictment's failure to plead specific official acts that go beyond the "express[ions of] support" that *McDonnell* rules out. That Mr. Sittenfeld allegedly stated he could "deliver votes" amounts to little more than a politician's speculative conjecture, not a "specific" or "identified" official act that qualifies under *McDonnell*. The government responds that under *Lee*, a legislator need not have "leverage" over other officials to "exert pressure." Opp. 15-16 (citing 919 F.3d at 352). But *Lee* involved a legislator seeking to influence a *city prosecutor*; the case did not address legislators seeking to influence *each other* through persuasive deliberations. Impermissible "pressure" or "advice" in the legislative context requires more than ordinary persuasion in a deliberative body—the equivalent of "expressing support." *McDonnell*, 136 S. Ct. at 2371.[3]

---

[3] *Blagojevich* illustrates the point: logrolling—which involves legislators engaging in "political horse-trading"—"is fundamentally unlike the swap of an official act for a private payment," and it is not a crime. 794 F.3d at 734, 736. Criminalizing logrolling would mean that "[e]ven a politician who asks another politician for favors only because he sincerely believes that these favors assist his constituents could be condemned as a felon[.]" *Id.* at 737-38. That is exactly the situation here, where the indictment itself makes clear that Mr. Sittenfeld supported Project 1 because development of the urban center was in the public interest—a reason independent of contributions. *See* Indictment ¶ 14 (Mr. Sittenfeld: "I'm always super pro-development and revitalization of especially our urban core."). This is not an argument that Mr. Sittenfeld would have taken the same action regardless of a bribe. *Contra* Opp. 13-14 (citing *United States v. Silver*, 948 F.3d 538, 562 n.14 (2d Cir. 2020); Sixth Cir. Pattern Jury Instruc. 17.02(2)(c)(3)). It is an argument that the independent rationale for Mr. Sittenfeld's action, coupled with the lack of connection between the contributions and his long-held positions, makes clear that the government has not pleaded an *explicit* quid pro quo. *Cf. Terry*, 707 F.3d at 615 (stating that "[w]ithout anything more, a jury could not reasonably infer that a campaign

*Phase 2*. In describing the second phase, the factual allegations are even less specific, and they too state neither a "specific" or "identified" matter nor a qualifying official act.

The government contends that in phase two, Mr. Sittenfeld "agree[d] to support local regulations to advance a sports book in Project 1." Opp. 10-11. As support, the government points to Paragraphs 31-32, which "detail a September 24, 2019 meeting in which [Mr. Sitternfeld] discusses ways to use the 'zoning code' to create a controlled environment 'within City limits' for sports betting." *Id.* In the indictment itself, those paragraphs demonstrate the lack of specificity: Paragraph 31 alleges that Mr. Sittenfeld stated, "[s]o like you can use zoning code, you know, and be like something, you know . . . I'm just, I'm confident there's some tool that if really need be within City limits could create a controlled environment." Indictment ¶ 31. And Paragraph 32 alleges that Mr. Sittenfeld suggested any number of other possibilities: "Right, That's the kind of thing, again, like you know, my mind goes to zoning, bonding, other specs." *Id.* ¶ 32. These suggestions are just that—suggestions; they are not "focused and concrete" policy decisions before Mr. Sittenfeld. They contrast sharply with the specific governmental actions found sufficient in *McDonnell*. *See* 136 S. Ct. at 2370. And the indictment also alleges that Mr. Sittenfeld suggested possible statewide legislation, *see id.* ¶ 29, 31, even though "Mr. Sittenfeld has no official way to influence *statewide* legislation, nor could the undercover agents reasonably think he did." Mot. 16-17. The government's opposition offers no response.

An official commits no crime unless the official explicitly agrees to act on a specific, identified matter in exchange for a benefit. Otherwise, an official who receives any benefit from

---

contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor," and pointing to additional "irregular" conduct that supported the inference of a corrupt agreement).

a constituent might be reluctant to take official action that might favor the constituent or engage with their colleagues about official actions, even if it is unrelated to the benefit. *McDonnell* 136 S. Ct. at 2372-73. *McDonnell* requires the government to prove an agreement to exchange bribes for official acts on an "identified," "specific," and "focused" matter to avoid treating everyday conduct as an attempt to control official action. *McDonnell*, 136 S. Ct. at 2360. Because the government fails to allege an identified, specific, and focused matter and official action "on" it (or agreement to act), the allegations describing purported official acts other than Mr. Sittenfeld's own vote on Project 1 must be struck.

## III. THE INDICTMENT FAILS TO ALLEGE A SECTION 666 OFFENSE

Section 666(a)(1)(B) prohibits "corruptly" soliciting or accepting a thing of value with the intent "to be influenced or rewarded in connection with" official business. Just as in the Hobbs Act and honest services context, Section 666 requires objective facts supporting an *explicit* understanding that political contributions will influence official favors. The indictment fails that test.

### A. Section 666 Requires An Explicit Understanding In The Political Contribution Context.

In *United States v. Abbey*, 560 F.3d 513, 520 (2009), the Sixth Circuit held that Section 666 does not require proof of a quid pro quo.[4] But *Abbey* also recognized that the official must act "corruptly" to violate the statute. "Corruptly" means "an act done with an intent to give some advantage inconsistent with official duty and the rights of others." *Id.* at 520 n.7. In the context of political contributions, therefore, a defendant violates Section 666 only if he accepts a contribution with an intent to provide an "advantage" to the donor that is "inconsistent with" the

---

[4] Mr. Sittenfeld maintains his argument that a quid pro quo is required. *See United States v. Fernandez*, 722 F.3d 1, 23-26 (1st Cir. 2013).

officer's duties and the rights of others. *Id.* This functionally requires the same kind of factual "context" as a corrupt exchange. *Landham*, 251 F.3d at 1080. And given the heightened concerns raised by criminalizing political contributions, Section 666—like the Hobbs Act and honest services—requires allegations of objective, *explicit* facts that the public official corruptly accepted a contribution to influence or reward him in connection with his official duties. *See United States v. Siegelman*, 640 F.3d 1159, 1170 & n.14 (11th Cir. 2011) (recognizing courts' extension of *McCormick* to Section 666 bribery charge in political contribution context). Those allegations are absent here.

Although Section 666's text does not require "explicitness," that is true for the Hobbs Act and honest services statutes, too, yet the government concedes that those statutes require an explicit quid pro quo, *see* Opp. 4-7. The Supreme Court's reasons for adopting that requirement in those other statutory contexts carry over to Section 666: A public official should not risk indictment whenever he acts for the benefit of some of his constituents around the same time as he solicits or receives political contributions. *See McCormick*, 500 U.S. at 272. That is precisely why "courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobbs Act" before treating the "accept[ance of] a campaign contribution" as corrupt. *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993) (dictum); *see also United States v. Pawlowski*, 351 F. Supp. 3d 840, 849 (E.D. Pa. 2018) (government agreed that where the alleged bribe takes the form of a campaign contribution, an *explicit* quid pro quo is required to state a Section 666 offense) (emphasis added); *United States v. Allinson*, 2018 WL 3618257, at *5 (E.D. Pa. July 30, 2018) (same). Any other view of Section 666 would criminalize political activity that is central to our democracy and constitutionally protected.

As the government acknowledges (Opp. 17), *Abbey* had no occasion to address whether,

in the *political contributions* context, the notion of explicitness recognized in the Hobbs Act and honest services contexts applies under Section 666. *See Abbey*, 560 F.3d at 515-16 (official received a free lot from a developer). And *United States v. Porter,* 886 F.3d 562, 564-65 (6th Cir. 2018), similarly did not involve political contributions; it rejected only an argument to apply *McDonnell* to Section 666—not *McCormick*'s explicitness requirement. But in its discussion of the Hobbs Act, *Abbey* recognized that charges premised on political contributions are "unique because almost all lawful contributions are given to influence future legislative or executive actions." 560 F.3d at 516. Accordingly, to separate lawful contributions from unlawful ones, the government must meet a standard of explicitness to show that he "corruptly" solicited or accepted a contribution to be influenced or rewarded in the Section 666 context.[5]

The rule of lenity supports this approach to Section 666. Section 666's language is "expansive" and "unqualified," *Salinas v. United States*, 522 U.S. 52, 56 (1997), and "its boundaries are difficult to limn" if "read as broadly as the government reads it." *United States v. Cicco*, 938 F.2d 441, 444 (3d Cir. 1991); *United States v. Thompson*, 484 F.3d 877, 881 (7th Cir. 2007) ("a broad reading" of Section 666(a)(1)(A) "turns all (or a goodly fraction of) state-law errors or political considerations in state procurement into federal crimes"). Although the government cites an Eleventh Circuit case holding that the rule of lenity applies only where a defendant identifies a "grievous ambiguity" or "show[s] that the statutory language criminalizes innocent behavior," *United States v. McNair*, 605 F.3d 1152, 1192 (11th Cir. 2010), Mr.

---

[5] The government also cites (Opp. 18) two other distinguishable cases. In *United States v. Garrido*, 713 F.3d 985 (9th Cir. 2013), the court held that a Section 666 charge does not require the jury to find a quid pro quo, but it did not address an explicitness issue. *Id.* at 996-97. And while *United States v. Gilbert*, 2018 WL 2095853 (N.D. Ala. May 4, 2018), rejected any "heightened standard" for political-speech prosecutions under Section 666, that observation was dictum because the court held that the indictment "sufficiently alleges an explicit quid pro quo" for purposes of the honest services charges. *Id.* at *9.

Sittenfeld satisfies the second prong, given that a failure to limit Section 666 to explicitly corrupt conduct would prohibit not only innocent but constitutionally protected acts. *See supra* Part II.

**B.  The Section 666 Counts Fail To Meet The Explicitness Requirement.**

Because the government must, at the very least, show explicit "corrupt[]" conduct to state a Section 666 offense, the Section 666 counts fail. The indictment alleges no such explicit acts to be influenced or rewarded. Indictment ¶¶ 42, 46. This is not a request that this Court weigh the evidence. *Contra* Opp. 19. Rather, it is an argument that the indictment fails because it does not allege objective facts supporting this explicitness requirement. To the contrary, the specific factual allegations are inconsistent with any notion that Mr. Sittenfeld acted "corruptly" within the meaning of Section 666. Where, as here, an indictment goes beyond reciting the elements of an offense and relies on particular factual allegations, the indictment fails if those factual allegations are inconsistent with the alleged offense. *See supra* Part I. Because the indictment's allegations show that Mr. Sittenfeld merely accepted contributions from his supporters while continuing to hold his longstanding policy positions, it is inconsistent with any Section 666 offense. These charges must be dismissed.

**IV.  ABSENT HEIGHTENED SHOWINGS, THE STATUTES ARE UNCONSTITUTIONALLY VAGUE**

The danger of this indictment is that it converts a local official's ordinary interactions with citizens in electoral politics into a federal crime, without drawing the explicit link between official conduct and political contributions that the law requires. But if the government is correct in its interpretations of the law, then the statutes are unconstitutionally vague as applied to Mr. Sittenfeld's indictment: the statutes fail to provide "fair notice" and they invite "arbitrary and discriminatory prosecutions." *Skilling*, 561 U.S. at 412. Here, if the requirement of "explicitness" for an exchange that the Court announced in *McCormick* is deemed satisfied on

charges so attenuated, no public official can interact with citizens and raise funds for electoral politics without risking charges. And if that "explicitness" requirement does not require, through the interpretation of the term "corruptly," objective facts denoting the requisite improper influence for the Section 666 bribery counts, the statute poses the same trap for innocent officials, and the same risk that prosecutors will choose their targets for arbitrary and discriminatory reasons. *McDonnell*, 136 S. Ct. 2372-73. Those constitutional concerns, as well as federalism and lenity interests, *see id.*, justify imposing heightened explicitness requirements—and a finding here that the indictment does not meet them. See *supra* Parts II and III. But if not, the statutes should be held unconstitutionally vague as applied.

## CONCLUSION

For the reasons in this memorandum and those set forth in his opening motion, Mr. Sittenfeld respectfully requests that the Court (1) dismiss Counts 1-6 for failure to charge a crime, or, in the alternative, (2) strike from the indictment all purported "official acts" (other than Mr. Sittenfeld's own vote) as invalid to support the charged crimes.

*/s/ Charles H. Rittgers*

| | |
|---|---|
| Charles H. Rittgers | Michael R. Dreeben (*Pro Hac Vice* Pending) |
| Rittgers & Rittgers | O'Melveny & Myers LLP |
| 12 East Warren Street | 1625 Eye Street, N.W. |
| Lebanon, OH 45036 | Washington, D.C. 20006 |
| (513) 932-2115 | (202) 383-5300 |
| charlie@rittgers.com | mdreeben@omm.com |

*Counsel for the Defendant*

Date: February 8, 2021