# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ALEXANDER SITTENFELD,
a/k/a "P.G. Sittenfeld,"

    Defendant.

Case No.: 1-20-cr-142

Hon. Douglas R. Cole

DEFENDANT'S REPLY IN
SUPPORT OF HIS MOTION FOR
ACQUITTAL

A memorandum in further support of Mr. Sittenfeld's motion pursuant to Federal Rule of

Criminal Procedure 29(a) is attached.

Respectfully submitted,

*/s/ Neal D. Schuett*

James M. Burnham
Harry S. Graver
Thomas E. Hopson
Jones Day
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-3939
jburnham@jonesday.com

Alexander V. Maugeri
Jones Day
250 Vesey St.
New York, NY 10281
(202) 326-3939
amaugeri@jonesday.com

Charles H. Rittgers
Charles M. Rittgers
Gus J. Lazares
Rittgers & Rittgers
12 East Warren Street
Lebanon, OH 45036
(513) 932-2115
neal@rittgers.com

*Counsel for the Defendant*

Campaign contributions are a constitutionally protected part of politics. The law thus forecloses their becoming fodder for federal prosecution absent an unambiguous *quid pro quo*, as the Supreme Court held in *McCormick v. United States*, 500 U.S. 257 (1991)—a seminal decision the Government largely ignores. The Court explained there that proving corruption in a campaign-contribution case requires showing an "explicit" *quid pro quo*. *Id.* at 273. To be "explicit," an agreement must be "[c]lear in understanding" and neither "obscure [nor] ambiguous." *United States v. Blandford*, 33 F.3d 685, 696 n.13 (6th Cir. 1994) (citation omitted). That is a demanding bar. And corruption convictions fail as a matter of law when they do not clear it.

Nothing in the Government's Opposition refutes this basic point. Mr. Sittenfeld is legally innocent because the Government did not prove that he entered an unambiguous *quid pro quo* agreement with "Rob" or anyone else. In resolving that *legal* question, the Court must of course consider the *evidence* in the light most favorable to the Government. But the Court is no longer artificially confined to the Government's carefully crafted pleadings—as it was at earlier stages. Far from being "beside the point," Gov't Opp'n to Mot. to Dismiss at p. 10, Dkt. 276, Mr. Sittenfeld's "legal arguments," *id.*, are now *the* point. Unlike at the indictment stage, the Court *must* dismiss the charges if the Government's proof is "insufficient . . . to unequivocally show that a crime did occur." Opinion of Mar. 3, 2021 at p. 21, Dkt. 53; *see also id.* at p. 22 (explaining the "deferential standard for judicial review of an indictment").[1] The prosecution managing to not plead "itself out of court," *id.* at p. 21, is no longer enough to escape dismissal.

---

[1] For a lengthier treatment of the differing modes of legal analysis at different stages in a criminal case, *see* James Burnham, *Why Don't Courts Dismiss Indictments? A Simple Suggestion for Making Federal Criminal Law a Little Less Lawless*, The Green Bag, available at http://greenbag.org/v18n4/v18n4_articles_burnham.pdf.

The Government tries to avoid this straightforward analysis by distorting both the law and the record. On the law, the Government claims it can prove an explicit agreement through proverbial "wink[s]" and "nudge[s]," along with proof that Mr. Sittenfeld and his supporters discussed policy issues and campaign contributions "in the same conversations." Gov't's Opp'n at p. 9 (citations omitted). But the decisions allowing juries to make such gauzy inferences involved *personal benefits*—a context in which inferring corruption is reasonable and core constitutional values are absent. When campaign donations are at issue, the law does not allow juries to divine corrupt agreements from ambiguous circumstances based on the supposed presence of imperceptible "winks." Holding otherwise would eradicate the longstanding distinction between the campaign context and others—making a mockery of *McCormick* and its fundamental holding that the corruption laws require unambiguous proof before campaign contributions can become criminal bribes. As for the facts, the Government's response takes snippets from innocuous conversations, omits surrounding context, and repeatedly substitutes its own editorializing for the actual evidence. Even in the context of post-trial review, that is not permissible.

When unelected prosecutors intercede in the political process, the constitutional threat is obvious. There is no context in which judicial vigilance is more important. Here, a team of federal agents designed a fake corruption scheme to induce a pro-development politician running for mayor into promoting (more) development while raising the funds needed for his political ascent. The convergence of raising money and promoting development that resulted from this ruse was entirely and utterly predictable. Treating that convergence as corruption would dramatically loosen the constraints of criminal law and put all politicians at extreme peril. This Court should instead dismiss the two remaining counts.

<u>**Argument**</u>

I. **The Government Failed to Prove an Explicit *Quid pro Quo*.**

   A. **The Sufficiency of the Government's Proof is a Question of Law Properly Before the Court.**

Federal Rule of Criminal Procedure 29(a) requires entering "a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Whether evidence sufficed as a matter of law is, of course, a question of law. To answer it, the Court views the evidence in the light most favorable to the prosecution and determines whether it satisfied the law's demands. *See, e.g.*, *United States v. Gibson*, 409 F.3d 325, 332 (6th Cir. 2005).

Federal courts routinely resolve dispositive legal issues in this posture. For example, *Blandford* assessed the relationship between *McCormick* and *Evans v. United States*, 504 U.S. 255 (1992), in reviewing a conviction for Hobbs Act extortion. *See* 33 F.3d at 693–99. *United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998), assessed whether 18 U.S.C. § 666 prohibits gratuities (as opposed to bribes) in reviewing a conviction for federal bribery. *See id.* at 1012. *McDonnell v. United States*, 579 U.S. 550 (2016), remanded a defendant's insufficiency argument "in light of [its] interpretation" of 18 U.S.C. § 201(a)(3). *Id.* at 580. And *McCormick* adopted its explicitness requirement in reviewing the Fourth Circuit's "approach to distinguishing between legal and illegal campaign contributions," *McCormick*, 500 U.S. at 271, which the Fourth Circuit had itself adopted in response to a sufficiency-of-the-evidence challenge, *see United States v. McCormick*, 896 F.2d 61, 64–67 (4th Cir. 1990).

Whether a defendant's proven conduct actually violated the law is, indeed, the *most* fundamental question in a criminal case. And that question has nothing to do with jury instructions, as the Government seems to think. *E.g.*, Opp'n at p. 9 (citing *United States v. Moreland*, 622 F.3d 1147, 1166 (9th Cir. 2010) ("[A] Rule 29 motion challenging the sufficiency of the evidence

cannot substitute as a timely objection to the jury instructions.")). It instead has everything to do with what the relevant statutes *actually forbid*—precisely as Mr. Sittenfeld's Motion explained. *But see id.* at p. 8 ("He raises these legal arguments without explaining how they are in any way relevant to the Court's task on this Rule 29 motion . . . .").

**B. Ambiguous Evidence Cannot Show an Explicit *Quid Pro Quo*.**

The law accordingly matters and the Government's rendition of it is wrong. As detailed below, its view depends on erasing *McCormick*, distorting post-*McCormick* decisions, obliterating the constitutionally compelled line between corruption prosecutions based on personal benefits and those based on constitutionally protected campaign contributions, and, as a result, creating a serious constitutional problem. This Court should decline that path.

*First*, the Government's argument depends on ignoring *McCormick*. By requiring proof of an "explicit promise or undertaking," *McCormick* requires more than innuendo or inferences. 500 U.S. at 273. "Winks and nods" might sometimes suffice, but *only* if the winking and nodding *actually* happened and *actually* evinced an unambiguous agreement—as they did in every previous decision that upheld corruption convictions involving campaign contributions on that basis. *See* Def.'s Mot. for Acquittal at pp. 8–9, Dkt. 270 (discussing *Evans*, 504 U.S. at 257; *Blandford*, 33 F.3d at 698–99; *United States v. Terry*, 707 F.3d 607, 610 (6th Cir. 2013); *United States v. Siegelman*, 640 F.3d 1159, 1166–67 (11th Cir. 2011) (per curiam)). Nor can timing suffice to prove corruption. *McCormick* expressly rejected the Government's argument that the close temporal proximity between a campaign contribution and a policy discussion can suffice to establish an "explicit" agreement. *See* 500 U.S. at 272 (legislators do not commit Hobbs Act extortion "when they act for the benefit of constituents . . . shortly before or after campaign contributions are solicited and received from those" constituents); *Terry*, 707 F.3d at 615 ("a jury could not reasonably infer that a campaign contribution is a bribe solely because a public official

4

accepts a contribution and later takes an action that benefits a donor"); *Siegelman*, 640 F.3d at 1170 ("federal law [] require[s] more for conviction than merely proof of a campaign donation followed by an act favorable toward the donor") (both citing *McCormick*, 500 U.S. at 272).

*Second*, the Government's argument depends on distorting the decisions it invokes. *Terry* was not some humdrum case about a hapless judge who received campaign contributions "before being asked to take official action." Gov't's Opp'n at p. 9. The defendant in *Terry* agreed to "fix cases" at the direction of a prominent donor, then resolved those cases "[w]ithout reading the motions, without consulting the case files and without relying on the recommendation of anyone— within the court system—who had read the files." 707 F.3d at 614–15. This is obviously improper behavior—"[n]o subtle winks or nods were needed," *id.*—miles from a steadfastly pro-development councilman agreeing to support a downtown real estate project. Same for *United States v. Pawlowski*, 27 F.4th 897 (3d Cir. 2002), in which the defendant-mayor was no run-of-the-mill official sucked in by an overzealous donor. The *Pawlowski* defendant refused to "officially sign[]" a government contract because the would-be contractor did not make a sizable "campaign contribution;" *id.* at 905–06; entered an express agreement with a law firm to sell a different contract for a literal "stack of cash," *id.* at 906–07; and demanded—through an intermediary—that a third donor give him "tickets to a Philadelphia Eagles playoff game," *id.* at 905. It is not clear why the Government views a case involving stacks of cash and playoff tickets as simpler than this one, Gov't's Opp'n at p. 9 n.3, but the behavior of the defendants in *Terry* and *Pawlowski* was facially egregious and unambiguously corrupt. Winks and nods had nothing to do with it.

*Third*, the Government's position would collapse the critical distinction between bribery cases that involve campaign contributions and those that do not. The Government faces a higher

burden in the campaign context. *See, e.g.*, *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009) (different standard "outside the campaign context"). That higher burden is essential to ensure that "otherwise permissible activity is not unfairly criminalized." *Id.* at 517; *see also Blandford*, 33 F.3d at 697 (explaining that campaign contributions enjoy "a presumption of legitimacy"). But the Government repeatedly conflates the legal rule in this case with decisions that involved direct personal benefits (such as *United States v. Blagojevich*, 794 F.3d 729, 733 (7th Cir. 2015))—never acknowledging that these decisions have only limited utility in ascertaining the correct rule here. If ambiguous nudges always sufficed in campaign-contribution cases, then the law would no longer meaningfully distinguish campaign-contribution bribery cases from bribery simpliciter. *But see Abbey*, 560 F.3d at 518; *McCormick*, 500 U.S. at 273.

*Fourth*, the Government's dilution of the explicitness requirement would create a serious constitutional problem. The explicitness requirement is vital to insulate protected speech from prosecutorial interference, to ensure that political actors have fair notice of the standards that govern them, to prevent undue intrusion into States' sovereign operations, and to respect Congress' central role in crafting the outer limits of the criminal law. *See* Def.'s Mot. at pp. 4–6. These are core constitutional principles. They are not trivialities to be summarily dismissed as not "in any way relevant to the Court's task on this Rule 29 motion." Gov't's Opp'n at p. 8.

*Finally*, this analysis in no way requires the Court to "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* at p. 4 (citation omitted). This is not a case about dueling testimony or witness credibility. The relevant interactions were recorded and have been transcribed. While the Court must construe the record in the Government's favor, that does not require that it divine unambiguous agreements from Rob's word salads, Mr. Sittenfeld's obviously different understanding of what "deals" he was agreeing

to support, or Mr. Sittenfeld's at-worst-ambiguous (and uncharged) statements to Mr. Ndukwe.

**C. The Government's Ambiguous Evidence Fails as a Matter of Law.**

The Government claims that its proof satisfied the law, but the evidence it invokes invariably falls short.

**a.** First, the Government argues that Mr. Sittenfeld formed a *quid pro quo* with Rob on November 7, 2018. Yet its brief relies on the same selective-quotation game that pervaded the indictment. For example, the Government states that "Rob offered the $20,000 to ensure enough votes . . . that the development agreement" would succeed. Gov't's Opp'n at p. 6. But in fact, Rob told Mr. Sittenfeld, "hey man I I'm I'm if if if we can get this deal done, like fuckin' let's do it." Gov't's Ex. 15C at p. 29. The Government neglects to mention that Rob had just used the word "deal" to describe his "*deal with Chin*,"—*i.e.*, their *investment* "deal" concerning 435 Elm— not a *bribery* "deal" with Mr. Sittenfeld. *Id.* (emphasis added). The Court must take the evidence in the light most favorable to the Government, but that does not require entering an alternate reality.

The remainder of the Government's paraphrasing follows the same pattern. The Government states that Mr. Sittenfeld "agreed to 'deliver the votes' in response" to an offer of a campaign donation. Gov't's Opp'n at p. 6 (quoting Gov't's Ex. 15C at p. 30). But that is not what happened. In fact, Rob asked how "to get that deal," prompting Mr. Sittenfeld to ask if Mayor Cranley was likely to "veto it"—making pellucid that Mr. Sittenfeld meant the 435 Elm "deal," for which he said he would "deliver the votes" separate from any campaign donation. Gov't's Ex. 15C at p. 29. The Government states that Mr. Sittenfeld "immediately began discussing how to pay the $20,000 (the *quid*) . . . in a way that would keep the UCEs' names off public filings." Gov't's Opp'n at p. 6. But it was *Rob* who asked about methods of donation, *see id.* ("So what's the best way to [make the donation?]"); and it was *Rob* who asked for anonymity, *see id. at* p. 29 (Mr. Ndukwe "doesn't want his name on anything" and "we typically don't either"). And the

7

Government ends its account of the November 7 conversation by stating that Mr. Sittenfeld "reaffirmed, 'we're gonna make [the development agreement] happen.'" Gov't's Opp'n at p. 6 (quoting Gov't's Ex. 15C at p. 37). But Mr. Sittenfeld did not mention the 435 Elm Project in the context of Rob's donation, as the Government implies. *See* Gov't's Ex. 15C at pp. 30–35. The topic arose only at the end of their exchange when Rob stated that "Chin wants to get that development agreement you know," *id.* at p. 38, at which point Mr. Sittenfeld returned to his prior focus on Mayor Cranley, *id.* ("we're gonna make it happen . . . we're not gonna let John torpedo [it]"). There is no unambiguous agreement lurking in this convoluted conversation, as the Government itself confirms by retreating to selective quotations.

The Government portrays this Court's decision on the motion to dismiss as having conclusively addressed the November 7 exchange, but that decision was based on the indictment's selective portrayal of the facts. This Court's earlier views about the legal significance of the indictment's misleading account obviously do not pretermit its current analysis of what the *evidence actually showed*.

**b.** The Government fares no better in trying to prove a separate explicit agreement involving Mr. Ndukwe. For example, the Government states that "the defendant solicited $10,000 from Chinedum Ndukwe, knowing that he was in the process of seeking a development agreement with the City for 435 Elm." Gov't's Opp'n at p. 5 (citation omitted). But *that* solicitation has never been alleged as criminal; indeed, it was precisely the sort of solicitation that *McCormick* and *Terry* make clear is not only lawful—*but constitutionally protected*. Campaign donors routinely have business pending before the government and asking those people to support one's campaign is called *fundraising*. It is not bribery, extortion, or any other federal crime.

The Government next quotes Mr. Sittenfeld's "love you but can't" comment and follows

it with the quotation, "whether you donate or don't donate, that [is] going to have an impact on my advocacy for you." *Id.* But while the Government presents these quotations as though both came from Mr. Sittenfeld, the latter is from Mr. Ndukwe's testimony about how he interpreted Mr. Sittenfeld's comment. *See* ECF 196 at pp. 41, 60. The supposed secret beliefs of a potential donor with his own criminal exposure testifying pursuant to a proffer agreement cannot convert ambiguous statements into unambiguous overtures for a corrupt bargain.[2] And as Mr. Sittenfeld has explained, his statement was a "political prediction about what an underfunded mayoral campaign would mean for Mr. Ndukwe's project—not a threat of retribution for lack of campaign support." Def.'s Mot. at pp. 17–18. This exchange is far too slender a reed to support corruption convictions in the sensitive context of campaign contributions.

**c.** Nor has the Government identified any other indicia of guilt—let alone evidence that satisfies *McCormick*. First, the Government suggests that *merely meeting* with Rob evinced openness to bribery, on the theory that Mr. Ndukwe had set the stage for Rob offering a bribe. *See* Gov't's Opp'n at pp. 5–6. But Mr. Sittenfeld told Mr. Ndukwe that he would *not* accept a bribe, *see* Gov't's Ex. 14B (Nov. 2, 2018 transcript) at p. 4 ("nothing can be a quid, quid pro quo"), made clear that he did *not* understand Mr. Ndukwe to have offered one, *see id.* ("I know that's not what you're saying either"), and obtained Mr. Ndukwe's *express confirmation* that no bribe had been intended, *see id.* ("Okay, no, I hear ya"). It was thus not evidence of criminality that Mr. Sittenfeld had lunch with Mr. Ndukwe's business associate.

The Government then claims that Mr. Sittenfeld could not have sincerely supported the 435 Elm Project because it was "complicated" and "economic development professionals in

---

[2] Mr. Sittenfeld maintains that the Government never alleged a bribery agreement with Mr. Ndukwe. *See* Def.'s Mot. at p. 18 (citing ECF 3 ¶¶ 42, 44). Because the Government disputes that point solely in its opposition to his Rule 33(a) motion, Mr. Sittenfeld has confined his response to his corresponding reply. Mr. Sittenfeld requests that the Court incorporate that response by reference here.

[Cincinnati] did not support" it. Govt's Opp'n at p. 6. But attempting to understand a complex project is what smart elected officials do. And an elected official agreeing to support a project over the objection of local bureaucrats is hardly evidence of corruption.

The Government also criticizes Mr. Sittenfeld for directing Rob to his leadership PAC. *See* Gov't's Opp'n at pp. 7, 12–13. But (again) it was *Rob*—not Mr. Sittenfeld—who asked for a way to donate money in a low-profile way. *See* Gov't's Ex. 15C at p. 29. And regardless, the First Amendment protects anonymous donations to PACs to the same degree that it protects personal donations to candidates themselves. *See FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 494 (1985) (rejecting view that "PACs' form of organization . . . diminishes their entitlement to First Amendment protection"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (First Amendment protects "anonymous election-related speech"). The Government's emphasis on the leadership PAC continues its effort to portray constitutionally-protected conduct as criminal. *See, e.g.*, ECF 267 (Kamrass testimony) at pp. 20, 32–37 (eliciting testimony about "targeting" potential donors); ECF 251 (Closing Argument) at pp. 142–43 (arguing that collecting donations from LLCs was incriminating because "[n]one of [the UCEs'] names appear").

Finally, the Government tries to wave away Mr. Sittenfeld's diligent compliance with the campaign finance laws. *See* Def.'s Mot. at pp. 13–14 (cataloging those efforts). The Government argues that Mr. Sittenfeld "cared less about complying with campaign finance laws . . . and more about finding a way to keep the UCEs' contributions for being disclosed publicly." Gov't's Opp'n at p. 12 (citation omitted). But that theory fails on its own terms: If Mr. Sittenfeld had wanted to avoid a record of Rob's donation, he would have simply accepted the (repeatedly) proffered cash. Following the campaign finance laws meant creating *a public record*. Corrupt politicians do not ordinarily insist on documenting their corruption for posterity.

*    *    *

The last thing our country needs right now is a massive expansion of the corruption laws. Empowering ambitious prosecutors and lay juries to impose corruption convictions on—and launch criminal prosecutions of—disfavored politicians or controversial donors on the basis of campaign contributions, ambiguous statements, imaginary "winks," and selective quotations from recorded conversations is a recipe for constitutional trouble. This Court should reject that perilous course, enforce the Supreme Court's decision in *McCormick*, and dismiss the remaining charges.

## II.   The Government Has Failed To Prove An Agreed "Official Action."

The Government's argument on the "official act" requirement fails, too. The Government's case on the remaining counts hinges entirely on whether Mr. Sittenfeld entered an explicit agreement to perform an official act on November 7, 2018. *See* Def.'s Opp'n at p. 13. An action is "official" for that purpose only if it involves a "formal exercise of governmental power" and concerns a "specific" "question, matter, cause, suit, proceeding or controversy." *McDonnell*, 579 U.S. at 574. But at no point on November 7 did anyone identify the specific matter for which Mr. Sittenfeld supposedly sold his office. *See* generally Gov't's Ex. 15C. "Simply expressing support" for a project is not official action. 579 U.S.at 573. And when Mr. Sittenfeld said he would "deliver the votes," Gov't's Ex. 15C at p. 30, the council had no upcoming vote on the project, *see* Gov't's Opp'n at p. 15; neither Mr. Sittenfeld nor Rob discussed a discrete vote on the issue, *see* Gov't's Ex. 15C at pp. 29–38; and it was unclear what Mr. Sittenfeld would "deliver the votes" for or what he even meant. Those omissions prevented Mr. Sittenfeld and Rob from forming the meeting of the minds that an "explicit" agreement requires, *McCormick*, 500 U.S. at 273. For that reason as well, the Government's evidence was insufficient to prove Hobbs Act extortion.

11

**III. The Federal Bribery Laws Are Unconstitutional As-Applied to Mr. Sittenfeld.**

In the alternative, this Court should hold that the federal bribery laws are unconstitutional as-applied to Mr. Sittenfeld. The First Amendment entitles candidates to announce their "views on disputed legal and political issues," *Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002); to personally solicit campaign contributions, *see Carey v. Wolnitzek*, 614 F.3d 189, 200 (6th Cir. 2010) (Sutton, J.); and to direct such contributions to political action committees, *see Nat'l Conservative Pol. Action Comm.*, 470 U.S. at 494. It further demands "breathing space" for lawful campaign conduct, *NAACP v. Button*, 371 U.S. 415, 433 (1963), to avoid the "chill[]" that would inevitably result from unbounded prosecutions in this sphere, *Citizens United v. FEC*, 558 U.S. 310, 334 (2010). The First Amendment accordingly forbids convicting Mr. Sittenfeld for the conduct at issue: soliciting campaign contributions while reciting his longstanding, pro-development views. And by seeking to convict Mr. Sittenfeld for creating a "target list" and using a leadership PAC, *see* ECF 251 at pp. 142–43; ECF 267 at pp. 20, 32–37, the Government has foreshadowed the constitutionally questionable cases to come if this one is permitted to stand.

The Government's responses miss the point. Mr. Sittenfeld never argued that the First Amendment or the Due Process Clause create a "magic-words requirement." Gov't's Opp'n at p. 16 (citation omitted). Nor can the Government evade constitutional scrutiny by gesturing vaguely at the jury's verdict. *See id.* at pp. 16–17. The Supreme Court has long emphasized the need for "independent examination of the entire record" to avoid "forbidden intrusion[s] on the field of free expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984). Accordingly, to the extent that the Court deems the federal bribery laws to capture Mr. Sittenfeld's conduct, it should independently determine that his speech falls on the licit side of the constitutional line.

## **Conclusion**

This Court should grant Mr. Sittenfeld's motion for judgment of acquittal and vacate the convictions.

Respectfully submitted,

*/s/ Neal D. Schuett*

James M. Burnham
Harry S. Graver
Thomas E. Hopson
Jones Day
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-3939
jburnham@jonesday.com

Alexander V. Maugeri
Jones Day
250 Vesey St.
New York, NY 10281
(212) 326-3939
amaugeri@jonesday.com

Charles H. Rittgers
Charles M. Rittgers
Gus J. Lazares
Rittgers & Rittgers
12 East Warren Street
Lebanon, OH 45036
(513) 932-2115
neal@rittgers.com

*Counsel for the Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Court's CM/ECF System provided to on this 4th day of November, 2022, which provides electronic notice to all parties.

*/s/ Neal D. Schuett*
Neal D. Schuett
*Counsel for the Defendant*
