# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No.: 1-20-cr-142 |
| | Hon. Douglas R. Cole |
| ALEXANDER SITTENFELD, a/k/a "P.G. Sittenfeld," | |
| Defendant. | |

# DEFENDANT ALEXANDER "P.G." SITTENFELD'S
## SENTENCING MEMORANDUM

# TABLE OF CONTENTS

Page

**INTRODUCTION**................................................................................................1


**P.G. SITTENFELD'S BACKGROUND** ...............................................................2
A. **Early Years (1984-2003)** ...........................................................................2
   The Sittenfeld Family ......................................................................................2
   Student Leader and Role Model ......................................................................4
B. **Princeton, Oxford, and Marshall Scholarship (2003-2009)** ...................6
   Princeton .........................................................................................................6
   Oxford and Marshall Scholarship ...................................................................7
C. **Early Career & Service Before Politics (2009-2011)**.............................8
   Community Learning Center Institute .............................................................8
   Community Service .......................................................................................10
D. **Running For Office & Elected Public Service (2011-2020)** .................10
   Becoming A Candidate...................................................................................10
   P.G. As A Fundraiser ....................................................................................12
   Service On The City Council.........................................................................13
   Collaboration With Law Enforcement..........................................................15
   Unwavering Support For New Development..................................................17
   A Voice For Those Without Money, Power, and Influence...........................19
   Through The Eyes Of P.G.'s Colleagues......................................................20
E. **Post-Indictment Life: Family, Faith, and Continuing Service (2020-Present)**....................22
   Family Life, Post-Indictment........................................................................22
   Faith ..............................................................................................................25
   Continuing Service To Others .......................................................................26
   Through The Eyes Of New Relationships .....................................................27
   Support During People's Darkest Hours.......................................................29
   Poised To Continue Helping Others ..............................................................31


**ARGUMENT** ....................................................................................................33
I. **THE RECOMMENDED SENTENCING GUIDELINES RANGE OF 41-51 MONTHS CANNOT BE JUSTIFIED BY THE STATUTORY PURPOSES OF SENTENCING** ...............................................................33

A. Case law supports a reduction in the Guidelines for acceptance of responsibility................33

B. If sentenced 30 days later, Mr. Sittenfeld would receive an additional two-level reduction ...........................................................................................................................34

C. Impermissible double counting is unjust.............................................................................35

D. A downward departure from the Guidelines is appropriate .................................................36

II.  **APPLICATION OF THE 18 U.S.C. § 3553 FACTORS COMPEL A VARIANT SENTENCE** ............................................................................................37

A. The Guidelines range for the two counts of conviction are equivalent to the Guidelines for all six charged counts, undermining the jury's verdict, and the purposes of just punishment and deterrence...........................................................................38

B. Mr. Sittenfeld's history and characteristics warrant a sentence well below the Guidelines range .................................................................................................................40
   1. Exceptional Character .................................................................................................42
   2. Good Deeds and Public Service...................................................................................43
   3. Strong Family Relationships........................................................................................43

C. The nature and circumstances of the offense compel a below-Guidelines sentence .............................................................................................................................44

D. Mr. Sittenfeld's trial and conviction alone act as powerful deterrents to public officials engaging in criminal conduct ................................................................................49

E. A prison sentence is not needed to protect the public from further crimes by Mr. Sittenfeld ...................................................................................................................52

F. A sentence far below Guidelines range is needed to avoid unwarranted disparities..........................................................................................................................53

G. A sentence which does not include incarceration will be a just punishment for Mr. Sittenfeld's conduct......................................................................................................56

H. An alternative sentence of rigorous community service and/or home imprisonment is sufficient, but not greater than necessary, to fulfill the statutory goals............................58

III.  **CONCLUSION** ....................................................................................................61

IV.  **EXHIBITS**

A. Memorandum of Understanding: Veteran's Community Project

B. Memorandum of Understanding: HELP Program of Cincinnati

# TABLE OF CONTENTS

Page

**CASES**

Evans v. United States, 504 U.S. 255 (1992) ........................................................................46

Gall v. United States, 552 U.S. 38 (2007)..............................................................................38

Kimbrough v. United States, 552 U.S. 85 (2007)....................................................................37

Koon v. United States, 518 U.S. 81 (1996).............................................................................44

McCormick v. United States, 500 U.S. 257 (1991)...............................................................46-47

Rita v. United States, 551 U.S. 338 (2007) ............................................................................38

United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006)...........................................43

United States v. Autery, 555 F.3d 864 (9th Cir. 2009)...........................................................41

United States v. Benjamin, No. 1:21-cr-00706-JPO (S.D.N.Y) ............................................53-54

United States v. Benkahla, 501 F. Supp. 2d 748 (E.D. Va. 2007).........................................42

United States v. Blandford, 33 F.3d 685 (6th Cir. 1994)........................................................46

United States v. Briggs, 623 F.3d 724 (9th Cir. 2010) ...........................................................40

United States v. Calvetti, 836 F.3d 654 (6th Cir. 2016) .........................................................33

United States v. Cherry, 366 F. Supp. 2d 372 (E.D. Va. 2005)..............................................43

United States v. Cooper, 394 F.3d 172 (3d Cir. 2005)..........................................................36-37

United States v. Edwards, 585 F.3d 1004 (9th Cir. 2010)......................................................50

United States v. Eversole, 487 F.3d 1023 (6th Cir. 2007)......................................................35

United States v. Farrow, 198 F.3d 179 (6th Cir. 1999) ..........................................................35

United States v. Flowers, 712 F. App'x 492 (6th Cir. 2017)...................................................40

United States v. Grossman, 513 F.3d 592 (6th Cir. 2008).......................................................38

United States v. Harding, No. 05 CR1285-02, 2006 WL 2850261 (S.D.N.Y. 2006) .......................43-44

United States v. Howe, 543 F.3d 128 (3rd Cir. 2008) ............................................................41

United States v. McKenzie, 656 F.3d 688 (7th Cir. 2011).......................................................40

United States v. Morales, 972 F.2d 1007 (9th Cir. 1992)........................................................37

United States v. Musgrave II, 647 Fed. Appx. 529 (6th Cir. 2016).........................................42

United States v. Nellum, No. 2:04-CR-30, 2005 BL 88941 (N.D. Ind. 2005)..................................43

United States v. Pimental, 367 F. Supp. 2d 143 (D. Mass. 2005)...........................................39

United States v. Ranum, 353 F. Supp. 2d 984 (E.D. Wis. 2005)............................................42

United States v. Siegelman, 640 F.3d 1159 (11th Cir. 2011) ..................................................46

United States v. Tyrone Riley, et al., No. 3:20-cr-00371 (N.D. Ohio)..................................55

United States v. Vigil, 476 F. Supp. 2d 1231 (D.N.M. 2007) ................................................39

United States v. Watts, 519 U.S. 148 (1997)...........................................................................39

Williams v. New York, 337 U.S. 241 (1949)................................................................50

## STATUTES

18 U.S.C. § 3553..........................................................................................*passim*

U.S.S.G § 2C1.1(a)(1)................................................................................35

U.S.S.G § 2C1.1(a)(2)................................................................................35

U.S.S.G. § 2C1.1(b)(3)..............................................................................36

U.S.S.G. § 2C1.1(b)(4)..............................................................................36

U.S.S.G. § 3B1.3 .......................................................................................36

U.S.S.G § 3E1.1, Note Two........................................................................33

U.S.S.G. § 5K2.20 (Policy Statement) .......................................................37

U.S.S.G. § 5K2.20(b).................................................................................37

## OTHER AUTHORITIES

Court & Community: An Information Series About U.S. Probation & Pretrial Services:
Community Service, Office of Probation and Pretrial Services, Administrative Office of the
U.S. Court (2007) ......................................................................................59

Crowe, City of Cincinnati, Assessment of Council Actions, Draft Report. Dec, 15, 2022................46-47

David Weisburd, et al., "Specific Deterrence in a Sample of Offenders Convicted of White-Collar
Crimes," 33 Criminology 587 (1995) ........................................................50

Michael E. Horowitz, "Memorandum: Top Management and Performance Challenges Facing the
Department of Justice – 2014," Nov. 10, 2014 ...........................................59

"The Report of the Department of Justice Pursuant to Section 15(h) of Executive Order 14074:
Resources and Demographic Data for Individuals on Federal Probation or Supervised Release ......58

United States Sentencing Commission, Amendments to the Sentencing Guidelines (4/27/23).........34

United States Sentencing Commission, 2022 Quick Facts, Bribery Offenses ...................................50

United States Sentencing Commission, 2022 Sourcebook, Table 13 .................................................50

United States Courts, Probation and Pretrial Services, "Incarceration Costs Significantly More
than Supervision" (August 17, 2017)...........................................................58

United States Courts, "Probation and Pretrial Services – Supervision" ............................................58

William Rhodes, et al., "Recidivism of Offenders on Federal Community Supervision"
Abt Associates, (2012).................................................................................52

Zvi D. Gabbay, "Exploring the Limits of Restorative Justice Paradigm: Restorative Justice and White-
Collar Crime," 8 Cardozo J. Conflict Resol. 421 (2007).................................................50

# INTRODUCTION

A just and individualized sentence for Mr. Sittenfeld, based on the totality of the conduct of his life, the evidence, and the law, should be a variant sentence of probation. Prior to Mr. Sittenfeld, it appears that no public official has ever been convicted of corruption charges on the basis of accepting publicly reported campaign donations, which resulted in no personal gain, where no express *quid pro quo* occurred. By and large, public corruption cases fit a standard mold of a public official accepting undisclosed cash payments for personal gain that were expressly exchanged for political favors. Here, the charged conduct is a "single aberrant act of criminal behavior," not only in Mr. Sittenfeld's life, which has been devoted to helping others and public service, but also when compared to other public corruption cases. That is just one of the many reasons that a sentence within the Guidelines range, presently calculated by Probation to be 41-51 months, is unjust in Mr. Sittenfeld's case.

The recommended Guidelines range contains a two-level increase based on the $20,000 campaign donation that Mr. Sittenfeld accepted in 2018. The amount of the campaign donation was chosen by the undercover agents, not Mr. Sittenfeld. Thus, the rigid Guidelines range fails to account for the fact that government agents, not Mr. Sittenfeld, chose the donation amount that increased the Guideline range. Mr. Sittenfeld tried months prior to his sentencing hearing to return not only the $20,000 received in 2018 but also the $20,000 donation he received in 2019 relating to acquitted conduct. Mr. Sittenfeld is still awaiting word from the government on how to move forward with this offer.

The Guidelines range calculated by Probation also fails to apply the two-level reduction for zero criminal history included in the Sentencing Commission Amendments that go into effect on November 1, 2023; fails to include a two-level reduction for accepting responsibility;

1

and includes a four-level increase that is impermissible double counting. These modifications to the Guidelines range would yield an offense level of 14 and a Guidelines range of 15-21 months.

Accordingly, Mr. Sittenfeld requests a variant, non-incarceration sentence of probation with a rigorous community service of 2,000 hours and/or home confinement for one year. A sentence which does not include incarceration is "sufficient, but not greater than necessary" to provide a just punishment for the offense.

## P.G. SITTENFELD'S BACKGROUND

In addition to letters to the Court being submitted from P.G. Sittenfeld's family members, lifelong friends, community members, and various faith leaders, testimonials and specific examples of P.G.'s character also come from, among others, constituents he has helped; former federal prosecutors; Cincinnati police officers; the journalists tasked with covering City Hall; and elected officials of both political parties. Their voices, stories, and first-hand accounts form the basis of the personal history that follows.

### A. Early Years (1984-2003)

<u>The Sittenfeld Family</u>:

P.G. Sittenfeld was born October 1, 1984, in Cincinnati, Ohio, the youngest of Paul and Betsy Sittenfeld's four children, and their only son. Paul, who spent the first part of his career in the non-profit sector and the second part as an investment advisor, was exceptionally gregarious, loved making people feel included, and had a generous heart for serving others. Dr. William Follansbee, a cardiologist and professor of medicine at the University of Pittsburgh, knew Paul from their freshman year of college onward, and recalls, "Just by way of example,

at graduation he [Paul] knew every one of our 825 college classmates by name." *Dr. William Follansbee.* Dr. Follansbee adds that P.G.'s father "had a deeply felt, life-long commitment to community service, a commitment that was reflected in all four of their children. He was especially dedicated to education, in particular improving opportunities for disadvantaged youth." *Dr. William Follansbee.*

P.G.'s mother, Betsy, who was a career school teacher and librarian, was a less boisterous and extroverted personality than her husband, but every bit as committed to showing kindness to people from all walks of life, every day, in ways both large and small. Anne Ramsay, a math teacher at the school where P.G.'s mother taught, recalls, "It was through Betsy that I, as a recent transplant from Atlanta, first came to understand the values manifested in Midwesterners that mean so much to me: generosity, hard work, a sense of humbleness, caring for the community, close family ties, and doing what is right." *Anne Ramsay.* While settling into her new life in Cincinnati, Mrs. Ramsay remembers P.G.'s mother, "inviting us over for dinner, digging up daylilies from her yard to share with me, bringing us meals when I had an unexpected knee surgery, and routinely sticking school library books in my work mailbox that she thought my daughter Mary Grace would enjoy." *Anne Ramsay.*

From an early age, P.G. had an instinct for putting into practice in his own life the values that were prioritized by his family – kindness; inclusiveness; and service to others, especially those less fortunate and more on the margins. Robin Taylor-Fabe, a childhood classmate of P.G.'s who grew up to be a science teacher, recalls performing their elementary school talent show for residents at a nursing home in Cincinnati, after which the class was told to visit with the residents. "Faced perhaps for the first time in our lives with people with profound physical and mental differences, my other classmates and I felt incredibly shy and uncertain as to how

3

to act," Ms. Taylor-Fabe remembers. "Perhaps that discomfort on my part is why I so vividly remember turning to see P.G. laughing genuinely with one elderly resident, saying to a friend, 'This guy's great!' Even as a 7 year-old child, P.G. had both the ability and the desire to make a genuine connection with a person who had an entire lifetime of experience wildly different from his own." *Robin Taylor-Fabe.* Like his parents, P.G. was a natural and cheerful connector of people, especially those who might otherwise have felt left out. "Each year of school when there was a new student, P.G. was the one who would ask him to join him and his friends for lunch or for a game of kickball," Ms. Taylor-Fabe remembers. "With his quick wit and welcoming sense of humor, he was able to reach out and connect with students who may have felt frightened or shy." *Robin Taylor-Fabe.*

<u>Student Leader and Role Model</u>:

P.G. viewed his involvement in a range of activities as a means of creating a broader sense of community. Wynne Curry, a veteran French teacher at the school P.G. attended, writes that, "Students respected him, elected him to important student offices (he was president of the School Senate his senior year), valued having him on their sports teams and in their clubs. He often took the shy student under his wing and had the courage to stand up to face the bullies who are present in every school. Teachers (myself included) loved teaching him for his great intellectual strengths and vitality, his cooperative spirit when working with classmates." *Wynne Curry.*

In adolescence, P.G. embraced the family ethos of service to others. Tshiunza Kalubi, a childhood schoolmate of P.G.'s who is now a project leader for an Ohio-based affordable housing developer, recalls the two of them spending their summers in high school "teaching

4

inner-city youths ranging between 6th and 8th grade," as part of the Summerbridge Cincinnati program. Mr. Kalubi writes:

> Having been raised by teachers, we both understood the importance of investing in the next generation of Cincinnatians. Working alongside P.G. for those summers, I was impressed by his ability to connect with the kids and his passion for helping them succeed. If a faculty member was needed to fill in for a skit during assembly, or if a teacher needed a lesson plan idea to make Shakespeare interesting to kids from Avondale, Evanston, or Madisonville, P.G. was your guy! He went above and beyond to ensure that each child felt seen, heard, and valued. *Tshiunza Kalubi*.

P.G. looked for opportunities to spark in his peers his own enthusiasm for service and leadership. Gabriel Davis, who was a prosecutor both at the U.S. Department of Justice and in the Manhattan District Attorney's Office, recalls, "During our senior year when P.G., who was Class President, invited me, a relatively shy student who was newer to the school than most others, to give the senior class speech at our graduation ceremony. P.G. saw something in me that I did not see. I would one day discover what he already knew, which is that I had a valuable perspective to share, an important voice that needed to be heard, and the potential to be a leader. P.G.'s confidence inspired me to dream a little bigger. It sparked a passion that would eventually lead me to seek and embrace leadership and service opportunities both personally and professionally." *Gabriel Davis.*

Even as a young person, P.G. took moral questions seriously, and he viewed challenging situations as an opportunity to put his own morality to the test. Alex Derkson, an attorney, graduate of Moritz College of Law, and high school classmate of P.G.'s, recalls a memorable example:

> During our junior year, one of our classmates was accused of posting information on the internet that suggested he might want to harm other students. To me and many of my classmates – none of whom had seen any of the evidence – the only proper response was for the school to immediately expel the accused. But, as evidence of his courage, compassion, kindness and even-mindedness, P.G. – the class president at the time – publicly urged students, faculty and parents alike not to jump to any conclusions, to

5

withhold judgment towards the accused and ultimately to show compassion for all involved. I remember thinking then as I do now: it takes a truly special person to show that level of maturity, virtue and calm in such a difficult situation. *Alex Derkson.*

### B. Princeton, Oxford, and Marshall Scholarship (2003-2009)

Princeton:

P.G. started at Princeton University in the fall of 2003. Daniel Shea, a Princeton classmate, writes, "What made P.G. different from the other students in our freshman class was that he sought to make everyone around him feel as comfortable on campus as he felt." *Daniel Shea.* Sophie Schmidt, who was two years behind P.G. at Princeton, recalls, "What was remarkable about PG, even then, was his boundless, guileless curiosity about the people around him." Ms. Schmidt writes that P.G. was, "the rare kind of your [*sic*] person who could genuinely befriend anyone, including professors, without even trying. Most of my memories of PG then center around a similar theme: PG cheering someone else on. He was a reliable front row fixture at all of his friends' extracurriculars, trading his own time (and sleep) to be a champion for the people he cared about." *Sophie Schmidt*

Amid a busy schedule that included being elected president of his class and serving on the University Honor Committee – the body charged with handling issues involving accusations of students failing to uphold Princeton's standards for academic integrity – P.G. was also selected to be part of a small student group that wrote news articles for national publications such as *The Wall Street Journal*, *The New York Times*, and *The Newark Star-Ledger*. Mike McCurry, a former White House Press Secretary who was a generation ahead of P.G. at Princeton, came to know P.G. through their involvement in this undergraduate group, known as the University Press Club. Mr. McCurry served on the alumni board of the organization, and notes how "P.G. was unfailingly supportive, respectful and enthusiastic in all his dealings with

6

fellow students, alumni and University authorities. He was a tutor for other students and assisted them in writing skills, something that P.G. has abundantly." *Michael McCurry*.

P.G. loved connecting with others, both intellectually and socially. Princeton Professor Jeff Nunokawa writes that,

> Time and again, I have seen P.G. create community out of a room of near strangers. He does this through the sheer force of his honesty and kindness. By his honesty, I mean first and foremost, his intellectual honesty. P.G. is the sort of person who will get things going by expressing an unfashionable point of view or confessing some embarrassing fault in ways that allow others to do the same...What I am trying to describe is a kind of openness that requires courage and compassion. It means looking for the people who need to be drawn out; people who need to be reminded that their lives matter and that their voices will be heard. I cannot count the number of people whose lives I have seen P.G. make better by the sheer force and skill of his candor and cogency…if you could see P.G. with people who have nothing to give except signs of their shyness, I think you would see what I see which is a warm and capable heart, helping people become their most fluent selves. *Professor Jeff Nunokawa.*

In P.G.'s senior year, because of his record of excellence inside the classroom and service outside the classroom, he was awarded a Marshall Scholarship for two years of study in the United Kingdom, bestowed annually upon 50 or fewer American students deemed "future leaders" of "high ability."

## Oxford and Marshall Scholarship:

At Oxford, most of P.G.'s prodigious energy was channeled outside of the classroom, in particular, into his relationships with other people. Spencer Witte, an Oxford friend of P.G.'s, recalls, "There was no apparent litmus test for who PG befriended. He was seemingly as interested in understanding the lived experiences of Oxford's hourly workers as its resident Rhodes Scholars…He looked for outsiders—I was one of them—and helped them to feel integrated and included." *Spencer Witte.*

A formative experience for P.G. while in graduate school was the deepening of his faith life – a planting of seeds that would grow in the years to come. Christian Sahner, who was at

7

Oxford with P.G., remembers that "During our two years in England (2007-2009), P.G. and I participated in a weekly men's Bible study with a small group of friends. This was self-organized—it had no connection to a particular church—and indeed, its members hailed from a broad cross-section of backgrounds, from ardent evangelicals to questioning agnostics." Professor Sahner, who specializes in Middle Eastern studies, explains the Bible study's impact on P.G.:

> We had the space and time to think about "big questions": What is my relationship to God? What does God expect me to do with my life? How does God wish me to treat other people? What is sin and forgiveness? What is the proper place of ambition in the Christian life?...P.G. was arguably the most enthusiastic participant in the Bible study, attending each session full of ideas and questions. I recall P.G. was especially taken by the writings of C.S. Lewis—the famous Christian apologist who had also been a professor of English literature at Oxford. *Professor Christian Sahner.*

During the summer between his two years in Oxford, P.G. was a summer intern in Google's London office. Though he was offered the opportunity to continue in a full-time position at the technology company, P.G. declined. The primary reason P.G. turned down such a lucrative opportunity was to go back home to Cincinnati. NYU Law School professor Daniel Hemel remembers, "One fact about P.G. that became apparent from the moment I first met him in September 2007 is that P.G. truly loves Cincinnati. While many members of our Marshall Scholar class were unsure where life would take us after our time in England, P.G. knew early on that he was headed home to serve the city and community that had raised him." *Professor Daniel Hemel.*

### C. Early Career and Service Before Politics (2009-2011)

<u>Community Learning Center Institute:</u>

After completing his Marshall Scholarship, P.G. returned to Cincinnati, where he started a job as the founding Assistant Director of the non-profit Community Learning Center Institute

8

(CLCI) at a salary of $35,000 per year. Jim Schiff, a professor at the University of Cincinnati and board member of CLCI, writes, "CLCI has transformed and revitalized more than a half-dozen Cincinnati schools and communities in Lower Price Hill, Price Hill, Evanston, Saylor Park, and elsewhere. Many of these schools, because of CLCI, now have their own eye and dental clinics, and provide mental health services, afterschool programs, daycare, and more. In addition, graduation rates have climbed dramatically as students in these schools are finally receiving the care and support they need in order to succeed."

With regard to P.G.'s involvement, Professor Schiff recalls,

I watched P.G., on numerous occasions, working with students, parents, and community leaders. Though P.G. is a skilled talker, what I noticed in these sessions is what an adept listener he can be. P.G. did very little talking; mostly he asked questions of students and parents: *What do you need in your life right now? How can we help to make this school better? What are your dreams for your community, and how can we help you realize them?* It was quickly apparent the degree to which P.G. had bonded with students, parents, and the community. They were quite close, affectionate even, and there was enormous mutual respect. Many of these students and their parents had never before been asked such questions, nor had people ever demonstrated so much interest in their communities and lives. P. G. was showing them that he cared, and in doing so, he played an important role in changing lives in that community. *Professor Jim Schiff.*

Karen Smith, a former manager at Procter & Gamble and another CLCI board member, writes that P.G.'s "discerning observations guided the CLCI Board's direction, leading us to focus on more than just the student. Bringing wifi to the neighborhood and addressing housing stability in the community are direct results of P.G.'s insights." *Karen Smith.*

Among the people working on the ground alongside P.G. was longtime Cincinnati Public Schools principal Craig Hockenberry. Principal Hockenberry recalls, "During my time as principal of Oyler, I spent countless hours with PG working to solve many complicated problems that were barriers to the students and families of Oyler School…His [P.G.'s]

responsiveness, integrity and commitment truly helped support one of the finest models in urban educational reform that I have ever been a part of in my career. " *Craig Hockenberry*.

Community Service:

P.G. also volunteered for organizations in his community ranging from the Freestore Foodbank to the United Way to the Adopt-A-Class mentoring program. Cincinnati resident, Susan Kelley-Fernandez, a former educator, vividly recalls her first interaction with him:

> P.G., who was not elected or running for office, first appeared on my radar one day well over a decade ago when he called our house and asked to speak with our oldest son, a high school student at the time. When I told P.G. our son was not home, he asked if I had a moment, then explained the purpose of his call – he had received our son's name from his high school and wanted to invite him to an information session for a group of volunteers P.G. was gathering in support of the Freestore Foodbank. I was struck by two memorable takeaways that day: 1. P.G. was not just reading from a list and moving on; he was sincerely and powerfully engaging with a stranger, and 2. I had just encountered an individual deeply committed to helping the underprivileged in our city by bringing a new generation forward to help. Not only did I make sure our son attended the meeting, but I never forgot the name of the caller. Today our son works for a non-profit in Washington D.C., building on the examples that were set for him in his hometown. *Susan Kelley-Fernandez.*

### D. Running For Office and Elected Public Service (2011-2020)

Becoming A Candidate:

P.G. became a first-time candidate in Cincinnati's 2011 city elections. Even with an early track record of service, as the youngest candidate in the field, P.G. had plenty of convincing to do. Dr. Jennifer O'Donnell, a forensic psychologist specializing in the risk of recidivism, recalls how upon meeting P.G., she "initially was skeptical that this young man with so much privilege and opportunity would have the humility and kindness that sometimes is lacking in those to whom much has been given. I was happily proven wrong and have been an enthusiastic supporter ever since. …When I met his parents, I realized he came from this commitment to

community genuinely, and he fully intended to deliver on good works using the tools and opportunities he had been given." *Dr. Jennifer O'Donnell.*

Others instantly gravitated toward P.G.'s values and energy. Bob Rawson, the former partner-in-charge of the Cleveland office of an international law firm, writes, "From the beginning, P.G. was engaged in public service for the right reasons – solving problems for others." *Robert Rawson.* David Singleton, former law professor at Northern Kentucky University's Chase College of Law and the executive director of the Ohio Justice & Policy Center (OJPC) for 21 years, recalls,

> Through my OJPC work, I met a young P.G. Sittenfeld in 2010, about one year before he became the youngest person elected to Cincinnati's City Council. P.G. reached out to me as he was planning his City Council run to solicit my views on criminal justice policy. I will never forget that first meeting with P.G. He impressed me as honest, deeply committed to public service, and compassionate, specifically for less fortunate members of the community who had not gotten a fair shake in life. I saw in P.G. the future: a potential leader with an unlimited horizon. I vowed right then to support P.G., believing he might one day hold statewide office or more. *David Singleton.*

Among the people who worked alongside P.G. in that first campaign was then college-student Walker Schiff, who writes,

> As many will attest, P.G. has a magnetic personality that energizes everyone who comes into contact with him…But what is less known about P.G., and what I learned on that first campaign, is that he is exactly the same caring and generous person behind-the-scenes. As a boss and mentor, I couldn't have asked for someone better. P.G. treated everyone that worked for him as equals and brought out the best in all of us. *Walker Schiff.*

P.G. prioritized listening to voters of all political persuasions and meeting people where they were, rather than preemptively writing anyone off. Michelle Rothzeid, Counsel at GE Aerospace, recalls, "I first met P.G. in 2010 when he came to speak at Frost Brown Todd [law firm] during his inaugural campaign for Cincinnati City Council. As a self-identified Republican (albeit moderate) voter at that time, I was impressed by P.G.'s ability to bridge the

11

political divide and be a voice of reason across the political spectrum…Unlike most politicians, P.G. sought to be surrounded by different voices and diverse viewpoints in order to find optimal, balanced solutions to everyday problems." *Michelle Rothzeid.*

<u>P.G. As A Fundraiser:</u>

Cincinnati-based attorney Paul De Marco served as a volunteer advisor to P.G. – as well as to dozens of other candidates – on political matters starting with P.G.'s first campaign, and Mr. De Marco continued to do so for the duration of P.G.'s time in politics. Mr. De Marco recalls, "I was involved and familiar with earlier political committees related to P.G. during his time on City Council, including helping with their set-up and operations. Without any prompting, P.G. was singularly committed to ensuring that these committees operated without the slightest hint that the funds coming in and going out would have any impact on P.G.'s performance of his official duties. He stayed true to this commitment, in both word and deed." *Paul De Marco.*

Another member of P.G.'s inaugural campaign team was Mark Longabaugh, a native Cincinnatian who has worked in senior positions on U.S. House, Senate, and Presidential campaigns during his 40-year career in politics. "Across more than a decade and five political campaigns, I saw PG act with the highest ethical standards," Mr. Longabaugh recalls. "He treated his staff and volunteers with respect. He never denigrated opponents in private. He handled his campaign financial and legal affairs honestly and with the utmost probity. Most of all, there was always a concern for the poor and less advantaged citizens of our city." *Mark Longabaugh.*

12

On P.G.'s last political campaign, Joshua St. Pierre served as an intern, after he specifically sought P.G. out as a mentor. Mr. St. Pierre, who now works in public policy in Washington, D.C., notes,

> I am one of a handful of people who sat next to PG when he was making fundraising calls and never once across hundreds of such calls did I witness anything other than totally honest, ethical conduct. These calls tended to follow a consistent pattern. PG would sit at one end of a long table, and I'd be at the other end. PG would say, "I want to invite you to this upcoming event," or "I want to see if you'd consider a donation to our campaign." Most of these calls lasted just a few minutes, although sometimes they would last longer, as PG would ask about a person's job or family or upcoming travel, and other times a person would want to share their opinion with PG about issues in the news. PG was unfailingly pleasant on these calls, and he realized that being told "No" was a fine and frequent part of political fundraising, at which point he would simply move on to the next call. *Joshua St. Pierre.*

Councilmember Chris Seelbach – one of P.G.'s elected colleagues – observed a similar integrity: "For nearly 10 years, we raised money from many of the same people – many of whom were developers – and I also attended political fundraisers that PG organized. During my time in politics, donors would share their opinions with me about various candidates and their fundraising practices, and I never heard anything other than that PG fundraised in an ethical, lawful way." *Councilmember Chris Seelbach.*

P.G. began to raise and accept campaign donations in 2010. For nearly a decade, he – with the professional assistance of lawyers, accountants, and political fundraising staff – filed all of the required campaign finance reports, documenting thousands of donations from thousands of individuals as well as corporate, labor, and advocacy group PACs, which totalled millions of dollars. Throughout the course of this voluminous and thoroughly-detailed fundraising, there was not a single suggestion of impropriety until the government informant in this case talked to the FBI and sought to avoid prosecution after he admitted to multiple federal felonies.

<u>Service On The City Council:</u>

P.G.'s inclusive approach to campaigning allowed him to overcome the historical pattern in Cincinnati elections of candidates failing to be elected in their first run for office. Gaining the trust and confidence of a broad, bipartisan base of support earned him a seat at City Hall and made him the youngest candidate ever elected. Two-term Cincinnati Mayor Mark Mallory remembers, "When he [P.G.] arrived at City Hall after winning the election, he took the place by storm. He was young, full of energy, full of ideas, and clearly bursting with love for our city…P.G. was constantly moving around the entire city, listening to community councils, joining neighborhood safety walks, and taking the time to walk in the shoes of our city employees." *Mayor Mark Mallory.* P.G. also was not afraid of taking on powerful interests. Mayor Mallory recalls, "When he got to City Council, we were still coming out of the Great Recession and we were still experiencing a foreclosure crisis. P.G. stood up to the big banks and made them take responsibility for vacant, blighted properties that were bringing down some Cincinnati neighborhoods." *Mayor Mark Mallory.*

Tim Burke, former Chair of the Hamilton County Board of Elections, which heard and ruled on various election and campaign finance matters, and who also served on the official anti-corruption task force that was convened following the indictments of council members, recalls, "I have had the opportunity to work with, literally hundreds of elected public officials and candidates…P.G. Sittenfeld is one of the brightest, most caring and courageous with whom I have had the opportunity to work. His tirelessness, drive, and creativity to get things done and solve problems was beyond compare." *Timothy Burke.*

<u>Collaboration With Law Enforcement</u>:

As an elected official, P.G. was committed to creating safe communities, and was known for his support of and collaboration with law enforcement, which in turn earned him high marks from Cincinnati's police officers. Officer Princess Davis, who spent 27 years as a member of Cincinnati's police force, writes that the city's most marginalized community members, "did not have a voice in Cincinnati, until P.G. Sittenfeld came along. He made time to hear and help the people in their communities that wanted to see change." *Officer Princess Davis.* Julian Johnson, whose law enforcement career spanned three decades, similarly recalls, "P.G. became known as the Council person the average citizen could depend on for help." *Officer Julian Johnson.*

Officer Donald Jordan, a 25-year veteran of the Cincinnati Police Department, recalls leading efforts alongside P.G. to reduce violence in the city. "With lacking resources, I went to then Council Member PG Sittenfeld to ask for his assistance with helping me to secure resources like a city park playing field at one of the city's recreation centers. PG not only assisted with the event, but his office also became a partner and a sponsor for the endeavor which became known as 'Pitching for Peace' Community Softball Game and Resource Fair.' Pitching for Peace became an annual event and was even added to the city's overall safety plan for several years. In my opinion, Pitching for Peace would not have been as successful without PG's belief and trust in my vision to do something so out of the box for our city." *Officer Donald Jordan.*

During times of strife between the community and law enforcement, P.G. worked to build relationships between opposing camps. Officer Johnson writes that, "Councilman Sittenfeld was a bridge builder, whether it be between the citizens of Cincinnati and the police department, or between city council and the police department. His good nature, knowledge and

willingness to solve problems and improve the quality of the lives of those he served made him one of the most well liked, well received, and well respected council persons to have ever served on Cincinnati City Council. He served the citizens of Cincinnati with enthusiasm, kindness and generosity, without ego." *Officer Julian Johnson*.

In addition to P.G.'s direct work with local law enforcement, P.G. earned the respect of numerous federal prosecutors, including those from the same office which has brought this prosecution, as well as from other federal prosecutors around the country. James Coombe, who spent 24 years as an Assistant U.S. Attorney in the Southern District of Ohio, writes,

> While we often differ politically, I have found Mr. Sittenfeld to be both a well spoken and considerate promoter of his views. He has always appeared willing to say what he believed, rather than what he thought his current audience wanted to hear…PG has always come off to me as both very honest and as someone who really tried to make his community a better one to live in. *Former AUSA James Coombe.*

Kathleen Brinkman, a former Assistant U.S. Attorney who spent 24 years as a federal prosecutor in the Southern District of Ohio, including prosecuting public corruption cases, upon reading the speaking indictment against P.G., immediately offered to help P.G. and the defense team *pro bono* as a consultant. She attended the entire trial. Former AUSA Brinkman explains that part of her motivation was "I followed his [P.G.'s] career as it increasingly benefited the community. I always knew him to be an honest, ethical, compassionate, and kind man, dedicated to helping others as a hard-working public servant. I never experienced nor heard anything that suggested he was not all of that." *Former AUSA Kathleen Brinkman.*

As many of those tasked with preventing crime in Cincinnati held P.G. in high esteem, so too did those who covered local crime as journalists. The longest-tenured among such reporters was Deborah Dixon, who was the crime reporter for WKRC Channel 12 for four decades. "During that time, I had to find people to trust," Ms. Dixon recalls. "One of the

16

trustworthy people I found was P.G. Sittenfeld. I remember going to city council meetings and watching him listen and pay attention to constituents, asking them questions to make sure he understood what they wanted, or needed." *Deborah Dixon.* Ms. Dixon laments that because of P.G.'s prosecution, "It's the end of a career I believe would have made Cincinnati a better place to live." *Deborah Dixon.*

Unwavering Support For New Development:

A hallmark of P.G.'s tenure at City Hall was championing a pro-growth agenda, in particular supporting new commercial and residential development and major construction projects. Michael Fisher, the former CEO of Cincinnati's Regional Chamber of Commerce and later the CEO of Cincinnati Children's Hospital, writes that "P.G. has made many substantial contributions to the vibrancy of our city. These include his efforts to ensure that transformative investments like the 1-71 MLK Interchange, the Cincinnati Children's Critical Care Building, and TQL Stadium, not only happened in the urban core, but that they explicitly incorporated considerations and commitments to the surrounding neighborhoods and their citizens." *Michael Fisher.*

The scale of investment that P.G. helped to attract, assist in advancing, and ultimately support as a voting member of the City Council totaled billions of dollars – the Children's Hospital expansion, referenced by Mr. Fisher, was a more than half-billion dollar project – and resulted in thousands of new jobs and thousands of new residential units, all of which helped Greater Cincinnati's economy become the largest in Ohio during P.G.'s tenure at City Hall.

P.G. considered development a major priority. Stephen Smith, who has spent nearly three decades leading one of the city's most active real estate development companies, writes, "As I got to know P.G. better, I began to appreciate his grasp of complex issues – especially

around housing and economic development. In my personal experience – his questions were smart, his conclusions were smart, and he acted with integrity in the best interest of the City." *Stephen Smith.*

Chris Dobrozsi, Executive Vice President with another of Cincinnati's largest real estate developers and a former Republican mayor of one of Cincinnati's neighboring jurisdictions, recalls, "I met P.G. while developing projects in the City and quickly learned that, while we had different political party affiliations, his passion and purpose in life was similar to mine – serving the public to improve the City in which we live." *Mayor Chris Dobrozsi.*

As a council member, P.G.'s support of new development projects was consistent: he never – not once – in nearly a decade of council service, voted against a single development project. He saw these projects as a vehicle for creating more jobs and expanding housing opportunities, and he supported these projects regardless of the project location and neighborhood, the type of new development (affordable, workforce, market-rate, or mixed-used), the developer, or whether the developer had been a donor to any of his campaigns. Mary Delaney, the longtime leader of Community Matters, recalls, "In 2020, P.G. lead the charge to save a critical affordable housing development, LPH Thrives…He also ensured that our neighbors were heard and valued when we were being dismissed by other leaders. Without P.G.'s support, our neighborhood would have lost out on $15 million in investment and 47 families would be without homes." *Mary Delaney.* Having interacted with P.G. on many occasions over more than a decade, Ms. Delaney adds, "Throughout all his work to help our community, P.G. acted with compassion and did so without the expectation of gaining anything other than doing the right thing on behalf of our neighborhood…I would like to note that I have

never been a donor to P.G.'s campaigns and was never solicited to become a donor by P.G. or any member of his team." *Mary Delaney.*

Another nonprofit leader, Bill Tucker, who led a social enterprise accelerator called FlyWheel, similarly writes, "I had no business before the city nor was I a significant campaign donor (donating less than a couple hundred dollars years after our relationship began). For a small nonprofit with only two employees we struggled to have the visibility that was needed. It was P.G. who gave us our "break" by speaking at key events in his role as the Chair of the city's Education, Innovation and Growth committee. P.G. genuinely cared about the work I was doing." *Bill Tucker.* Mr. Tucker adds, "I saw P.G. support many organizations that were working to improve the lives of the people of Cincinnati. And, never with the expectation of anything in return." *Bill Tucker.*

<u>A Voice For Those Without Money, Power, and Influence:</u>

While P.G. was proud of his support of large-scale projects that fueled the local economy, his greatest passion and effort as a council member was focused on those who most needed help – whether they were hard-working small business owners, homeless veterans, low-income senior citizens, or other people living closer to the city's social and economic margins.

One example, among many from the letters presented to the Court, comes from Tom Hagins, a 61-year-old sidewalk vendor who since 1992 has sold peanuts and bottled water outside Reds and Bengals games. Mr. Hagins explains:

> In early 2014, I attempted to contact every member of Cincinnati City Council about my sidewalk vending business. I was concerned that the administration was going to make changes to the vending program that would've resulted in the destruction of my business. I received vague, indifferent email responses from only two council members. The only council member who personally contacted me by phone was Mr. Sittenfeld. I am a nobody. I'm not wealthy. I'm not a mover and shaker in Cincinnati. I have no influence on anything. I'm not politically connected. I'm just a nobody. However, I estimate that I've saved patrons at downtown events over $2 million with my prices.

19

> Even though I'm a nobody, P.G. called me personally. We spent about ten minutes on the phone during this first meeting. P.G. listened to me. He cared. Over the next year, Mr. Sittenfeld worked with the city manager and Community Development to protect the business I had worked to build since 1992. P.G. always kept in contact with me and we met several times in person at his office. I could always see that he was sincere in his efforts to protect my business. If it wasn't for Mr. Sittenfeld, I would've lost my vending locations. I would probably be homeless if it wasn't for P.G. He saved me and my family. He never asked for anything from me to do this. He just did the right thing. I consider P.G. to be a champion for the little people. *Tom Hagins.*

Social status, income level, or the ability to make campaign contributions was never the determinant for whether P.G. got involved and helped. Jason Kander, veteran of the war in Afghanistan, former Secretary of State of Missouri, and now the president of national expansion at Veterans Community Project, writes,

> In 2019 I had the chance to work closely with him [P.G.] when he began an effort to bring a Veterans Community Project to Cincinnati to address the issue of veterans homelessness…He more than almost any other leader in the multiple cities I have worked in in this role took a hands on approach. He did not let up, and he did not seek public attention for his work. He was enormously and impressively effective in building a coalition of people ready to embark on a purely charitable endeavor. In my work with P.G., I experienced – without exception – a dedicated, honest, and passionate community advocate…His having to leave elected office was a shock to me…Without P.G. at the council and in a position to quarterback the effort, we were not able to continue. *Captain Jason Kander*

One of Cincinnati's longest tenured City Hall journalists, Jay Hanselman, who covered local government for three decades, recalls P.G. coordinating the effort to keep a community center for low-income senior citizens open. Mr. Hanselman covered a press conference announcing the plan to save the senior center, and noted how P.G. "could have popped in and popped out, but he did not do that" – instead staying to visit with those using the center once the cameras were no longer rolling. *Jay Hanselman*.

<u>Through The Eyes of P.G.'s Colleagues:</u>

In addition to the constituents whose lives P.G. touched, the people who knew him best as a council member were his colleagues – elected and non-elected; Republican and Democrat;

high-level department directors and young behind-the-scenes aides. Former Assistant County Prosecutor and current KMK Law partner Greg Hartmann recalls that during the eight years he spent as a Hamilton County Commissioner, "I worked with City Hall on many issues and P.G. was front and center on them all. We reinvented how homelessness is approached here, funding the construction of a new facility with joint city/county participation. He was a big believer in this type of collaboration," and would "listen to my perspective, even though I was from the opposite political party." *Commissioner Greg Hartmann*. Typical of P.G.'s gregarious nature, he also made an effort to turn professional relationships into personal friendships. Commissioner Hartmann remembers how P.G. "and his wife hosted dinners with leaders from varied backgrounds where no topics were off limits. I enjoyed those conversations and could see P.G.'s passion for our community up close." *Commissioner Greg Hartmann*.

Cincinnati Council Member Chris Seelbach notes that, "Few people had the chance to watch PG in a legislative context the way I did," and that "Whether it was his crackdown on predatory towing companies soon after he arrived at City Hall or his innovative legislation expanding housing access in his final term, PG was very gifted at educating and rallying fellow council members to support initiatives that made tangible improvements in the lives of our constituents. I observed him up close as he shepherded legislation with focus, energy, and the highest of ethics for almost a decade." *Council Member Chris Seelbach*.

Following her time as a Victims Advocate in the Hamilton County Prosecutor's Office and a court bailiff for a Hamilton County judge – each role under an elected Republican – Tamiko Maudlin served as an aide at City Hall for a Republican council member during the time P.G. was on Council. Mrs. Maudlin remembers P.G. as an enthusiastic and helpful mentor, writing, "I will be forever grateful for everything I learned from him when it came to giving

back to the community and helping constituents. A pothole that needed filling, a missed garbage pickup, drug dealing happening in a neighborhood…no problem was too small and no person was too unimportant for P.G. to quickly dive in with a phone call or a site visit or by pushing the appropriate City department to get the issue fixed. He treated people's problems and their priorities as though they were his own. I know from having worked there that people are often cynical about City Hall. P.G. was one of the few people who truly made people believe that City Hall was on their side." *Tamiko Maudlin.*

Laure Quinlivan, a former longtime investigative reporter for one of the local TV stations before she was elected to City Council, recalls transitioning from serving with P.G. to becoming his constituent:

> After leaving council, two issues arose that I needed help with, and PG is the council person I called. He was the only person on city council that I believed would take time to help. First, my neighbors in Mt. Lookout were concerned with dangerous speeding cars on hilly Kroger Avenue. The city Dept. of Transportation told us our street is too steep for speed bumps, so we citizens proposed a simpler solution…a stop sign at an intersection halfway up Kroger. DOT told us stop signs aren't "allowed" to slow traffic and declined to install one. We decided to fight city hall, as it were, and knew we needed at least one council member on our side who would fight for/with us. After contacting all 9 at-large council members, only PG and his staff responded. PG came to our street to see for himself, and then authored a Motion to overrule city DOT on this particular safety issue and grant citizens a stop sign on Kroger Ave. When it came up for a vote, with some council members hesitant to overrule DOT, PG made a wonderful speech about the need to side with the mothers with baby carriages testifying in council chambers, not city engineers. We got our stop sign, thanks to PG, and it has made a world of difference on Kroger Avenue. Pets no longer get run over by speeding cars, and our children are safer playing outside. *Council Member Laure Quinlivan.*

### E. Post-Indictment Life: Family, Faith, and Continuing Service (2020-Present)

<u>Family Life, Post-Indictment:</u>

P.G. was charged in late November 2020. He has spent almost three years under indictment and as a defendant. Soon after his indictment, he accepted a voluntary suspension

from his seat on City Council and also voluntarily withdrew from the campaign in which he was widely expected to become Cincinnati's next mayor – a crushing and shocking turn of events after devoting his entire adult life to various forms of public service.

Less than four months after his indictment, P.G.'s father died, as a fast-moving and previously undetected liver cancer shut down his body. Many people who know the Sittenfeld family noted the severe physical and emotional toll that P.G.'s prosecution took on both his parents, especially his father, who was already in vulnerable health. Beverly Grant, a retired Procter & Gamble executive who came to know P.G. when her son and P.G. worked together at a store in the mall in high school, writes, "I do believe that P.G.'s father died from a broken heart due to the arrest of his only son. I have observed the stress and pain of his mother dealing with the death of her husband and this more than stressful and life changing ordeal with her son." *Beverly Grant.*

With P.G.'s life turned upside down, his father – who was also his best friend and mentor – suddenly gone, and his reputation tarnished, P.G. chose to anchor himself in the midst of uncertainty by focusing on faith, family, and service to others, even if that service was no longer from elected office. P.G. and his wife, Dr. Sarah Sittenfeld, an oncologist at the University of Cincinnati, married in 2016, welcomed their first son George, in 2019, and their second son, Francis-Paul, in 2022. As Sarah wrote in her letter, "I personally do not like politics because it too often seems like arguing instead of problem solving. But I know that my husband got into the political arena with the best and purest of intentions, and because he cared so much about service, about people, and about Cincinnati, having his dream of continuing to serve his hometown come to a sudden and painful end was nothing short of crushing for P.G." *Dr. Sarah Sittenfeld.* Sarah notes, however, "that is not where my husband's story ends":

23

Everything that he gave to serving the city of Cincinnati – his time, his energy, his creativity – he now devotes to raising our two sons and to being a caring presence for people (both those he knows and also those he doesn't) whom he hears are struggling. I believe P.G.'s big-heartedness is what caused him to go into politics in the first place, and while this prosecution broke his heart, it has also simultaneously made it bigger.

It sounds somewhat strange to say, since this legal situation has been both scary and traumatic for our family, but as a result of it, P.G. has gone from being a very good husband and a very good father to a truly excellent husband and excellent father. He has taken an extremely difficult circumstance and determined to be his best self throughout all of it – more patient, more selfless, more loving. *Dr. Sarah Sittenfeld.*

Beyond the significant time demands of assisting his lawyers in his defense, the other foremost time commitment in P.G.'s days post-indictment is as the caretaker for his and Sarah's two young sons. Tyler McIlwraith, the preschool teacher of P.G.'s older son, shares her twice-a-day glimpse of P.G. as a father: "I have witnessed his bond with his boys daily as P.G. drops George off in my classroom with the younger in tow. His shy and quiet older son clings to P.G.'s hand each morning as they go through their drop-off routine. P.G. smiles and says hello to all of the other three and four-year-old students in my class, as he helps George wash his hands and answer the 'Question of the Day' that I write on a dry erase board." *Tyler McIlwraith.*

As he navigates that particular stage of life with both young children and also an aging parent, P.G. is the only one of four siblings who lives in Cincinnati, and thus the one who helps tend to his mother's daily needs. As P.G.'s sister Curtis shares, "P.G is the primary in-person helper for our widowed 75-year-old mother," which includes getting her to and from medical appointments, and "household tasks for her such as going to the grocery store when the weather is bad, helping her if she has Internet problems or when her printer is finicky, and carrying heavy objects that need moving, including the artificial Christmas tree she keeps stored in her basement. And I can confirm, with only a small pang of sibling rivalry, that PG is the apple of our mother's eye." *Curtis Sittenfeld.*

Marc Gustafson, who has known P.G. since their time together as Marshall Scholars and who has served as a career civil servant for the U.S. Government, and in senior leadership roles during the last three Administrations, summarizes P.G.'s reaction to the past several years:

> I worried that this trial, which ended PG's career and served as a very public and embarrassing blow to all his family members, could trigger an onset of depression, defeatism, or antipathy toward the US government. Instead, it has helped PG strengthen his family commitment and allowed him to see that every day should be treasured, especially when it comes to spending time with his sons. He sends me pictures, anecdotes, and videos of his sons almost daily and has channeled all his energy into loving and caring for them. He recognizes that each day with his boys and his wife is a gift. This has been inspiring to me and has solidified my view that PG is a noble and loving person who will continue [to] do great things for his family and his community if given the chance. *Marc Gustafson.*

<u>Faith:</u>

P.G. was baptized and raised Catholic. His prosecution catalyzed a new chapter of leaning into his faith more intensely. This was influenced by finding a spiritual mentor in Cyrus Habib, a blind Rhodes Scholar and graduate of Yale Law School who went on to become the youngest Lieutenant Governor in the country in the State of Washington before choosing not to run for reelection in order to become a Jesuit Priest.

Cyrus Habib recalls how "two and a half years ago, P.G. reached out to ask if I'd be willing to speak with him about his ordeal. We had never met before, though we knew each other by reputation, having both been recognized as young leaders within the Democratic Party interested in reaching across the aisle to solve problems for our constituents. P.G. wasn't seeking my legal or political advice. He had read about my becoming a Jesuit and was hoping that we could speak on a spiritual level." *Cyrus Habib, S.J.*

P.G. has poured himself into his faith journey with the same dedication with which he once approached campaigns and government service. Cyrus Habib notes, "I have observed a powerful transformation in P.G. Nourished by the two dozen works of spiritual nonfiction he's

25

read since we first spoke and his weekly Mass attendance and daily prayer, P.G. has become a more forgiving and compassionate person. While he has certainly expressed anguish at what this situation has meant and will continue to mean for his family, he has worked harder than anyone I've met in my ministry to discover where God is at work in the midst of adversity."

*Cyrus Habib, S.J.*

Aside from trying to cultivate his own faith, P.G. has worked to channel his faith into action as a volunteer. Dr. Jennifer O'Donnell describes P.G.'s volunteer work for a faith-based nonprofit, HELP, affiliated with his church, "where he [P.G.] is helping returning [formerly incarcerated] citizens find sustainable work and prosocial pathways to successfully return to the community." *Dr. Jennifer O'Donnell.*

<u>Continuing Service To Others:</u>

While P.G.'s employment prospects have been severely limited by his legal situation – with multiple potential employers saying that they wanted to hire him but could not while his legal situation is unresolved – he has been contracted to complete some freelance writing projects for schools and nonprofits to help support his family. However, most of his contributions have been as a volunteer. Cathy Crain, a retired investment consultant who did not support P.G. politically or donate to his campaigns, nonetheless attended every day of his trial. Following the trial's conclusion, Ms. Crain writes,

> I asked PG to volunteer to help with a large and complicated project that will partner our academic hospital and our City Parks. This partnership will be the largest in the country and will allow for doctors to prescribe time in our Parks to those patients suffering from chronic diseases i.e., mental health, obesity, diabetes, heart disease and cancer. The data retrieved from this program will be used for further research and solidifying the evidence-based findings correlating nature and health. The reason that this is such an important project is because of the joining of better outcomes and reduced healthcare costs. PG jumped at the opportunity and with his incredible writing skills and strategic thinking was able to refine the business plan and help to find and write grants

26

for the funding of this program…I use this as an example of what this young man could do for so many other organizations. *Cathy Crain.*

One year after P.G. was indicted, a new class of candidates was elected to seats at City Hall – an election cycle that P.G. had once hoped would culminate in his own election as mayor. Given P.G.'s effectiveness as a councilmember over the prior nearly 10 years, several newly elected officials sought out his counsel. One of them, Councilmember Reginald Harris, writes, "During the first three months of my term after being elected in 2021, I had a weekly call with PG every Thursday at 9:00 AM. These calls provided me with a safe space to express my thoughts, ask questions, and vent… What struck me the most was that during one of the most difficult times in his life, instead of withdrawing, PG chose to invest his time in volunteering and helping others in meaningful ways that went unnoticed by most. This is the PG I know. This is the PG I want others to know." *Council Member Reginald Harris.*

### Through The Eyes Of New Relationships:

Included among the many letters to the Court are those from individuals who came to know P.G. *after* his indictment. One such individual, Buck Brody, CFO for a local software company and a former legislative aide in the United States Senate, writes, "I have only known P.G. since his arrest and the end of his political career. In that time, I have never been a potential voter or campaign donor for P.G. We are not even particularly aligned on most political issues. What struck [me] about P.G., from the first time I met him, is his passion, curiosity, and devotion to issues of public policy, politics, and most importantly – to his community…Fewer individuals from my generation seem to be interested in public service than prior generations; of those that do, even fewer seem properly qualified. I deeply wish we had more people like P.G. in public office." *Buck Brody.*

Another person whose relationship with P.G. began after P.G.'s indictment is Phil Glotfelty, a veteran Captain of the U.S. Army, when Captain Glotfelty's family moved next door to the Sittenfelds. Captain Glotfelty recalls, "Since this first time I met PG, our friendship has grown and his sincerity, honesty, and integrity are without question. He is the neighbor I trust to keep an eye out for my 13-year-old son running around the neighborhood. I trust him to house-sit while we are out of town. When he found out that I was converting to Catholicism, he invited me to go to our local parish with him. When our car had a dead battery in the winter, it was PG who trudged out into the snow to help with a jump. He also helped me to become active in our neighborhood council as a board member. He is a good husband, father, and neighbor. Character traits like these are hard to find…Throughout this period of struggle, PG has shown courage, joy, integrity, and perseverance." *Captain Philip Glotfelty.*

Alex Heiman, President of a Cincinnati-based global textile manufacturing company, knew P.G. before his arrest but it was only *after* P.G.'s very public prosecution began that Mr. Heiman began to view P.G. as a role model, in particular for young people. Mr. Heiman explains, "It's deeply important to me that my son, Charlie (named after his great-great grandfather), upholds our family's values. It might seem strange to say but I believe P.G. is a role model for him in that pursuit. I want Charlie to be someone who's capable of tremendous gratitude even in challenging times. I want him to be dedicated to the wellbeing of others even when it'd be easier to be selfish. I want him to have a high degree of integrity and candor, even when it'd be easier to flee or give up. I want my son to be like P.G. Sittenfeld because P.G. has demonstrated that those characteristics define him, no matter the gravity of his circumstances." *Alex Heiman.*

28

<u>Support During People's Darkest Hours:</u>

The outpouring of support following the passing of P.G.'s father was in no small measure because his father was known for being there for people during their worst, lowest, hardest moments. P.G. absorbed this habit of character from his father, and especially tried to channel it once his father was gone. Cincinnati resident Kerry Mattingly met P.G. during his campaign for City Council, and subsequently signed up to volunteer for him. She recalls, "On a personal note, I have seen both Paul [P.G.'s father] and P.G. reach out to people who I know that were struggling with addiction issues and come and visit them in rehab and encourage them when many had written them off as unsalvageable. These are the things no one sees, and they do not talk about. PG is a good friend. He learned well from his father." *Kerry Mattingly.*

During one of the hardest moments of her life, Karen Smith, the retired Procter & Gamble manager, shares how P.G. unexpectedly showed up:

> In the Christ Hospital ICU, my mother had been taken off life support and we all knew she would soon die. Just after the drugs needed for the ventilator were wearing off and before she weakened, she was remarkably—even frighteningly—lucid. It happened to be during that period that we received a message that we had a visitor. P.G. had come to the hospital to support my husband and me. But because Mom was awake and even chatty, and because we knew she valued and was honored by her relationship with her young friend, we dared to ask him if he could handle coming inside and visiting her. He didn't even flinch. I will forever cherish the memory of his grace at her bedside. He told her how important she had been to her assisted living community and how much she had brought to her new friends there. He held her hand and told her that he had learned from her and that she had inspired him. She died knowing that he, too, had been honored by their friendship. *Karen Smith.*

Alex Heldman, who attended the same middle school as P.G., is grateful that after he began requiring a wheelchair to get around, P.G. helped him to get a wheelchair-accessible ramp installed at his favorite Cincinnati ice cream shop. But that is not what Mr. Heldman most appreciates about P.G. Mr. Heldman explains how in college he "suddenly acquired epilepsy, a

29

very serious neurological condition. I was placed in an induced coma for 6 months to calm my seizures down. I lost many friends during this experience. Because epilepsy is a brain injury, there is a certain stigma surrounding it…I can count the number of people from my childhood with whom I still speak. I thank P.G. for being one of those people for having the courage to take time out of his day to correspond with an old friend. It is these small, albeit, gracious acts that shine light into P.G.'s character." *Alex Heldman.*

In the time after his indictment, P.G. learned that another childhood friend was struggling with alcoholism. The younger brother of P.G.'s friend shares, "My brother eventually confided, although on a limited scale, the challenges he was facing and he entrusted P.G. into his inner circle. Although my brother was living in Colorado as opposed to Cincinnati, P.G. made it a point to reach out consistently. This is in the face of the daunting struggles that P.G. was facing himself. While my brother lost his battle to this insidious disease, I know in my heart that the friends that stuck by him meant the world to him and that it gave him motivation to keep fighting throughout." *Charlie Rush.*

Cincinnati resident Christine Carli first came to know P.G. through requesting his assistance with street calming measures. She remembers how, "We met on an oppressively hot summer day, spending more than an hour walking the busiest parts of Columbia Parkway so he could observe firsthand how dangerous our neighborhood was for pedestrians. He followed up right away, and in a short time, we had the City's support for better crosswalks, signage, and speed reduction tactics." *Christine Carli.* Ms. Carli did not imagine at the time that she would later call upon P.G. in an even higher stakes situation:

> Later in 2019, I reached out to Councilmen Sittenfeld in a panic. My aunt, who was living with acute kidney failure, had been informed that her access to on-site dialysis was being discontinued. She was too weak to be transported, and the loss of this access would have certainly killed her. PG immediately leapt into action on behalf of my aunt.

30

He used his relationships with the Council on Aging and other advocacy agencies to successfully restore her dialysis care. I do not know what I would have done without his support. He literally saved my aunt's life and assured that her quality of life was honored and protected. *Christine Carli.*.

<u>Poised To Continue Helping Others:</u>

While P.G.'s efforts at City Hall and in the community earned him many admirers – across different professions and political parties – P.G. admits that he was also ambitious and in a hurry. Washington D.C.-based attorney Nate Wenstrup writes, "In two decades of friendship, I have heard skepticism of P.G.: he is an operator, he is always politicking, he is always eyeing the next thing." *Nate Wenstrup.* While Mr. Wenstrup adds, "My experiences [with P.G.] have always belied that cynicism," that was of course not the case for everyone. P.G., like all public officials in any community, had his share of critics. Kathleen Norris, the head of a real estate and planning firm, wonders if "he [P.G.] became a member of council at, perhaps, too young an age…That lack occasionally manifested itself in a kind of innocence, even a little of hubris, edges which time would inevitably have helped to smooth." *Kathleen Norris.*

P.G. himself acknowledges in his own letter to the Court that he is a flawed and imperfect person. Yet still, his life, when considered in the aggregate, has been one of consistent and sincere service to others. And importantly, as so many letter writers have conveyed, that service will continue if P.G. is given the chance. Former Assistant U.S. Attorney and Congressional investigator Steve Glickman shares his confidence that P.G. will "come back an even stronger advocate for repairing what's broken in America." *Steve Glickman.* Former White House Counsel Gregory Craig writes, "I know P.G. Sittenfeld to be smart and decent and energetic. I also believe him to be honorable and public-spirited. I would urge the court to recognize that these aspects of P.G. Sittenfeld's character and personality are still alive and can

31

– in the form of the court's sentence – be put to good purpose." *Gregory Craig*. Or as Cincinnati Police Officer Donald Jordan shares, "I truly believe our city will see the best of P.G. Sittenfeld after this situation is over." *Officer Donald Jordan*.

This case has been highly unusual, even unprecedented, in many ways. In its substance it is a non-express quid pro quo case based solely on publicly reported campaign donations, in the context of an undercover government sting operation, and with zero evidence of personal gain. Just as the case's prosecution is unusual, so too are the letters and specific examples of P.G.'s character that have been submitted to the Court – for the range of their writers and for the depth, emotion, and consistency of their messages.

**ARGUMENT**

## I. THE RECOMMENDED SENTENCING GUIDELINES RANGE OF 41-51 MONTHS CANNOT BE JUSTIFIED BY THE STATUTORY PURPOSES OF SENTENCING.

Probation has calculated a Sentencing Guideline range of 41 to 51 months in this case. This calculation fails to include a reduction for acceptance of responsibility and the reduction adjustment for zero-point criminal history that is set to take effect on November 1, 2023. Moreover, the Guidelines themselves raise issues of fundamental fairness.

### A. Case law supports a reduction in the Guidelines for acceptance of responsibility.

The Sentencing Guidelines calculation for Mr. Sittenfeld should include a two-level reduction for "acceptance of responsibility" pursuant to U.S.S.G. § 3E1.1, Note Two. A two-level reduction for "acceptance of responsibility" is permitted when, as Mr. Sittenfeld did here, a defendant proceeds to trial to make a constitutional challenge to a statute and challenges the applicability of a statute to his conduct. *See United States v. Calvetti,* 836 F.3d 654, 670 (6th Cir. 2016). Mr. Sittenfeld has never denied that he accepted campaign donations from agent Rob. Rather, starting from his initial motion to dismiss the indictment, Mr. Sittenfeld has challenged the constitutionality of 18 U.S.C. §§ 1343 & 1346, 18 U.S.C. § 666(a)(1)(B), and 18 U.S.C. §§ 1951(a)&(b)(2) as applied to his acceptance of campaign donations in 2018 and 2019. While the application of a two-level reduction for accepting responsibility may be rare when a defendant does not plead guilty, Mr. Sittenfeld's case satisfies the conditions carved out in U.S.S.G § 3E1.1, Note Two. Applying the two-level reduction for "acceptance of responsibility" yields a sentencing range of 33-41 months.

B.  If sentenced 30 days later, Mr. Sittenfeld would receive an additional two-level reduction.

The Sentencing Commission has adopted Amendments to the guidelines, which go into effect on November 1, 2023 – three weeks and a day after Mr. Sittenfeld's sentencing.  The adopted Amendments include a reduction in guidelines for those, like Mr. Sittenfeld, who appear before the Court with zero criminal history points.  "New §4C1.1 provides a decrease of two levels from the offense level determined under Chapters Two and Three for offenders who did not receive any criminal history points under Chapter Four, Part A and whose instant offense did not involve specified aggravating factors."  United States Sentencing Commission, *Amendments to the Sentencing Guidelines*, at 79 (adopted April 27, 2023; effective November 1, 2023) (available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf).  The Commission was clear that "[r]ecidivism data analyzed by the Commission shows, however, that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point."  *Id.*

Mr. Sittenfeld meets the criteria for the imminent amendment, and the research thus also supports the conclusion that Mr. Sittenfeld would have a "considerably lower recidivism rate[]" than other offenders.  Consequently, the Commission's research and assessment justify a downward adjustment of two offense levels to accomplish the purpose set out by the Commission's amendment.  Not considering the Commission's research and conclusion merely because it is set to become effective less than a month after his sentencing leads to the arbitrary result where a similarly situated defendant whose sentencing might have been adjourned beyond November 1 to accommodate counsels' calendars might receive the new reduction and Mr. Sittenfeld would not.  Accordingly, Mr. Sittenfeld should be granted a two-level reduction based

34

on the imminent amendment of §4C1.1 yielding a Guideline range of 27-33 months.

      C.  Impermissible double counting is unjust.

The sentencing range calculation for Mr. Sittenfeld also includes impermissible double counting. Impermissible double counting occurs "when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *United States v. Eversole*, 487 F.3d 1023, 1030 (6th Cir. 2007) (internal citations and quotation marks omitted). The guideline base offense level for a violation of 18 U.S.C. § 666(a)(1)(B) is 14 because Mr. Sittenfeld was a public official. U.S.S.G. § 2C1.1(a)(1). This base level of 14 already includes an increase of two levels from U.S.S.G § 2C1.1(a)(2) which applies to any person other than a public official.  In the context of this chapter, any person who is *not* a public official must be, by definition, a person without official status who is making the improper payment (or is otherwise involved in a bribe scheme, for example, as a "bagman").  Thus, the Guidelines apply an offense level of 12 to the payor of the bribe and an offense level of 14 to the public official recipient of the bribe; the heartland of cases envisioned by the Guidelines will follow this very construct and, indeed, it is difficult to imagine a case that would not fit this definition.

Probation has calculated and the government has advocated for a four level enhancement under U.S.S.G. § 2C1.1(a)(2) because the offense *involved* an elected public official, i.e., Mr. Sittenfeld. This additional four level enhancement is impermissible double counting because the same "aspect of the defendant's conduct"—Mr. Sittenfeld acting in his official capacity as a public official—"both determines his offense level and triggers an enhancement." *Eversole,* 487 F.3d at 1030, quoting *United States v. Farrow*, 198 F.3d 179, 193 (6th Cir. 1999).  Moreover, an interpretation of this chapter is that the Guidelines do not envision the application of this enhancement against the public official, for whom an offense level 14 has already been applied,

but to the non-public official with an offense level of 12. According to the Background notes for this chapter, the enhancement under § 2C1.1(b)(3) applies "*if the payment was for the purpose of* influencing an official act by certain officials." (Emphasis added). Thus, the description of the conduct focuses on the payor, not the recipient, which is a reasonable interpretation of this enhancement because the public official's status has already been accounted for in calculating the base offense level of 14.

In addition, the language of U.S.S.G. § 2C1.1(b)(3) is in stark contrast to U.S.S.G. § 2C1.1(b)(4), which specifically and explicitly applies to "a defendant who is a public official" and engages in certain proscribed action. If the Guidelines were meant to apply a four-level enhancement to a public official who is also an elected official, then they would say so in language similar to that from this provision, i.e., applying a four-level enhancement to "a defendant who is an elected official".

One final point. This chapter specifies that § 3B1.3 (Abuse of Position of Trust or Use of Special Skill) shall not be applied. The language of § 3B1.3 explicitly states: "This adjustment may not be employed if an abuse of trust or skill is *included in the base offense level* or specific offense characteristic." (Emphasis added). That § 2C1.1 rules out the application of § 3B1.3 indicates an express effort to avoid impermissible double counting for defendants convicted of crimes covered under this chapter. Removing the duplicitous four-level enhancement would yield a sentencing range of 15-21 months.

**D. A downward departure from the Guidelines is appropriate.**

A downward departure from the 15-21 month sentencing range is warranted in Mr. Sittenfeld's case. A sentencing court may find a downward departure appropriate if a defendant's life has demonstrated "exceptional" good works for the community. *See United*

36

*States v. Cooper*, 394 F.3d 172, 178 (3d Cir. 2005).

Moreover, "a district court may depart below Criminal History Category I in instances where the court concludes that the offense of conviction is a single aberrant act of criminal behavior." *United States v. Morales*, 972 F.2d 1007, 1011 (9ᵗʰ Cir. 1992); § 5K2.20 Aberrant Behavior (Policy Statement). To be entitled for a downward departure due to aberrant behavior, the offense must have been a single criminal occurrence or transaction that was committed without significant planning, was of limited duration, and represented a marked deviation by the defendant from an otherwise law-abiding life. U.S.S.G. § 5K2.20(b).

Mr. Sittenfeld's conduct satisfies all of the requirements of § 5K2.20(b). The conduct in the counts of convictions was a singular event, of limited duration, and was a marked deviation from Mr. Sittenfeld's otherwise law-abiding life. Therefore, Mr. Sittenfeld is entitled to a downward departure from the 15-21 month guideline range.

A sentence which includes incarceration, however, would be a severely disproportionate punishment because a variant sentence is appropriate pursuant to the 18 U.S.C. § 3553 sentencing factors that must guide this Court's decision. For the reasons explained in Part II, *infra*, a variant sentence of probation with rigorous community service and/or home confinement for one year best serves the goals of justice, fairness, and mercy in this case.

## II.    APPLICATION OF THE 18 U.S.C. § 3553 FACTORS COMPEL A VARIANT SENTENCE

While the Court must consider the Guidelines calculation as part of the sentencing process, the Guidelines merely "serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Rather than simply impose a sentence within the Guidelines range, the Court must consider the whole range of factors listed in 18 U.S.C. § 3553 and determine the sentence that is "'sufficient,

but not greater than necessary,' to accomplish the goals of sentencing." *Id*. at 101 (quoting 18 U.S.C. § 3553). Indeed, the Court may not even "presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). The sentencing court has wide latitude to impose a sentence below the Guidelines range, "perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007) (internal citations omitted). That wide latitude is designed to allow the sentencing court to exercise its judgment and fulfill its obligation to determine a fair sentence instead of relying on a detached mathematical proof. *See United States v. Grossman*, 513 F.3d 592, 595-596 (6ᵗʰ Cir. 2008). After applying the § 3553(a) factors, this Court must make an individualized assessment based on the particular facts of Mr. Sittenfeld's case. *Id*. (citing *Gall*, 552 U.S. 50). Any sentence imposed by this Court must reflect what the defendant actually did. *Id.* Here, the § 3553(a) factors overwhelmingly support a sentence that is far below the suggested Guidelines range. Instead of a multi-year prison term, sentencing Mr. Sittenfeld to probation including rigorous community service hours and/or home confinement of one year would be "sufficient, but not greater than necessary" to satisfy the statutory factors.

    A. **The Guidelines range for the two counts of conviction is equivalent to the guidelines range for all six charged counts, undermining the jury's verdict, and the purposes of just punishment and deterrence.**

       The calculated 41-51 month Guidelines range for Mr. Sittenfeld are exactly the same as they would have been if the jury would have convicted him on all six charged counts[1]. Such a

---

[1] The multiple count grouping rules, pursuant to U.S.S.G. §§3D1.1(a)(1), 3D1.2(d), and 3D1.3(b), would result in the same base level offense of 14.

38

sentencing scheme undermines the verdict of the jury. The jury in this case spent weeks listening to the evidence and deliberating on all six charged counts. It convicted Mr. Sittenfeld on only two of the counts. A sentencing scheme that treats the outcomes interchangeably effectively dismisses their efforts. *United States v. Watts*, 519 U.S. 148, 170, 117 S.Ct. 633 (1997) (Kennedy, J., dissenting). ("increas[ing] a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007), aff'd, 523 F.3d 1258 (10th Cir. 2008) ("But when the Guidelines require the sentencing court to consider conduct for which the defendant was acquitted and to enhance the defendant's sentence based on the judge's finding that the conduct occurred by a preponderance of the evidence, the court's actions can be viewed as at tension with the jury's verdict of acquittal."); *United States v. Pimental*, 367 F. Supp. 2d 143, 150 (D. Mass. 2005) ("The jury is intended to be the centerpiece of the criminal justice system. Determining 'more than actual truth, guilt, or innocence, its decisions represent a popular conception of a 'just verdict.' In effect, juries rule on 'legal guilt, guilt determined by the highest standard of proof we know, beyond a reasonable doubt. And when a jury acquit[s] a defendant based on that standard, one would have expected no additional criminal punishment would follow.'").

In addition, such a sentencing scheme undermines two of the statutory purposes of sentencing – effective deterrence and just punishment. A deterrent system cannot succeed where a defendant is sentenced the same for six convictions or a fraction of those convictions – particularly where they are equally serious offenses. Any rational individual considering attempting the same crimes would interpret such a result as an endorsement to attempt all six, given that the latter four will not result in individual penalties.

Similarly, it defies logic that if 41-51 months is a just punishment for six convictions that is also a just punishment for two convictions. If you told the average person that an individual was charged with six equally serious crimes and convicted of two, they would expect one-third the sentence.

This is particularly true in a case where a primary driver of the guidelines is the amount of the donation made by the undercover agents, which was strategically chosen by government agents in setting the sting. If they had elected to set the amount at $15,000, the guidelines would be significantly lower. The loss amount is completely manufactured by the government. In other contexts, courts have noted the significance of the government's power in sting operations – setting amounts and thus setting guideline ranges or mandatory minima. *See United States v. Flowers,* 712 F. App'x 492, 509 (6th Cir. 2017) ("Scholarly writing has also criticized the [stash house robbery] stings, noting that the government … has 'full control over the amount of time its targets spend in prison because it can specify the amount of drugs involved in the fictional conspiracies,'"); *United States v. McKenzie,* 656 F.3d 688, 692 (7th Cir. 2011) ("Furthermore, the district judge addressed the discomforting factor of the government's role in determining the severity of the Guidelines level to be applied by mitigating the defendants' sentences."); *United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir. 2010) (criticizing how stash house stings allow "the government [the] virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant."). Clearly, the recommended sentencing range of 41-51 months is unjust.

B. Mr. Sittenfeld's history and characteristics warrant a sentence well below the Guidelines range.

In determining the particular sentence to be imposed, 18 U.S.C. § 3553(a)(1) directs the Court to consider the "history and characteristics of the defendant." The fact that the United

40

States Sentencing Commission and Courts have endorsed so many bases of variance from the Guidelines is an acknowledgement that the Guidelines are not suited to every defendant's circumstances; therefore, sentencing courts must be flexible to reflect an individualized assessment of the defendant under Section 3553(a) factors. For example, a variant sentence is appropriate where a defendant has no criminal history. *See United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (because "Criminal History Level I did not fully account for [defendant's] *complete* lack of criminal history, considering it as a mitigating factor was not redundant or improper.") (emphasis added)).

Similarly, Mr. Sittenfeld's years of demonstrated honesty, integrity, public service, good works and good character—not adequately accounted for in the Guidelines range—weigh strongly in favor of a sentence that does not include imprisonment. As the nearly 200 letters submitted to the Court from Mr. Sittenfeld's family, friends, professional colleagues, constituents, police officers, and former federal prosecutors attest, Mr. Sittenfeld has adhered to the highest ethical standards throughout his life, and mistakes in judgment that led to this case are completely inconsistent with his life as a whole. A finding by the trial court that the criminal conduct was an "isolated mistake" is a valid consideration in the totality of the circumstances review required by the § 3553(a) factors. *United States v. Howe*, 543 F.3d 128, 133-140 (3rd Cir. 2008), citing *Gall* 552 U.S. at 50. (sentence of two years' probation including three months' home confinement was reasonable for defendant convicted of two counts of wire fraud despite an advisory Sentencing Guidelines range of 18 to 24 months). Moreover, Mr. Sittenfeld has tirelessly served this community and has consistently put the needs of others above his own—even before he was an elected official. *See Section C. Early Career and Service Before Politics, supra.* Finally, Mr. Sittenfeld has strong ties with his family and plays an

41

indispensable role in the lives of his young children and his 76-year-old mother. *See Section E. Post-Indictment Life: Family, Faith, and Continuing Service, supra.* Accordingly, any term of incarceration, especially a multi-year sentence as recommended by the Guidelines range, would be far greater than necessary to achieve the § 3553(a) sentencing goals. Probation with rigorous community service and/or home confinement of one year is warranted.

1. Exceptional Character

Courts may impose a sentence below the Guidelines range where, as here, the offense conduct was an aberration and fundamentally at odds with the defendant's life and character. *See United States v. Musgrave II,* 647 Fed. Appx. 529 (6ᵗʰ Cir. 2016) (imposing non-Guidelines sentence of probation with home confinement was a reasonable variance from recommended 57-71 month range given § 3553(a) considerations including defendant's lack of criminal history, extensive work in the community, and familial support.)  *United States v. Benkahla*, 501 F. Supp. 2d 748, 761 (E.D. Va. 2007) (awarding downward variance by approximately 10 years for terrorism offense where letters attest to defendant's "honor, integrity, moral character, opposition to extremism, and devotion to civic duty"); *United States v. Ranum*, 353 F. Supp. 2d 984, 991 (E.D. Wis. 2005) (imposing non-Guidelines sentence for defendant's "otherwise outstanding character"). Mr. Sittenfeld accepts full responsibility for his inartful responses describing his confidence in the support that pro-development projects like 435 Elm would have in the city council, but these mistakes in judgment are completely inconsistent with the character that Mr. Sittenfeld has shown throughout his life to be honest, law-abiding, and acting in the best interests of his community and family.

As the supporting letters relate, Mr. Sittenfeld has consistently adhered to the highest moral standards, respecting the law and acting with honesty, integrity, and sound moral

character. That history alone supports a below-Guidelines sentence. *See, e.g.*, *United States v. Howe*, 543 at 132 (3d Cir. 2008) (affirming downward variance where defendant committed "isolated mistake" in an otherwise "honorable and lawful life"); *United States v. Cherry*, 366 F. Supp. 2d 372, 377 (E.D. Va. 2005) (awarding downward variance where letters reflected that offense was "an instance of poor judgment and aberrational behavior").

### 2. Good Deeds and Public Service

In determining a sentence, the court may also consider a defendant's good deeds and public service. *See, e.g.*, *Rita v. United States*, 551 U.S. at 365 (2007) (Stevens, J., concurring) (noting that a sentencing judge may consider public service under § 3553(a)); *United States v. Adelson,* 441 F. Supp. 2d. 506, 513-14 (S.D.N.Y. 2006) (recognizing defendant's good deeds, including numerous acts of compassion and generosity). Mr. Sittenfeld's good deeds and public service in Cincinnati began well before – and notably have continued well after – his name ever appeared on a ballot or in City Hall. His work for the non-profit Community Learning Center Institute was pivotal in helping disadvantaged students and schools in Cincinnati, as well as consistent community service for various nonprofits.

### 3. Strong Family Relationships

Under the § 3553 analysis, family ties "are pertinent to crafting an appropriate sentence." *United States v. Nellum*, No. 2:04-CR-30, 2005 BL 88941, at *4 (N.D. Ind. Feb. 3, 2005). Mr. Sittenfeld is extremely close with his immediate and extended family, who have supported him every step throughout this entire process and will continue to do so. *See, e.g.*, *Benkahla*, 501 F. Supp. 2d at 760 (awarding downward variance based on, among other things, defendant's "strong, positive relationships with friends, family and the community"); *United States v.*

43

*Harding*, No. 05 CR1285-02, 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (awarding a non-Guidelines sentence, taking "note of the significant network" ready to support defendant).

      C.  The nature and circumstances of the offense compel a below-Guidelines sentence.

      The Court must consider the "nature and circumstances of the offense" in determining the sentence to be imposed. 18 U.S.C. § 3553(a)(1). Because "[a]typical cases were not 'adequately taken into consideration'" by the Guidelines, "factors that may make a case atypical provide potential bases for departure." *Koon v. United States*, 518 U.S. 81, 94 (1996) (quoting Guidelines).

      Mr. Sittenfeld's actual conduct differs in critical ways from other defendants who have been convicted for violating the same federal bribery laws, including former Cincinnati city council members Jeff Pastor and Tamaya Dennard. Even accepting *arguendo* that the government met its burden of proof with respect to the *quid*, the *quo*, and the *pro* of the required criminal intent, a closer examination of the evidence underlying each of those elements leaves no doubt that Mr. Sittenfeld's actions do not deserve to be punished as if this were a run-of-the-mill bribery case. To the contrary, as even the government has been unable to refute, its facts make it a unique case in American legal history.

      The undercover agents admitted at the trial that they approached Mr. Sittenfeld to offer him campaign donations; he did not approach them. While Mr. Sittenfeld discussed campaign donations in his conversations with the agents, Mr. Sittenfeld did not ask the agents for any donation, nor for a particular amount, nor for a particular number of donations. The agents proposed all those specifics. Moreover, Mr. Sittenfeld never expressed any connection between a specific official act and the agents' unsolicited campaign donation. The only time that an express *quid quo pro* was offered, Mr. Sittenfeld unequivocally rejected any agreement to

exchange a donation for his vote.

Furthermore, Mr. Sittenfeld rejected agent Rob's proposed form of donations when they violated campaign finance laws. Mr. Sittenfeld went to great lengths to make sure that the ethical and legal rules for accepting any campaign donations were followed. The Court should, in choosing a just sentence, consider Mr. Sittenfeld's consistent history of law-abiding conduct in receiving and reporting donors and expending donated funds as allowed by laws.

Mr. Sittenfeld began to raise and accept political donations in 2010. For nearly a decade, with the advice of lawyers, accountants, and fundraising professionals, Mr. Sittenfeld filed complete and truthful campaign finance reports as required by law for both his campaign fund and his PAC for each donation. These reports included all required information about thousands of individual and organization donors and donations. These donations totaled millions of dollars. These complete and truthful campaign finance reports also included all required information about expenditures of donated funds. No one, not Mr. Ndukwe, any other government witness, or anyone else has accused Mr. Sittenfeld of violating these laws.

The evidence at trial showed that Mr. Sittenfeld rigorously complied with these laws regarding donations by the undercover agents. When agent Rob suggested he donate to Mr. Sittenfeld, in the form of cash, Mr. Sittenfeld rejected that offer because the law did not allow it. When the agent then suggested donating via money orders, Mr. Sittenfeld called for advice and rejected the offer because he learned it was not allowed by law. When the agent then made bundled donations to Mr. Sittenfeld by checks from organizations the agent represented were LLCs, Mr. Sittenfeld researched whether the donor organizations were LLCs and returned the checks when he found the donors were corporations and not allowed by law to donate to him. Concurrently, Mr. Sittenfeld fired Jared Kamrass when he learned that Kamrass had lied

to him about complying with the campaign finance reporting requirements. The agent bundled donations from LLCs were completely and truthfully reported as required by law. The funds from those bundled LLC donations are still in the PAC account.

Further, Mr. Sittenfeld's acceptance of the campaign donations must be viewed in the context of the City of Cincinnati's ethical rules. At the time he accepted the undercover agent's donation, the City's ethics rules expressly permitted the kind of bundled donation from multiple LLCs which he accepted from agent Rob.[2]

Mr. Sittenfeld's actions must also be viewed in the context of the financial reality of campaigning in this country, in which the United States Supreme Court has routinely acknowledged the reality of our representative government and the need for politicians to solicit and receive donations from supporters and constituents who may have a personal interest in the outcome of political decisions. *See United States v. Siegelman*, 640 F.3d 1159, 1173 n.21 (11th Cir. 2011); *Evans v. United States,* 504 U.S. 255, 257-258 (1992). Accordingly, campaign contributions enjoy what might be labeled as a presumption of legitimacy. *United States v. Blandford*, 33 F.3d 685 (6th Cir. 1994). Campaigning and accepting donations are an unavoidable and constitutionally protected part of the daily business of American political life. *See McCormick v. United States,* 500 U.S. 257, 272 (1991).

This issue has been thoroughly briefed and argued in this case. There can be no disagreement with this Court's finding that campaigning plays a fundamental and unavoidable role in the American political process which, for better or worse, means that "[m]oney is constantly being solicited on behalf of candidates who run on platforms and who claim support

---

[2] Crowe, City of Cincinnati, Assessment of Council Actions, Draft Report. Dec, 15, 2022, *available at* https://www.scribd.com/document/620793644/City-of-Cincinnati-Assessment-of-Council-Actions-Draft-Report#from_embed

on the basis of their views and what they intend to do or have done." *Id.* The law is also clear that there is a line between legitimate solicitation and bribery. *Id.* at 273. But when there is not an express *quid pro quo*, and the statements being used to argue an illicit agreement are strung together across multiple conversations with multiple people that were weeks apart, resulting in a case in which a finding of criminality turns largely on intent, this Court acknowledged that line is "fuzzier here than elsewhere." (Doc. 283, #7146). As this Court noted, many of Mr. Sittenfeld's statements to Mr. Ndukwe and agent Rob were "ambiguous, especially considered in isolation" and, therefore, "the Court agrees that a rational jury could have come out the other way on the existence of a quid pro quo." (Doc. 283, #7142). The Court also acknowledged that the agreement to perform an official act in this case was a close call that could have very easily have ended in acquittal. (Doc. 283, #7144). While the Court denied Mr. Sittenfeld's Motion for Acquittal (Doc. 270), the Court noted that "similar conduct (to Mr. Sittenfeld's) *could* lead to different outcomes depending on how the jury in a given case assesses the public official's intent." (Doc. 283, #7146) (emphasis in original). These "close calls" weigh in favor of a variant sentence well below the Guidelines range like probation and/or home confinement.

A recent assessment of Cincinnati City Council's handling of 227 development project ordinances passed between January 1, 2018 and December 31, 2020 (during which Mr. Sittenfeld was a member of Council) "did not identify any instances of non-compliance, fraud, waste, or abuse in the city's development project related ordinances during the stated period."[3] The assessment further found no instances existed where "a council member had a conflict of interest with the entity included in the ordinance."[4] The Crowe Assessment of Council Actions detailed Mr. Sittenfeld's voting history on development ordinances, like the 435 Elm project, during the

---

[3] Crowe, Assessment of Council Actions, *infra,* at p.24.
[4] *Id.*

47

same time as the indicted offenses in this case. Mr. Sittenfeld's law abiding and ethical conduct in the totality of development ordinances during 2018-2020 is a relevant consideration for this Court in determining a sentence that avoids unwarranted disparities. Mr. Sittenfeld had a history of voting "yes" on all development ordinances that were presented to the Council for a vote. It was this strong pro-development history that connected Mr. Ndukwe and Mr. Sittenfeld rather than an intent to pocket cash bribes as in the cases of Mr. Pastor and Ms. Dennard. While Mr. Sittenfeld's pro-development history is not a legal defense to bribery, it is relevant to the severity of his sentence to avoid unwarranted disparities when compared to public officials who accepted bribes to change their vote. It is noteworthy that Mr. Sittenfeld never voted "yes" on any development ordinance to approve granting development rights to agent Rob or Mr. Ndukwe for the 435 Elm project. Nor is there any evidence that Mr. Sittenfeld took any steps to pressure any City council members to vote in favor of the development of the 435 Elm property. Council voted unanimously to transfer to a different public agency the right to select the developer for the 435 Elm property.

Mr. Sittenfeld acknowledges and accepts responsibility that he did not say expressly to the agents what he had already expressly said to Mr. Ndukwe, that "nothing can be a quid, quid pro quo" and that Mr. Sittenfeld expressly refused to participate in anything illegal.

The recordings of the agents and Mr. Sittenfeld show that the agents never expressly proposed to Mr. Sittenfeld the exchange of a donation for a vote on the 435 Elm project as Mr. Ndukwe had. If the agents had, Mr. Sittenfeld would have expressly rejected it as he had done with Mr. Ndukwe. The recordings show that the agents never requested Mr. Sittenfeld to vote or take any other official act in exchange for their donation.

Mr. Sittenfeld's case is the exception among federal bribery cases because there is no

evidence that he took any official action to specifically benefit agent Rob. The evidence showed that Mr. Sittenfeld did not act out of character or outside the routine procedures of a city council member to benefit agent Rob or the 435 Elm project. Mr. Sittenfeld did not change his vote regarding the 435 Elm project. Nor did Mr. Sittenfeld persuade any of his fellow council members to change their votes on the 435 Elm project. Mr. Sittenfeld has consistently denied that he perceived that the agent's donation required him to cast any specific vote to benefit the agent.

As discussed further in Part II, Section C, *infra*, we have been unable to find—and the government has failed to offer—a single example of any federal or state bribery conviction in any jurisdiction in American history based on facts like these. Accordingly, it would be a tremendous injustice to send Mr. Sittenfeld to prison for this conduct. The legal flaws of the jury's verdict have been thoroughly argued (Doc. 270 and Doc. 271), Mr. Sittenfeld truly believed and has consistently asserted that the transaction between him and agent Rob was a constitutionally protected political donation and a separate discussion of his pro-development philosophy including the merits of the 435 Elm project. In discussing the 435 Elm project, Mr. Sittenfeld was focused on bringing jobs and investment to the City that would remove a long-blighted property in a vital business district for the City of Cincinnati that would *save* the taxpayers money. That good intent for the benefit of the community without personal gain to him weighs against the imposition of a Guidelines sentence.

D. Mr. Sittenfeld's trial and conviction alone act as powerful deterrents to public officials engaging in criminal conduct.

While the Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), this Court shall not impose a sentence that is "greater than necessary." 18 U.S.C. § 3553(a). For "[t]he punishment should fit the offender and not merely

the crime." *Musgrave II*, 647 Fed.Appx. at 533 (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949). In *Musgrave II*, the Sixth Circuit, in affirming a sentence of probation with a two-year term of home confinement for wire and bank fraud, agreed with the trial court that "[t]here is no justice in imposing a sentence merely to make an example out of a defendant." *Musgrave* (II), 647 Fed.Appx. at 533. It is not "necessary" to imprison Mr. Sittenfeld to promote general deterrence.

Section 3553(a) does not require the goal of general deterrence to be satisfied by a term of incarceration. *United States v. Edwards*, 585 F.3d 1004, 1016-1017 (9th Cir. 2010). Federal sentencing data for bribery and corruption cases confirms that incarceration is not required to satisfy general deterrence. In 2022, 23.1% of bribery and corruption convictions resulted in a sentence of probation, and of those, 69.9% of those cases resulted in a sentence of probation only and 30.1% of those cases resulted in a sentence of probation and alternative terms like home confinement. United States Sentencing Commission 2022 Sourcebook, Table 13. Concomitantly, in 2022, bribery and corruption sentences 53.8% of defendants received a variant sentence, in which 98.3% received a downward variance with an average sentence reduction of 60.2%.[5]

There is no empirical evidence that lengthy prison sentences provide any additional deterrent effect to white collar crime. Zvi D. Gabbay, "Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime," 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) (no evidence supporting "the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders"); David Weisburd, et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) ("It has often been assumed by scholars and policymakers that white-

---

[5] United States Sentencing Commission, 2022 Quick Facts, Bribery Offenses, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Bribery_FY22.pdf

collar criminals will be particularly affected by imprisonment. Our analyses suggest that this assumption is wrong, at least as regards official reoffending among those convicted of white-collar crimes in the federal courts. We find that prison does not have a specific deterrent impact upon the likelihood of rearrest over a 126-month follow-up period."). Moreover, in considering general deterrence, sentencing courts have recognized the failure of the government to present any evidence or cite to any studies indicating that a sentence of a multi-year incarceration is necessary to achieve the general deterrence objective specific to white collar defendants like Mr. Sittenfeld. *See United States v. Adelson*, 441 F.Supp.2d at 514-515 "And 'necessary' is the operative word," *Id.*, when analyzing the considerations within §3553(a) to impose a sufficient sentence but not one that is "greater than necessary." 18 U.S.C. §3553(a).

The government's inability to present any controlling or persuasive authority requiring this Court to sentence Mr. Sittenfeld to a term of imprisonment in order to satisfy section 3553(a)'s general deterrence consideration is even more fatal to the government's request given the atypical facts of this case. Mr. Sittenfeld's conviction for accepting unsolicited campaign donations as part of a non-express *quid pro quo* agreement, with no personal gain, is so unique that, as mentioned, we were unable to find a similar fact pattern throughout American history. For example, Shawn Morse, the former Mayor of Cohoes, New York, was convicted of conspiracy to commit wire fraud after, with the help of his campaign treasurer, he defrauded his supporters by stealing $12,250 in campaign contributions for his personal benefit. Morse was sentenced to two years of probation, 200 hours of community service, and a $3,000 fine. And yet, Morse's actions were more culpable and a more significant abuse of the public trust than the charges against Mr. Sittenfeld. Morse personally solicited funds from supporters, schemed to use

51

them for personal gain, and then purposefully concealed the nature of the fraudulent expenditures by falsely reporting or not reporting the expenditures at all.

The media coverage of Mr. Sittenfeld's trial and conviction for accepting an unsolicited campaign donation without any express *quid pro quo* agreement to perform a specific official act, the City of Cincinnati's subsequent public internal investigation conducted by Crowe, *infra*, and the City's public passage of Chapter 119 (Prohibition on the Solicitation or Acceptance of Campaign Contributions from Persons with a Financial Interest in City Business) all create sufficient general deterrence without imprisoning Mr. Sittenfeld. It is not a just sentence to make an example of Mr. Sittenfeld by sentencing him to prison to achieve general deterrence when it has already been accomplished.

E.  A prison sentence is not needed to protect the public from further crimes by Mr. Sittenfeld.

The Court must impose a sentence that "protect[s] the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). There is no need to imprison Mr. Sittenfeld to accomplish that goal because there is no risk that he will commit bribery or extortion as a public official in the future. According to a 2012 study funded by the Department of Justice, recidivism is more likely when a defendant has a prior criminal history, drug abuse problems, mental health issues, and challenges with unemployment, housing, and transportation.[6] Factors that decrease risk include having a strong social support system, marketable educational skills, and a motivation to change.[7]

---

[6] William Rhodes, et al., Recidivism of Offenders on Federal Community Supervision at 1, Abt Associates, Dec. 21, 2012 (prepared for Bureau of Justice Statistics and Office of Probation and Pretrial Services).
[7] *Id.*

Mr. Sittenfeld's risk of recidivism is zero. He has no prior criminal history. His career in politics is over. He will never again be in a situation where he can receive an unsolicited PAC donation that could be expressly or implicitly connected to an official act. And most importantly, he is now the father and daily caregiver to his two young sons. Mr. Sittenfeld's daily events are no longer those of an aspiring politician but instead are focused on raising two healthy boys, and assisting his aging mother. All of these considerations support the conclusion that Mr. Sittenfeld is exceedingly unlikely to reoffend in the future.

F. A sentence far below the Guidelines range is needed to avoid unwarranted disparities.

Title 18 U.S.C. § 3553(a)(6) instructs the Court to impose a sentence that "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." This is a difficult factor to apply because no elected official has ever been convicted of federal corruption offenses on the basis of conduct similar to Mr. Sittenfeld's. The facts of this case are well outside the "heartland" of public corruption cases in which public officials accept cash payments for personal benefit as part of an expressed *quid pro quo* agreement for an official act. Indeed, every recent prosecution of a public official—prior to this one—involved allegations that the public official provided false statements and/or illicitly exchanged an official act for gifts, cash, or some other type of personal benefit. The defense is aware of no instance of the Government successfully prosecuting any public official on the basis of accepting an unsolicited campaign donation without an express *quid pro quo* agreement to perform a specific official act like the statements and acts upon which Mr. Sittenfeld's prosecution was based.

For example, earlier this year U.S. District Judge J. Paul Oetken granted former New York Lt. Governor Brian Benjamin's motion to dismiss three corruption counts of conspiracy,

bribery, and honest services wire fraud. Benjamin argued that "to be unlawful, an alleged agreement to exchange campaign contributions for official action must be explicit: not inferred from ambiguous statements or a chronology of events, but *explicit*, meaning actually, clearly, and unambiguously expressed by the parties." (*United States v. Benjamin,* S.D.N.Y. Case No: 1:21-cr-00706-JPO, Defendant's Motion to Dismiss, Dkt No. 53 at 1) (emphasis in original). Judge Oetken agreed with Benjamin and found "for criminal liability for bribery in the context of campaign contributions, there must be a *quid pro quo* that is clear and unambiguous, meaning that (1) the link between the official act and the payment or benefit—the *pro*—must be shown by something more than mere implication, and (2) there must be a contemporaneous mutual understanding that the specific *quid* and a specific *quo* are conditioned upon each other." (*United States v. Benjamin*, S.D.N.Y. Case No. 1:21-cr-00706-JPO, Opinion and Order, Dkt No. 76 at 23). The government has appealed Judge Oetken's decision to the Second Circuit; however, to date Mr. Sittenfeld's facts and case remains an outlier across the country.

In the last three to five years, there have been multiple examples of public officials convicted of corruption charges for accepting cash bribes—which Mr. Sittenfeld did not do— who received sentences below the Guidelines range, including a sentence of probation. While not an exhaustive list, the examples below illustrate the national trend of public officials who accept cash bribes receiving sentences well below the Guidelines range, and including probation.

- Linda Baun (Township Treasurer, Pennsylvania): $150,000 in bribes and mail fraud; Guideline range of 15-21 months; sentence: 100 days incarceration and 3 years supervised release. (Case No.: 2:2021cr00469 (W.D.Pa.))

- Frank Gilliam (Mayor, New Jersey): $86,760 in bribes and wire fraud; Guideline

range of 15-21 months; sentence: 30 days incarceration and 11 months home confinement, 3 years supervised release, and 200 hours of community service. (Case No.: 1:2019cr00719 (D.N.J.))

- Kory O'Hara (Town Supervisor, New York): $24, 915 in bribes and wire fraud; Guideline range of 4-10 months; sentence: 12 months probation. (Case No.: 1:2019cr00398 (N.D.N.Y.))

- Ralph Signoracci, IV (City Councilman, New York): wire fraud conspiracy to steal $12,250 in PAC donations for personal use; Guideline range of 12-18 months; sentence: 12 months probation and 100 hours community service. (Case No.: 1:2019cr00065 (N.D.N.Y.))

- Shawn Morse (Mayor, New York): wire fraud conspiracy to steal $12,250 in PAC donations for personal use; Guideline range of 8-12 months; sentence: 24 months probation and 200 hours community service. (Case No.: 1:2019cr00070 (N.D.N.Y.))

As recently as a few weeks ago, United States District Court Judge Helmick sentenced three former Toledo council members for Hobbs Act offenses. *United States v. Tyrone Riley, et al.*, Case No.: 3:20-cr-00371 (N.D. Ohio, Western Division). All three former council members participated in a bribes-for-votes scheme wherein they accepted payments ranging from $500 to $5,000 in exchange for their votes on zoning requests and special use permits for local businesses. All three were given lower than guideline range sentences, including a four-month sentence for Larry Sykes who accepted, on two occasions, approximately $1,500 in bribes for his support of special use permits.

All of these cases are factually distinct from Mr. Sittenfeld's convictions for accepting

an unsolicited, publicly-reported PAC donation from an undercover agent. The fact that there has never been a similarly situated defendant facing sentencing supports the conclusion that Mr. Sittenfeld should receive a sentence far below the Guidelines range. Similarly, it is inequitable to sentence Mr. Sittenfeld to a prison term when bribery, corruption, and fraud offenders who received personal benefits in the form of gifts, cash, or other things of value were sentenced to terms of probation. (e.g. Defendants Musgrave, O'Hara, Signoracci, and Morse, *supra*)

Sentencing data for 2022 bribery cases also supports the conclusion that Mr. Sittenfeld should receive a sentence far below the Guidelines range. The average sentence for bribery offenders in 2022 was 23 months, which is well below the 41-51 month calculation in Mr. Sittenfeld's Presentence Investigation Report[8]. Concomitantly, 66.7% of bribery offenders convicted of an offense that carried a mandatory minimum penalty were relieved of that penalty[9]. Nationwide, courts have concluded that the sentencing range suggested by the Guidelines for bribery crimes is far too high and are reducing sentences accordingly. All of these facts favor a variant sentence well below the Guidelines range to avoid punishing Mr. Sittenfeld for the crime charged rather than the acts committed.

G. A sentence which does not include incarceration will be a just punishment for Mr. Sittenfeld's conduct.

The Court must ensure that the sentence imposed "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] [a] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). An alternative sentence of intensive, rigorous community service and/or home confinement will accomplish these goals.

Any prison sentence, and certainly one driven by the formulaic, non-individualized math

---

[8] United States Sentencing Commission, 2022 Quick Facts, Bribery Offenses, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Bribery_FY22.pdf
[9] *Id.*

of the Guidelines, is unwarranted. A sentence guided solely by a number generated by the Guidelines fails to "reflect the seriousness of the offense," "promote respect for the law," and "provide [a] just punishment" for Mr. Sittenfeld's conduct as required by § 3553(a)(2)(A). A comparison of Mr. Sittenfeld's conduct – accepting campaign donations (not cash) in an ambiguous, unspoken quid pro quo – to other crimes highlights the inadequacy of the Guidelines to assess a just punishment in this case. Despite having no criminal history, Mr. Sittenfeld faces higher guidelines than defendants convicted of:

- extortion by force involving kidnapping or bodily injury (level 20);

- extortion by force with a preparation carrying about death or serious bodily injury (level 21);

- aggravated assault with bodily injury (level 21);

- stalking or domestic violence with bodily injury, strangulation, or threatened use of dangerous weapon (level 20);

- burglary of a residence with a dangerous weapon (level 19);

- burglary of a residence with more than $500,000 in loss (level 21);

- burglary of a non-residence with more than $9,500,000 in loss (level 20);

- robbery with $20,000 to $95,000 in loss (level 21).

In short, a sentence of probation with rigorous community service and/or home confinement of one year reflects the seriousness of the offense, promotes respect for the law, and provides a just punishment for Mr. Sittenfeld's conduct substantially more than one based on the math of the Guidelines.

57

H. An alternative sentence of rigorous community service and/or home confinement is sufficient, but not greater than necessary, to fulfill the statutory goals.

18 U.S.C. § 3553(a)(3) instructs the sentencing court to consider "the kinds of sentences available." In certain cases, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007).

For this reason, Courts have recognized that in appropriate cases, sentences other than incarceration—such as probation, home confinement, community service, or some combination thereof—can provide a just punishment that is sufficient, but not greater than necessary, to satisfy the § 3553 factors. Such an alternative sentence has many societal benefits. A sentence of probation and community service costs significantly less than incarceration as the average costs of incarceration are eight times as expensive as the average costs of placing a defendant on probation.[10] A term of probation for Mr. Sittenfeld is, therefore, less of a burden on society, yet it still holds him accountable.[11] By allowing defendants to maintain employment and familial relationships, probation would allow Mr. Sittenfeld to continue to be a productive member of society thereby reducing any concerns of recidivism while still promoting a respect for the law.[12]

The Administrative Office of the U.S. Courts has also endorsed community service as "a

---

[10] "Incarceration Costs Significantly More than Supervision" August 17, 2017, *available at* https://www.uscourts.gov/news/2017/08/17/incarceration-costs-significantly-more-supervision
[11] "Probation and Pretrial Services – Supervision," United States Courts, *available at* https://www.uscourts.gov/services-forms/probation-and-pretrial-services/probation-and-pretrial-services-supervision
[12] "The Report of the Department of Justice Pursuant to Section 15(h) of Executive Order 14074: Resources and Demographic Data for Individuals on Federal Probation or Supervised Release" *available at* https://www.justice.gov/d9/2023-05/Sec.%2015%28h%29%20-%20DOJ%20Report%20on%20Resources%20and%20Demographic%20Data%20for%20Individuals%20on%20Federal%20Probation.pdf

58

flexible, personalized, and humane sanction" in appropriate cases that "addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation" and "may be regarded as . . . a form of symbolic restitution when the community is the victim."[13] A non-incarceration sentence would also further the Justice Department's stated goal of finding alternatives to incarceration in appropriate cases in order to alleviate the "persisting crisis in the federal prison system" resulting from chronic overcrowding and escalating costs.[14] The United States Sentencing Commission has similarly joined the effort to find alternatives to incarceration in appropriate cases.

District judges have found alternative sentences especially appropriate in non-violent cases where a defendant has specialized expertise that might uniquely aid community service organizations, and which would otherwise be wasted by a prison sentence. *See Musgrave.* In the unique circumstances of this case, a multi-year sentence of rigorous community service is the option that best offers a just punishment while giving a community service organization the opportunity to make use of Mr. Sittenfeld's unique skill set.

We highlight the following two proposals - for which we have also attached Memorandums of Understanding ("MoU") from two different organizations as exhibits - for the Court's consideration that, respectively, focus on helping homeless military veterans in (and beyond) Cincinnati; or in the second MoU, on helping formerly incarcerated individuals seek and sustain employment:

---

[13] Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (2007), *available at* https://www.miep.uscourts.gov/downloads/CourtCommunity.pdf

[14] *See* Michael E. Horowitz, "Memorandum: Top Management and Performance Challenges Facing the Department of Justice – 2014," Nov. 10, 2014, *available at* https://oig.justice.gov/sites/default/files/reports/2014.pdf

1.    **Veterans    Community    Project**:    Veterans    Community    Project (veteranscommunityproject.org) is a certified 501(c)(3) national charitable organization, founded and run by combat veterans, that supports veterans who took an oath to serve America by providing housing and walk-in support services to veterans experiencing homelessness. Veterans Community Project has proposed that Mr. Sittenfeld serve a two-year unpaid term helping the organization launch a Cincinnati site to provide housing to the city's population of homeless veterans, as well as to assist the organization with assignments ranging from grant writing to direct support services for the organization's veteran clients. The Veterans Community Project states that "Mr. Sittenfeld is already known and trusted" by the organization for his extensive prior efforts to support their mission, as detailed in the MoU.

**2. The HELP Program**: The HELP Program (helpprogramcincinnati.org) is a certified 501(c)(3) local faith-based nonprofit that helps returning citizens (individuals with felonies) in Cincinnati prepare for, seek, and sustain employment. The HELP Program has proposed that Mr. Sittenfeld serve a two-year unpaid term helping - in various ways detailed in the MoU - its program participants prepare for jobs after getting out of prison, and then succeed once in those jobs. The HELP Program also already knows Mr. Sittenfeld well as a volunteer and as an active member of the church where the program is located and welcomes his participation to help reduce recidivism among its members and help them to be fully contributing members of the Cincinnati community.

Either of these proposals would provide a sentence that fulfills all of the factors set out in Section 3553(a). A prison sentence is not needed to reflect the seriousness of Mr. Sittenfeld's conduct, promote respect for the law, afford adequate deterrence to criminal conduct, or protect the public from further crimes of the defendant.

A prison sentence would punish Mr. Sittenfeld for going to trial to challenge the constitutionality of the indicted offenses as applied to his constitutionally protected campaigning and legislating. Not only would such a punishment be antithetical to our long-held notions of due process and justice in this country, it would also be a punishment based on the offense, not the offender, which is contrary to the considerations of Section 3553(a). "The moment of P.G.'s sentencing will be – putting aside all else that has happened – a real test of the American criminal justice system" that comes with "an opportunity to use the tools of punishment to achieve concrete and positive results." *Former White House Counsel Greg*

60

*Craig*. By ordering Mr. Sittenfeld to give back to the community through a term of probation and/or home confinement, the Court can use "P.G's energy and intelligence to restore the public's faith in honest government." *Former White House Counsel Greg Craig.* A sentence of intensive community service and/or home confinement would indeed be sufficiently punitive without punishing Mr. Sittenfeld more than is necessary to achieve justice in this case.

## III.     CONCLUSION

For the foregoing reasons, and because the Sentencing Guidelines fail to account for Mr. Sittenfeld's history and characteristics, his lack of criminal history, and the unique nature of this case, we respectfully request that the Court impose a sentence of probation with rigorous community service for a term of 2,000 hours and/or home confinement for one year.

Respectfully submitted,

*/s/ Neal D. Schuett*
Charles M. Rittgers
Charles H. Rittgers
Neal D. Schuett
Gus J. Lazares
RITTGERS RITTGERS & NAKAJIMA
12 East Warren Street
Lebanon, OH 45036
(513) 932-2115
neal@rittgers.com
*Counsel for the Defendant*

*/s/ Justin E. Herdman*
Justin E. Herdman (pro hac vice)
Jones Day - Cleveland
901 Lakeside Avenue
Cleveland, OH 44114
216-586-7113
Fax: 216-579-0212
jherdman@jonesday.com
*Counsel for the Defendant*

**CERTIFICATE OF SERVICE**

     I hereby certify that the foregoing was filed with the Court's CM/ECF System provided to on this 26th day of September, 2023, which provides electronic notice to all parties.

*/s/ Neal D. Schuett*
Neal D. Schuett
*Counsel for the Defendant*

# IV.  EXHIBITS

A.  Memo of Understanding: Veterans Community Project

B.  Memo of Understanding: The HELP Project of Cincinnati

# MEMORANDUM OF UNDERSTANDING
between
*Veterans Community Project*
and
*Alexander P.G. Sittenfeld*

- Veterans Community Project (veteranscommunityproject.org) is a certified 501(c)(3) charitable organization that supports veterans who took an oath to serve America by providing housing and walk-in support services to veterans experiencing homelessness.

- Veterans Community Project was founded by a group of combat veterans in Kansas City, Missouri in 2016. The organization has since spread to five additional U.S. cities, and continues to expand.

- Alexander P.G. Sittenfeld has nine years' experience as a Cincinnati City Councilmember, and nine years' experience as Assistant Director for the nonprofit Community Learning Center Institute ("CLCI") - significant nonprofit and governmental experience working with and assisting people trying to stabilize their lives and make positive contributions to their communities.

- In fall 2023, Mr. Sittenfeld will come before the United States District Judge Douglas R. Cole for sentencing following a 3-week trial that resulted in two convictions and four acquittals on July 8, 2022 related to his office as a Cincinnati Councilmember. Mr. Sittenfeld will immediately appeal those convictions after being sentenced. Mr. Sittenfeld has no prior criminal record and had no prior accusations of wrongdoing as a Councilmember.

- From his indictment in November 2020 until his trial ended in July 2022, Mr. Sittenfeld's daytime hours were necessarily devoted primarily to two duties: caring for his son, while his wife worked to support their family, and working with his attorneys to defend himself. As time allowed, Mr. Sittenfeld also assisted nonprofits and schools with writing projects as an independent contractor, and also served as a volunteer for his church and for other charitable

1

DocuSign Envelope ID: 5C9556A7-2352-4F54-A942-B80BCEC46F4B

organizations. In August 2022, Mr. Sittenfeld and his wife's second son was born, for whom Mr. Sittenfeld is the primary caretaker.

- Mr. Sittenfeld desires to devote time that he had previously devoted to defending himself to doing volunteer work that helps others trying to overcome challenging circumstances. He desires to work pro bono as a half-time volunteer for Veterans Community Project, assisting its veteran clients using his experience and skills developed through his work at CLCI and as a Councilmember.

- Veterans Community Project desires to accept Mr. Sittenfeld as a valuable volunteer member of its team.

- Mr. Sittenfeld is already known and trusted by Veterans Community Project. In 2020 - prior to his legal situation - Mr. Sittenfeld proactively reached out to Veterans Community Project to help launch a site in Cincinnati. Without seeking media attention, recognition, or compensation, Mr. Sittenfeld gave his time to:
    1) Organize an all-volunteer planning group consisting of local veterans, architects, engineers, construction project managers, social services providers, and homeless advocates;
    2) Identify and receive commitments to fund the project from local philanthropic sources;
    3) Research, identify, and tour possible parcels of land on which to build a new Veterans Community Project site;
    4) Work, communicate, and coordinate with Veterans Community Project staff and leadership on various facets of the project.

- The combination of Mr. Sittenfeld needing to give up his seat on City Council, as well as challenges stemming from the Coronavirus pandemic, caused planning and momentum for the Cincinnati site to stall. Veterans Community Project would - with Mr. Sittenfeld's help - enthusiastically resume work on it.

- Mr. Sittenfeld will serve 2,000 volunteer hours over two years as part of the Veterans Community Project team.

DocuSign Envelope ID: 5C9556A7-2352-4F54-A942-B30BCEC46F4B

- In addition to receiving no salary or other compensation, Mr. Sittenfeld will also receive no other benefits (and will remain on his wife's healthcare).

- Mr. Sittenfeld will be supervised by and report to Veterans Community Project's President of National Expansion, United States Army Veteran Jason Kander.

- Mr. Sittenfeld's volunteer contributions will include, but not be limited to:
  1) Helping to resume Veterans Community Project's efforts to launch a Cincinnati site to help provide housing to the city's population of homeless veterans;
  2) Assisting with the organization's grant writing and communications efforts;
  3) Supporting veteran clients with their job applications, including drafting résumés and cover letters, conducting practice job interviews, and honing other "soft" and "hard" skills;

- While Mr. Sittenfeld's skills will be beneficial in numerous administrative functions, he will also be in direct communication with program participants when they have questions, encounter problems, and need a sounding board.

DocuSigned by:

_____     9/13/2023
1424055C4D214B8...                    _____

Jason Kander                          Date
President, Veterans Community Project
United States Army Veteran

DocuSigned by:

P.G. Sittenfeld

_____     9/13/2023
FDAC63E0BD89431...                    _____

Alexander P.G. Sittenfeld             Date

3

# MEMORANDUM OF UNDERSTANDING

between
*The HELP Program of Cincinnati*
and
*Alexander P.G. Sittenfeld*

- The HELP Program (helpprogramcincinnati.org) is a certified 501(c)(3) faith-based nonprofit organization that helps returning citizens (individuals with felonies) prepare for, seek, and sustain employment so that they can be contributing members of society.

- HELP was founded by Marianst Brother Mike Murphy and is currently led by executive director Wilson Willard, III. HELP is one of six social service organizations/schools that partner with and are supported by St. Francis De Sales Church in the Cincinnati neighborhood of East Walnut Hills. HELP operates out of offices located within the church.

- Alexander P.G. Sittenfeld has nine years' experience as a Cincinnati City Councilmember, and nine years' experience as Assistant Director for the nonprofit Community Learning Center Institute ("CLCI"). Therefore, he has significant nonprofit and governmental experience working with and assisting marginalized individuals.

- In fall 2023, Mr. Sittenfeld will come before the United States District Judge Douglas R. Cole for sentencing following a 3-week trial that resulted in two convictions and four acquittals on July 8, 2022 related to his office as a Cincinnati Councilmember. Mr. Sittenfeld will immediately appeal those convictions after being sentenced. Mr. Sittenfeld has no prior criminal record and had no prior accusations of wrongdoing as a Councilmember.

- From his indictment in November 2020 until his trial ended in July 2022, Mr. Sittenfeld's daytime hours were necessarily devoted primarily to two duties: caring for his son, while his wife worked to support their family, and working with his attorneys to defend himself. As time allowed, Mr.

1

Sittenfeld also assisted nonprofits and schools with writing projects as an independent contractor. In August 2022, Mr. Sittenfeld and his wife's second son was born, for whom Mr. Sittenfeld is the primary caretaker.

- Mr. Sittenfeld desires to devote time that he had previously devoted to defending himself to doing volunteer work that helps others who have experienced the criminal legal system. He desires to work pro bono as a half-time volunteer for HELP assisting its clients using his experience and skills developed through his work at CLCI and as a Councilmember.

- HELP desires to accept Mr. Sittenfeld as a valuable volunteer member of its team.

- Mr. Sittenfeld will serve 2,000 volunteer hours over two years as part of the HELP team.

- In addition to receiving no salary or other compensation, Mr. Sittenfeld will also receive no other benefits (and will remain on his wife's healthcare).

- Mr. Sittenfeld will be supervised by and report to HELP's executive director, Wilson Willard, III.

- Mr. Sittenfeld's volunteer contributions will include, but not be limited to:
    1) outreach to employers who might consider hiring participants in HELP's program;
    2) assisting with the organization's grant writing and communications efforts;
    3) teaching, training, and helping program participants with the job application process, including drafting résumés and cover letters, conducting practice job interviews, and honing other "soft" and "hard" skills;
    4) coordinating transportation so that program participants can reach their jobs;
    5) providing ongoing support to program participants once they are gainfully employed so that they stay gainfully employed.

2

- While Mr. Sittenfeld's skills will be beneficial in numerous administrative functions, he will also help program participants in HELP's *Drive-To-Thrive* program to navigate the process of getting a driver's license, buying insurance, and establishing record keeping for their donated vehicle which allows them to get to and from their place of employment. He will also be in direct communication with program participants when they have questions, encounter problems, and need a sounding board.

- Mr. Sittenfeld is already known and trusted by HELP, as a volunteer who assists in identifying and reaching out to employers to match program participants with; who is available as a mentor to program participants; and who is also known and trusted as a parishioner and volunteer with St. Francis De Sales Church.

<br>

_____          _____

Wilson H. Willard, III          Date

<br>

_____          _____

Father Mike Nartker          Date

<br>

_____          _____

Alexander P.G. Sittenfeld          Date

desires to work pro bono as a half-time volunteer for HELP assisting its clients using his experience and skills developed through his work at CLCI and as a Councilmember.

- HELP desires to accept Mr. Sittenfeld as a valuable volunteer member of its team.

- Mr. Sittenfeld will serve 2,000 volunteer hours over two years as part of the HELP team.

- In addition to receiving no salary or other compensation, Mr. Sittenfeld will also receive no other benefits (and will remain on his wife's healthcare).

- Mr. Sittenfeld will be supervised by and report to HELP's executive director, Wilson Willard, III.

- Mr. Sittenfeld's volunteer contributions will include, but not be limited to:
  1) outreach to employers who might consider hiring participants in HELP's program;
  2) assisting with the organization's grant writing and communications efforts;
  3) teaching, training, and helping program participants with the job application process, including drafting résumés and cover letters, conducting practice job interviews, and honing other "soft" and "hard" skills.
  4) coordinating transportation so that program participants can reach their jobs;
  5) providing ongoing support to program participants once they are gainfully employed so that they stay gainfully employed.

- While Mr. Sittenfeld's skills will be beneficial in numerous administrative functions, he will also help program participants in HELP's *Drive-To-Thrive* program to navigate the process of getting a driver's license, buying insurance, and establishing record keeping for their donated vehicle which allows them to get to and from their place of employment. He will also be in direct communication with program participants when they have questions, encounter problems, and need a sounding board.

- Mr. Sittenfeld is already known and trusted by HELP, having begun serving as a mentor to a program participant, and because he is a parishioner & volunteer with St. Francis de Sales Church.

| | | | |
|---|---|---|---|
| *(signature)* | 5-22-23 | *Rev. Michael F. Nartker, SM* | 22 May 23 |
| Wilson H. Willard, III | Date | Father Mike Nartker | Date |
| *(signature)* PG Sittenfeld | 5-22-23 | | |
| Alexander P.G. Sittenfeld | Date | | |

JEFF BROWN
Notary Public
State of Ohio
My Comm. Expires
March 10, 2027

Page **2** of 2